<table>
<tr><td>

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

KING LINCOLN BRONZEVILLE NEIGHBORHOOD
ASSOCIATION, OHIO VOTER RIGHTS ALLIANCE FOR
DEMOCRACY, LEAGUE OF YOUNG
VOTERS/COLUMBUS, RAINBOW PUSH COALITION,
COLUMBUS COALITION FOR THE HOMELESS,
WILLIS BROWN, PAUL GREGORY, MILES CURTISS,
MATTHEW SEGAL, HARVEY WASSERMAN, AND
GLORIA KILGORE, individually and as CLASS
REPRESENTATIVES under Fed.R.Civ.P. 23,


Plaintiffs,

v.

J. KENNETH BLACKWELL, in his official and individual
capacity as the Secretary of State of the State of Ohio, THE
OHIO REPUBLICAN PARTY, in its official and individual
capacity, ROBERT T. BENNETT, in his official and
individual capacity as Chair, Cuyahoga County Board of
Elections and State Chair, Republican State Central and
Executive Committee of Ohio, MATTHEW M.
DAMSCHRODER, in his official and individual capacity as
Director, Franklin County Board of Elections, SAMUEL
HOGSETT, Technician for Election Systems & Software, in
his official capacity and individual capacity, and DANIEL
BARE, in his official and individual capacity, former
Director, Clermont County Board of Elections,

and

JOHN or JANE DOES Nos. 1-100, in their official and
individual capacities as public election officials and private
contractors,

Defendants.

</td><td>

Civil Action No. C2 06 745

JUDGE ALGENON MARBLEY

MAGISTRATE JUDGE KEMP

**AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT,
PRELIMINARY AND
PERMANENT INJUNCTIVE
RELIEF, FOR A SPECIAL
MASTER AND FOR OTHER
RELIEF**

</td></tr>
</table>

## PRELIMINARY STATEMENT

1.     This is a civil rights action in which named Plaintiffs Willis Brown, Paul Gregory, Miles Curtiss, Matthew Segal, Harvey Wasserman, and Gloria Kilgore, on behalf of themselves and a class of similarly situated individuals, and King Lincoln Bronzeville Neighborhood Association, Ohio Voter Rights Alliance For Democracy, the League of Young Voters/Columbus, Rainbow PUSH Coalition, and the Columbus Coalition for the Homeless seek relief for Defendants' violation of their rights, privileges, and immunities secured by the Civil Rights Act of 1870 and 1871, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3); The Civil Rights Act of 1964, 42 U.S.C § 1971(a) & (b); Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a); 42 U.S.C. § 1988a; the First, Fourth, Thirteenth, Fourteenth, Fifteenth, Nineteenth and Twenty-Sixth Amendments to the United States Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Constitution and laws of the State of Ohio arising out of the conduct of Ohio's Secretary of State J. Kenneth Blackwell and other named and unnamed Defendants in connection with the November 2, 2004 presidential and subsequent elections.

2.     Specifically, on information and belief, Defendant Blackwell and those acting in concert with him under the color of law, including but not limited to the Ohio Republican Party; Robert T. Bennett, Chair, Cuyahoga County Board of Elections and State Chair, Republican State Central and Executive Committee of Ohio; Matthew M. Damschroder, Director, Franklin County Board of Elections; Samuel Hogsett, Technician for Election Systems & Software; and Daniel Bare, former Director, Clermont County Board of Elections, have conspired to deprive Plaintiffs of their right

to vote and have, in fact, deprived Plaintiffs of their right to vote by undermining the bipartisan supervision of elections prescribed by Ohio law and avoiding any election audit so as to permit the following: fraudulent votes to be cast for George W. Bush ("Bush") ("election fraud"); the double-counting of absentee ballots ("vote dilution"); the suppression and/or spoiling of votes in areas that tended to vote for John Kerry ("Kerry") and the inflating of vote tabulations in areas that tended to vote for George Bush ("vote suppression"); the failing to follow Ohio's law for the proper recount of votes ("recount fraud"); and other violations of federal and state laws.

3.     The election fraud, vote dilution, vote suppression, recount fraud, and other violations included, but were not limited to, public election officials and private contractors who conspired with, worked together with, obtained significant aid from, or whose conduct is otherwise chargeable to some or all the Defendants.  Upon information and belief, the Defendants engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that public election officials and private contractors committed the following acts:

A.  Arranged for the use of tens of thousands ballots in high-performance Democratic precincts that were prepunched for a third-party presidential candidate so as to create an overvote and disqualification of such vote when cast for Kerry.

B.  Substituted blank ballots or fabricated ballots showing a vote for Bush for ballots cast by legitimate voters for Kerry.

C.  Adjusted vote tabulating machines to tabulate votes cast for Kerry as votes cast for Bush.

D.   Tabulated tens of thousands ballots cast in one precinct for Kerry as if they were ballots cast in another precinct where, through ballot rotation in the sequence of the presidential candidates, such votes would be counted as having been cast for Nader, Peroutka, Badnarik, or for Bush.

E.   Directed or executed the withholding of unused ballots in response to public records requests and/or directed or executed the destruction of unused ballots from the 2004 election in violation of federal law for the purpose of concealing evidence of vote tampering.

F.   Directed or executed breaks in the bipartisan chain of custody of the 2004 ballots in violation of Ohio law and/or directed or permitted tampering with ballots by marking ballots on which the voter did not cast a vote for president with a mark for Bush or by marking ballots in which the voter cast a vote for Kerry with a vote for another presidential candidate.

G.   Directed or engaged in other illegal practices for the purpose of recording fraudulent votes for Bush for president and/or discarding votes for Kerry for president, including, but not limited to, the "remaking" of ballots as cast by the voter with substitute ballots and adjusting the substitute ballots to increase the count of votes for Bush and decrease the number of votes for Kerry.

H.   Directed or engaged in the illegal practice of selective counting absentee ballots twice for partisan advantage.

4.      The actions and inactions described above and detailed below were undertaken pursuant to an ongoing conspiracy among some or all of the Defendants to disenfranchise and intimidate voters in the class represented by the Plaintiffs and to dilute their vote.

5.      The actions and inactions described above and detailed below reveal a recurring pattern of voter disenfranchisement and intimidation and vote dilution directed at the class represented by the Plaintiffs.

6.      The actions and inactions described above and detailed below were taken pursuant to a scheme to deprive the Plaintiffs of fair and honest government and did deprive the Plaintiffs of fair and honest government.

7.      The actions and inactions described above and detailed below have the direct and proximate effect of depriving the Plaintiffs of their voting rights, including the right to have their votes successfully cast without intimidation, dilution, cancellation or reversal by voting machine or ballot tampering, to produce reported results for a presidential race opposite to that determined by the voters and to continue to produce dishonest and/or unreliable results in other elections, including the important upcoming November 7, 2006 election, in which contested races will determine the composition of Ohio's apportionment board and Ohio's congressional representatives.

8.      Amended Substitute House Bill No. 3 of the 126th General Assembly of the Ohio legislature ("H.B. 3") made numerous modifications and additions to the Ohio Elections Code (Title XXXV of the Ohio Revised Code) and changes to certain other election-related statutes.  H.B. 3 was signed into law by Ohio Governor

Robert Taft on January 31, 2006, and most of the provisions became effective on May 2, 2006.

9. Based upon this ongoing conspiracy and recurring pattern of selective and discriminatory voter disenfranchisement, intimidation, and vote dilution, the Plaintiffs also bring this complaint to challenge portions of recently enacted provisions of H.B. 3 requiring restrictive voter identification requirements for registering and casting a vote, Ohio R.C. §§ 3501.01 *et seq*. These statutes selectively and discriminatorily disenfranchise, intimidate, or otherwise burden the Plaintiffs' right to vote.

## JURISDICTION

10. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4), 1971(d), 1973j(f), 1983, 2201, and 2202 because this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

11. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

12. Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

13. Venue is proper in the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 1391 (a), (b), and (c).

14.     Defendant J. Kenneth Blackwell is the Secretary of State of the State of Ohio and a current gubernatorial candidate.  During the November 2004 election, Defendant Blackwell also served as co-chair of the Bush-Cheney Ohio Campaign for President.  Defendant Blackwell is sued in his individual capacity and in his official capacity as the Secretary of State of Ohio, acting under the color of law.  His statutory election duties are enumerated in Ohio R.C. §§ 3501.04 and 3501.05.  Upon information and belief, under the color of state law, Defendant Blackwell conspired to commit and in fact did commit election fraud, vote suppression, recount fraud, and other violations of federal and Ohio state law during the 2004 presidential election to ensure that Ohio tabulated more votes for Bush than for Kerry.  Defendant Blackwell is responsible for overseeing the elections process and appointing the members of boards of elections in each of Ohio's eighty-eight counties.  In this capacity, he is charged with supervising the administration of election laws; investigating election fraud and irregularities; training election officials; promulgating rules, practices, and procedures to implement laws regarding Ohio elections; and compelling the observance of Ohio election law by election officers in the counties of Ohio.  Defendant Blackwell engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that election fraud, vote suppression, recount fraud, and other violations of federal and Ohio state law occurred in November 2004 and continue to occur.

15.     The Ohio Republican Party is sued as a state actor in its role in the conduct of the statewide election in November 2004.  Upon information and belief,

under the color of state law, Defendant Ohio Republican Party conspired to commit and in fact did commit election fraud, vote suppression, recount fraud, and other violations of federal and Ohio state law during the 2004 presidential election to ensure that Ohio tabulated more votes for Bush than for Kerry.

16.     Robert T. Bennett is sued in his official and individual capacity as Chair, Cuyahoga County Board of Elections and State Chair, Republican State Central and Executive Committee of Ohio.  Upon information and belief, under color of state law, Defendant Robert T. Bennett conspired to commit and in fact did commit election fraud, vote suppression, recount fraud, and other violations of federal and Ohio state law during the 2004 presidential election to ensure that Ohio tabulated more votes for Bush than for Kerry.  Upon information and belief, Defendant Bennett participates in the development and execution of legislative, executive, and administrative strategies and procedures (including for the offices of the Secretary of State and Board of Elections). These strategies and procedures for the partisan advantage of Republican Party candidates include strategies and procedures with the purpose and/or effect of suppressing African-American, young, elderly, and lower-income voters and votes.

17.     Matthew M. Damschroder is sued in his official and individual capacity as Director, Franklin County Board of Elections.  Upon information and belief, under color of state law, Defendant Matthew M. Damschroder conspired to commit and in fact did commit vote suppression and other violations of federal and Ohio state law during the 2004 presidential election to ensure that Ohio tabulated more votes for Bush than for Kerry.

18.     Samuel Hogsett, Technician for Election Systems & Software, is sued in his official capacity acting under color of state law and in his individual capacity. Upon information and belief, under color of state law, Defendant Samuel Hogsett conspired to commit and in fact did commit vote suppression and other violations of federal and Ohio state law during the 2004 presidential election to ensure that Ohio tabulated more votes for Bush than for Kerry.

19.     Daniel Bare is sued in his official and individual capacity as former Director, Clermont County Board of Elections, for acts taken while he served as director. Upon information and belief, under color of state law, Defendant Bare conspired to commit and in fact did commit election fraud and other violations of federal and Ohio state law during the 2004 presidential election to ensure that Ohio tabulated more votes for Bush than for Kerry.

20.     John or Jane Does 1-100 are public election officials and private contractors ("Election Officials") who provided services to the State of Ohio, whose identity is presently unknown to Plaintiffs, and who, upon information and belief, conspired to commit and in fact did commit election fraud, vote suppression, recount fraud, and other violations of federal and state law during the 2004 presidential election. These public election officials and private contractors acted under color of state law to ensure that Ohio tabulated more votes for Bush than for Kerry. These public election officials and private contractors conspired with, worked together with, obtained significant aid from, and/or engaged in conduct which is otherwise chargeable to the above-named Defendants under color of state law. John or Jane Does 1-100 include, but are not limited to, the following:

21.     The Doe or Does who designed and implemented a system whereby ad hoc discretion rather than a consistent principle is used to determine which of the two numbers ("cards cast" or "times counted") generated by the Diebold tabulators for ballots casts could be reported in selected counties for partisan advantage and not appear to exceed the number of voters voting in an election, as appears to have happened in Sandusky County in November 2, 2004, and even more broadly in the elections of November 8, 2005 and May 2, 2006;

22.     The Doe or Does who adjusted the tabulators for Election Systems & Software in Butler and Auglaize Counties to handicap the vote count in favor of Bush;

23.     The Doe or Does who substituted blank ballots for ballots cast by legitimate voters in high-performance Democratic precincts in Cuyahoga County;

24.     The Doe or Does who designed and implemented procedures for allocation of voting machines in a manner to short the number of machines in relation to reasonably foreseeable voting turnout in high-performance Democratic urban precincts in Franklin County and created a black-out list of 125 inner-city voting machines to be withheld from polling locations for the 2004 general election after assignment;

25.     The Does or Does who arranged for the use of prepunched ballots in high-performance Democratic precincts in Cuyahoga, Trumbull, Summit, Stark, Hamilton, Richland, and Montgomery Counties, which created overvotes, thereby disqualifying those votes cast in jurisdictions that voted overwhelmingly for Kerry;

26.     The Doe or Does who remade ballots cast for Kerry in Clermont County by placing white oval stickers over the Kerry-Edwards mark and filling in the Bush-Cheney oval; and

27.     The Doe or Does who took ballots to an unauthorized warehouse at which ballots cast for Kerry were shifted to different Warren County precincts in which such ballots would, by ballot rotation, be counted as votes for Bush.

## ORGANIZATIONAL PLAINTIFFS

28.     The organizational Plaintiffs, set forth and described below, all share the following characteristics in common:

A.  Their members have a reasonable fear that there is a likelihood of repetition in the upcoming election on November 7, 2006 of the practices and policies in 2004 that resulted in unnecessary delays in voting in their communities as well as other voting obstacles including fraudulent manipulation of election results.

B.  This reasonable fear is based on the perception, founded on facts set forth below and herein, that the aforementioned delays and obstacles were created by the intentional actions of some or all of the Defendants, as a result of Defendants' policies and practices, to wit that members of the Plaintiff groups and others in the same communities will be prevented from voting in numbers as large as they otherwise would, due to the obstacles set forth below, and that these policies and practices are based upon invidious racial animus and invidious animus to other characteristics, such as youth and student status.

C.  Further, as a result of the wrongful actions of the Defendants as herein

alleged, the organizations, associations, and groups identified as Plaintiffs

herein, and their members, have been required to engage in substantial

organizational effort and the expenditure of substantial organizational

resources to address and attempt to partly correct the harm that has

resulted.

D.  As a result of this pattern of intentional delays and obstacles,

members of these organizational Plaintiffs have a reasonable fear that the

identification requirements for registering to vote and the identification

requirements for voting will disparately impact them and were intended

to disparately impact them based upon invidious racial animus and

invidious animus to other characteristics such as youth and student status

or party association, perpetuating vote suppression and voter intimidation

and disenfranchisement.

E.  The consequence of the adverse experiences in 2004 and the

cumulative effect of this recurring pattern of delays and obstacles result

in a residual depressing effect on the exercise of the franchise by some of

their members in 2006.

29.     KING LINCOLN BRONZEVILLE NEIGHBORHOOD

ASSOCIATION is a non-profit organization incorporated in the State of Ohio, and its

membership includes many of the four thousand, primarily African-American, residents

of this Columbus, Ohio neighborhood.  The residents of this area vote at the Broad

Street Presbyterian Church in Columbus, Ohio.  In the November 2004 general election,

numbers of its members experienced wait times in excess of three hours to vote and, as a consequence, many were discouraged from voting and ultimately did not vote.

30.     OHIO VOTER RIGHTS ALLIANCE FOR DEMOCRACY is a non-profit organization incorporated in the State of Ohio.  Its members are primarily African-American voters in Columbus, Ohio who were targeted by the policies of the Defendants, which resulted in vote suppression in the African-American community and other communities as well as other irregularities in the 2004 general election, set forth below.

31.     THE LEAGUE OF YOUNG VOTERS/COLUMBUS is the Columbus chapter of the League of Young Voters, which has authorized it to join in this lawsuit.  Its members played a leadership role in the convening of public hearings after the November 2004 election, because many young people, particularly college students, had been targets of vote suppression efforts through the shorting of machines at precincts in which they voted.

32.     RAINBOW PUSH (an acronym for "People United to Save Humanity") COALITION is a public interest organization committed to, among other things, the preservation of civil rights in the United States.  The Rainbow PUSH Coalition on behalf of its members in Ohio and around the country has been active, through the personal leadership of civil rights leader Rev. Jessie Jackson, in supporting efforts to investigate, analyze, and litigate issues raised by the November 2004 presidential election and to check the vote suppression intended by the new voter identification provisions of H.B. 3., which were enacted on an entirely partisan basis.

33.     THE COLUMBUS COALITION FOR THE HOMELESS is a non-profit organization that has existed for twenty years.  Its mission is to address issues of discrimination towards all people, but particularly discrimination directed towards African Americans and the poor.  The Coalition works locally to educate and advocate for the actual homeless person and to serve as the voice for the person on the street. The Coalition is comprised of people who work with many different non-profit agencies, including, but not limited to, Friends of the Homeless, Faith Mission, The Family Shelter, The Open Shelter, Columbus Housing Network, Southeast Recovery and Mental Health, Inc., Homeless Health Care Project, Netcare, the YWCA, the Equal Justice Foundation, Maryhaven, Amethyst, Inc., and Central Presbyterian Church.

34.     Many members of the above organizations are citizens of the United States who were or are legally registered to vote in local, state, and federal elections in the State of Ohio and who intend to vote in future elections.

35.     The organizational Plaintiffs also bring claims on behalf of their members who are over eighteen years of age, United States citizens, and residents of Ohio eligible to vote in the upcoming federal and state election, but who are not registered to vote because of the identification requirements or will find it extremely difficult to do so successfully because of the identification requirements.

36.     The organizational Plaintiffs also bring claims on behalf of their members who are over eighteen years of age, United States citizens, and residents of Ohio eligible to vote in the upcoming federal and state election and registered to vote in the upcoming federal and state election, but who will not vote or who will find it

extremely difficult to do so successfully because of the identification requirements for voting.

**INDIVIDUAL PLAINTIFFS**

37.     Willis Brown is a near Eastside resident of Columbus, Ohio, a resident of the King Lincoln Bronzeville neighborhood, and president of the King Lincoln Bronzeville Neighborhood Association.  He shared the experiences and shares the concerns of the members of his association and fully supports the objective of restoring equal access and the integrity of future Ohio elections.  He is African American.

38.     Paul Gregory is a resident of Columbus, Ohio who personally does not know if the vote he tried to cast for John Kerry on an electronic voting machine in Franklin County, Ohio was counted in the November 2004 election.  He is president of the Ohio Voter Rights Alliance for Democracy.  Personally and as an organizational leader, Gregory stresses the need for corrective litigation of this kind to restore faith in the act and efficacy of voting and democracy.  He is African American.

39.     Miles Curtiss is a registered voter in the City of Columbus who voted in the November 2004 election and then functioned as a volunteer observer for two Columbus polling locations with dramatically unequal conditions for voting over the full course of the day.  He serves as national council representative of the Columbus chapter to the League of Young Voters.  He is African American.

40.     Matthew Segal was a student at Kenyon College and voted in Gambier, Ohio in the November 2004 election after having to wait in line for eight hours because of the breakdown of one machine, leaving only one machine to handle the voting of all the students of the college.  He testified in favor of corrective action before the hearings convened by Rep. John Conyers in the United States Congress after the November 2004 election.  He continues to support corrective action for the problems that he and other students faced that he believes no one in a democracy should face in the future.

41.     Harvey Wasserman teaches history at the college level, and he is an active writer and journalist.  As a voter in Bexley, Ohio in the November 2004 election, he faced great difficulty in casting his absentee ballot.  His primary concern, as a close observer of the many problems in the 2004 presidential election, is for the preservation of the records of the election for the sake of students of history.

42.     Gloria Kilgore is a resident of Franklin County and a member of the Columbus Coalition for the Homeless.  She has voted in the same precinct in Franklin County since 1996.  She does not have any of the identification required by H.B. 3, specifically Ohio R.C. § 3505.18, to vote a regular ballot in the upcoming election on November 7, 2006.  For the first time in her life, she will be forced to vote a provisional ballot.

43.     Gloria Kilgore is concerned that she will be singled out in the polling site, delayed in casting a vote, and possibly unable to vote.  She is also concerned that if she does cast a provisional ballot, it will not be counted.  She is African American.

44.     The above Plaintiffs are citizens of the United States who were or are legally registered to vote in local, state, and federal elections in the State of Ohio and who intend to vote in future elections.

## FED.R.CIV.P 23 CLASS CERTIFICATION STATEMENT

45.     Plaintiffs allege that certification of the plaintiff class as a class consisting of all voters in Ohio who were disenfranchised or intimidated in the November 2004 election and continue to be disenfranchised or intimidated, specifically including African-American and young voters, is appropriate because the class is so numerous that joinder of all members is impracticable, there are questions of law and fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

46.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for the Defendant state actors; adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and the Defendant state actors have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Because this action arises out of the conduct of the Defendant state actors in relation to the statewide electoral process, the questions of law and fact common to the members of the

class predominate over any questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of the instant controversy.

## FACTUAL ALLEGATIONS

47.     As alleged above, Defendants, upon information and belief, conspired to commit and in fact did commit election fraud, vote suppression, recount fraud, and other violations of federal and state law. The following paragraphs allege the specific means Defendants used to ensure that Ohio tabulated more votes for Bush than for Kerry. These actions were undertaken pursuant to an ongoing conspiracy among the Defendants to disenfranchise and intimidate voters and cause vote dilution in 2005 and 2006. The actions and inactions described above and detailed below reveal a recurring pattern of voter disenfranchisement and intimidation and vote dilution.

48.     The following allegations regarding election fraud, vote dilution, vote suppression, recount fraud, and other violations of federal and state laws are more specifically described in the declaration submitted by the chief investigator and principal expert witness in this case, Richard Hayes Phillips, and are illustrated by the exhibits to his declaration.

## ELECTION FRAUD

49.     Upon information and belief, Election Officials illegally recorded, or directed that others illegally record, fraudulent votes for Bush or discard votes for Kerry.

50.     Upon information and belief, Election Officials, specifically Defendant Bare, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials remade ballots cast by voters in Clermont County with substitute ballots and adjusted the substitute ballots to increase the count of votes for Bush and decrease the number of votes for Kerry.

**VOTE DILUTION**

51.     Upon information and belief, on November 2, 2004, absentee ballots in Sandusky County were counted twice for presidential candidates, thus increasing the margin of victory for Bush in these counties where a preponderance of voters preferred Bush.

52.     Upon information and belief, on November 8, 2005, absentee ballots in at least twelve counties were counted twice as ballots cast, thus creating the appearance of large numbers of overvotes.

53.     Upon information and belief, on May 2, 2006, absentee ballots for Pike County were counted twice as ballots cast on the official web site of Ohio Secretary of State Blackwell, even though the Pike County Board of Elections publicly reported no such number.

## **VOTE SUPPRESSION**

54.     Upon information and belief, Election Officials used a false claim of a Homeland Security alert at the Warren County Board of Elections as a cover for breaking the bipartisan supervision of ballots, taking ballots to an unauthorized warehouse at which ballots cast for Kerry were shifted to different Warren County precincts in which such ballots would, by ballot rotation, be counted as votes for Bush.

55.     Upon information and belief, Election Officials programmed computers, which were using direct recording electronic voting machines without a paper trail in the 2004 election, in Franklin and Mahoning Counties to cause votes for Kerry to be lost or extra votes to be recorded for Nader in Franklin, or for approximately twenty-five machines to default to Republican candidates for office, including Bush, in Mahoning County.

56.     In addition, while corrected, the initial reporting of 4268 votes for Bush out of a total of 638 ballots cast in a Gahanna precinct, Franklin County (the corrected total was 365), a 131% turnout in Clyde township, Sandusky County reported on election night, and a negative 25 million votes for Kerry in Mahoning County were manifestations of programming in play designed to tilt the election in a particular way.

57.     Upon information and belief, Election Officials, specifically Defendant Hogsett, designed and implemented a strategy of adjusting computer software in tabulators and by other means to officially count more votes for Bush in predominantly Republican suburban and rural counties than were in fact cast for Bush in those counties in the 2004 general election in Ohio.  Upon information and belief, Defendant Hogsett specifically programmed the tabulators in Delaware and Miami Counties before the general election to ensure such a result.

58.     In the following twelve Ohio counties, Auglaize, Brown, Butler, Clermont, Darke, Highland, Mercer, Miami, Putnam, Shelby, Van Wert, and Warren, Kerry received fewer votes than the losing Democratic Party candidate for Chief Justice of the Ohio Supreme Court and many other losing Democratic Party candidates in those counties.  Kerry received fewer votes than non-competitive or token Democratic candidates for lesser offices.  These results suggest a substantial probability of vote tampering in all of these counties.

59.     For example, in the Granville AAZ precinct of Mercer County, Kerry reportedly received 122 votes, while Ellen Connally, the losing Democratic candidate for Chief Justice, received 291.  Kerry reportedly received fewer votes than the losing Democratic candidate for Congress, who lost Mercer County by 78.4% to 21.6%.

60.     In addition, in the Marion West precinct of Mercer County, Kerry reportedly received 107 votes, while Ellen Connally received 253.  Kerry reportedly received fewer votes than the losing Democratic candidate for State Representative, who lost Mercer County by 76.7% to 23.3%.

61.     Upon information and belief, Election Officials, including but not limited to Defendant Bennett, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials arranged for the use of ballots in high-performance Democratic precincts in Cuyahoga, Trumbull, Summit, Stark, Hamilton, Richland, and Montgomery Counties that were prepunched for third-party presidential candidates, creating overvotes, thereby disqualifying those votes cast in jurisdictions that voted overwhelmingly for Kerry.

62.     Upon information and belief, Election Officials, including Defendant Bennett, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials substituted blank ballots for ballots cast by legitimate voters in high-performance Democratic precincts in Cuyahoga County.

63.     Upon information and belief, Election Officials adjusted vote tabulating machines in Butler and Auglaize Counties to alter the vote count in favor of Bush.

64.     Upon information and belief, Election Officials, specifically Defendant Bennett, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials allowed ballots to be punched in voting machines intended for another precinct where, through ballot rotation in the sequence of the presidential candidates, votes for Kerry would be counted as having been cast for Nader, Peroutka, Badnarik, or Bush.

65.     Upon information and belief, Election Officials, specifically Defendant Damschroder, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials designed and implemented procedures for allocation of voting machines in a manner to short the number of machines in relation to reasonably foreseeable voting turnout in high-performance Democratic urban precincts in Franklin County and created a black-out list of 125 inner-city voting machines to be withheld from polling locations for the 2004 general election after assignment.

66.     Upon information and belief, Election Officials designed and implemented a vote suppression strategy in Lucas County through, among other things, implementation of faulty optical scan machines and failure to set precinct boundaries in a timely manner.  The eighty-eight Lucas County precincts with the lowest reported turnout (less than 62.72%) were all won by Kerry, and thirty-one of them are identified in complaints of vote suppression.  Forty percent of the challenged voters in all of Lucas County were in four wards in Toledo with only 7.8% of the voters, where Kerry got 86% of the vote.

67.     Upon information and belief, Election Officials designed and implemented a vote suppression strategy targeted at minority precincts in Lucas County through, among other things, placing in service faulty optical scan machines and failing to set precinct boundaries in a timely manner.

68.     Upon information and belief, Election Officials designed and implemented an interpretation of provisional balloting and voting precinct administration that resulted in the City of Cincinnati accounting for 95% of the rejected provisional ballots in Hamilton County, even though only one-third of the county voters are in Cincinnati, for the purpose of depriving urban and minority voters of their right to vote.  In rural Miami County, even a voter who resided in another county was allowed to vote; in urban Franklin County, when 356 voters asked for provisional ballots because of long lines and executed such paper ballots in the correct precinct, the ballots were rejected on the basis that these voters should have been required to vote by machine.

69.     Upon information and belief, Election Officials designed a system of reporting more votes cast in Miami County, where the reported vote was two to one in favor of Bush, than were cast by voters who signed poll books.

70.     Upon information and belief, Election Officials directed, executed, or allowed breaks in the bipartisan chain of custody of the 2004 ballots in violation of Ohio law in Delaware and Hocking Counties and/or directed or permitted tampering with ballots by marking ballots on which the voter did not cast a vote for president with a mark for Bush in Miami County, and by marking ballots in which the voter cast a vote for Kerry with a vote for another presidential candidate in Clermont County.

71.     Upon information and belief, Election Officials designed procedures for purging voters from the rolls with a disparate concentration upon high-performance Democratic precincts.  For example, in Cuyahoga County, voters were disparately purged, whereas in rural counties such as Miami County, no voters were purged.

72.     Provisional ballot rules were narrowed before Election Day to limit the locations where voters could cast provisional ballots and have these ballots counted, not rejected. Upon information and belief, Defendant Blackwell and other Defendants selectively and discriminatorily devised a system of provisional voting whereby African-American voters were disparately impacted and not allowed to have their votes counted.

73.     With respect to provisional voting prescribed by the Help America Vote Act ("HAVA"), Defendant Blackwell adopted a harshly restrictive interpretation in Directive 2004-43, dated October 25, 2004, that had the effect of suppressing the voting rights of the Plaintiffs and other urban and minority voters, and which restriction was perpetuated on a partisan basis in H.B. 3.

74.     With respect to provisional voting prescribed by HAVA, Defendant Blackwell issued conflicting directives in 2004 on whether legitimate provisional votes would be counted.

75.     According to one of his policies, Defendant Blackwell attempted to impose a requirement that valid registrations could only be executed on eighty-pound card stock.

76.     As a consequence of Defendant Blackwell's restrictive policy for provisional voting in the November 2004 general election, Ohio had a higher incidence of provisional balloting and a higher number of provisional voters rejected than Florida in the 2000 presidential election.

77. As a consequence of Defendant Blackwell's restrictive policy for provisional voting in the November 2004 general election, Ohio placed large numbers of people in provisional voting status in urban counties, creating delays and long lines, because of the longer time required to fill out provisional balloting forms and to otherwise complete the provisional voting process.

78. Upon information and belief, Election Officials, specifically Defendant Blackwell and Defendant Damschroder, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials failed to print and/or distribute paper ballots in Franklin County or to provide that paper ballots would be counted as full votes when machines failed or voters excessively waited in line, contributing to long lines and vote suppression.

79. Upon information and belief, Election Officials, specifically Defendant Blackwell, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials failed to print and/or distribute paper ballots in Knox County or to provide that paper ballots would be counted as full votes when machines failed or voters excessively waited in line, contributing to long lines and vote suppression.

## **RECOUNT FRAUD**

80.     Upon information and belief, Defendant Blackwell's delay in the certification of the presidential election results in 2004 obstructed the opportunity for filing of election recount requests and contests.

81.     Upon information and belief, Defendant Blackwell's delay in the scheduling of the recount process after the requests for recounts were filed provided the opportunity for Ohio boards of elections to engage in a process of preselection of the sample of ballots for recount by other than random methods.  Ohio law at the time mandated a random selection for recounts. Rather than selecting an actual 3% random sample at the time public observers gathered for the manual recount, in accordance with official directives, the sample was selected by other than random criteria.

82.     Upon information and belief, Election Officials designed and implemented a strategy of preselecting ballots/precincts for recounts rather than a system of random selection prescribed by law for the 3% hand count as a check against machine-counted initial official results in Clermont, Green, Cuyahoga, Hocking, and many other counties in Ohio.

83.     Upon information and belief, Election Officials hand sorted ballots by presidential candidates in preparation for the recount in Miami County and in other precincts that were not subject to hand recount in Butler and Delaware Counties.

84.     Upon information and belief, Election Officials, specifically Defendant Bare, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that he and/or Election Officials designed and implemented the placement of stickers over marks designated for John

Kerry in the Clermont County precincts selected for the 3% manual recount and marked such ballots for Bush so that the manual recount of those precincts corresponded to the previously reported tabulated vote count for those precincts.

## VIOLATIONS OF OHIO LAWS

85.    Upon information and belief, Election Officials in Delaware and Hocking Counties directed or permitted tampering with ballots by marking ballots on which the voter did not cast a vote for president with a mark for Bush in Miami County and by marking ballots in which the voter cast a vote for Kerry with a vote for another presidential candidate in Clermont County in violation of Ohio R.C. § 3599.26, "Tampering with ballots."

86.    Upon information and belief, Election Officials directed or executed the withholding of unused ballots in response to public records requests and/or directed or executed the destruction of unused ballots from the 2004 election in Cuyahoga, Delaware, Clermont, Warren, Trumbull, Stark, and Summit Counties in violation of Ohio R.C. § 3505.31, "Disposition of ballots, pollbooks, poll lists or signature pollbooks, tally sheets," for the purpose of concealing evidence of vote tampering.

87.    Upon information and belief, Defendant Blackwell failed in his statutory role as Ohio Secretary of State and chief elections law enforcement officer to review, investigate, or answer inquiries concerning irregularities in voting statistics and results that were raised after the November 2004 general election and deprived the Plaintiffs of fair and honest government.

# HISTORY OF H.B. 3

88.     H.B. 3 was introduced by Representative Kevin DeWine (R) on January 24, 2005, and referred to the Elections and Ethics Committee.

89.     The original bill focused primarily on requirements mandated by the Help America Vote Act, such as provisional voting and ballot standards.  With respect to voter identification, HAVA requires that a voter present evidence of identity only for the first vote by a voter who registered by mail.

90.     H.B. 3 passed in the Ohio House of Representatives on May 17, 2005.

91.     When introducing the Senate's proposed changes, Senator Kevin Coughlin (R), the Senate sponsor, stated: "The Senate bill includes other important fraud protections of note, including: . . . key protections for the disabled, senior citizens and home-bound Ohioans to ensure that they receive unbiased assistance in fulfilling their right to be heard through the ballot."

92.     Senator Coughlin also argued that the legislation was necessary because "special interests came from out of state, willing to stop at nothing to affect the results of the election, even if it meant gaming the system through false registrations."

93.     In June 2005, and again in December 2005, the Senate Rules Committee heard testimony regarding the effect of H.B. 3.

94.     Many individuals and organizations testified before the Senate Rules Committee that the identification restrictions of H.B. 3 would discourage voters from registering and/or casting their vote.

95.     In testimony presented to the Senate Rules Committee, it was shown that out of over 9 million votes cast in the 2002 and 2004 general elections in Ohio, there were only 4 proven cases of voter fraud in the entire state.

96.     H.B. 3 was given final legislative approval on December 13, 2005.

97.     H.B. 3 passed in both the House and the Senate along primarily partisan lines, with no votes by Democratic members, and with three Republican members voting against it.

98.     No African-American legislator voted in favor of this legislation.

99.     Governor Robert Taft summarily signed H.B. 3 into law on January 31, 2006.

100.    Governor Taft provided little opportunity for interested groups and citizens to meet with him and explain how the identification restrictions of H.B. 3 would discourage voters from registering and/or casting a vote.

101.    Most provisions of H.B. 3 took effect on May 2, 2006, the date of the primary election in Ohio.

102.    The provisions in H.B. 3 restricting voter registration by third-parties was enjoined on September 8, 2006 by the United States District Court in the Northern District of Ohio, *Project Vote v. Blackwell*, Case No.1:06 CV 1628, http://moritzlaw.osu.edu/electionlaw/litigation/projectvote.php.

103.    The challenged law and regulatory materials are not necessary to address voter registration fraud or voter fraud at the polls. Ohio law already separately penalizes voter registration fraud in Ohio R.C. § 3599.11(A), which provides that "[n]o person shall knowingly . . . aid or abet any person to [register in a precinct in which the person is not a qualified voter]," or "knowingly induce any person to" register under more than one name," or "knowingly make any false statement on any form for registration."

104.    Ohio law already separately penalizes election falsification in Ohio R.C. § 3599.36, which provides:

> No person, either orally or in writing, on oath lawfully administered or in a statement made under penalty of election falsification, shall knowingly state a falsehood as to a material matter relating to an election in a proceeding before a court, tribunal, or election official, or in a matter in relation to which an oath or statement under penalty of election falsification is authorized by law, including a statement required for verifying or filing any declaration of candidacy, declaration of intent to be a write-in candidate, nominating petition, or other petition presented to or filed with the secretary of state, a board of elections, or any other public office for the purpose of becoming a candidate for any elective office, including the office of a political party, for the purpose of submitting a question or issue to the electors at an election, or for the purpose of forming a political party.

> Whoever violates this section is guilty of election falsification, a felony of the fifth degree.

105.    Ohio law already separately penalizes voter fraud in Ohio R.C. § 3505.22, which provides:

> If any precinct officer has reason to believe that a person is impersonating an elector, that person, before being given a ballot, shall be questioned as to the person's right to vote, and shall be required to sign the person's name or make the person's mark in ink on a card to be provided. If, in the opinion of a majority of the precinct officers, the signature is not that of the person who signed the name in the registration forms, that person

shall be permitted to cast a provisional ballot under section 3505.181 [3505.18.1] of the Revised Code.

106. Ohio law already separately penalizes illegal voting in Ohio R.C. § 3599.12, which provides:

(A) No person shall do any of the following:

(1) Vote or attempt to vote in any primary, special, or general election in a precinct in which that person is not a legally qualified elector;

2) Vote or attempt to vote more than once at the same election by any means, including voting or attempting to vote both by absent voter's ballots under division (G) of section 3503.16 of the Revised Code and by regular ballot at the polls at the same election, or voting or attempting to vote both by absent voter's ballots under division (G) of section 3503.16 of the Revised Code and by absent voter's ballots under Chapter 3509 or armed service absent voter's ballots under Chapter 3511 of the Revised Code at the same election;

(3) Impersonate or sign the name of another person, real or fictitious, living or dead, and vote or attempt to vote as that other person in any such election;

(4) Cast a ballot at any such election after objection has been made and sustained to that person's vote;

(5) Knowingly vote or attempt to vote a ballot other than the official ballot.

(B) Whoever violates division (A) of this section is guilty of a felony of the fourth degree.

**VOTER IDENTIFICATION STATUTES, OHIO R.C. §§ 3501.01 *et seq.***

107. H.B. 3 revised the Ohio Revised Code to include voter identification requirements for registering to vote and casting a vote.

108. These statutory changes pursuant to the new identification requirements are extensive and affect the provisional voting process.

109.    Section 3503.14(5) requires that voter registration forms provide space for the following: "The voter to provide one or more of the following:

(a) The voter's driver's license number, if any;

(b) The last four digits of the voter's social security number, if any;

(c) A copy of a current and valid photo identification, a copy of a military identification that shows the voter's name and current address, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document, other than a notice of an election mailed by a board of elections under section 3501.19 of the Revised Code or a notice of voter registration mailed by a board of elections under section 3503.19 of the Revised Code, that shows the voter's name and address."

110.    These identification requirements for registering only apply to newly registering voters or voters who change their name or address on the registration form.  There is no requirement that all voters update their registration with their driver's license number or the last four digits of their social security.

111.    Prior to the enactment of H.B. 3, there was no requirement that voters provide their social security number when they registered to vote.  Such additional information was optional on the voting registration form.

112.    There is no rational relation between this new identification requirement for registering to vote and the recently enacted identification requirement for voting.  This additional information is not recorded in the pollbooks, and it does not aid the Board of Elections in determining the validity of provisional ballots because a.) many voters, those that registered before the effective date of H.B. 3,  will not have

provided this information and b.) voters who register after the effective date of H.B. 3 will have provided either their driver's license number *or* their social security number *or* any number of additional identifications enumerated in the voter registration form, none of which contain the driver's license number or social security number.

113.    The only written notation of identification at the polling place on the pollbooks occurs when the voter, pursuant to § 3503.16(B)(1)(a), moves within a precinct and does not file a change of residence.  Such a voter must provide the identification required for registration.  If that identification does not show the name and current address of the voter, "the elector shall provide the last four digits of the elector's driver's license number or state identification card number, and the precinct official shall mark the poll list or signature book to indicate that the elector has provided a driver's license or state identification card number with a former address and *record the last four digits of the elector's driver's license number or state identification  card number."* (emphasis added).

114.    This written notation is gratuitous.  The person, if the address on the identification is in the precinct, can vote a regular ballot, and no nonforwardable notice, which would begin to trigger the removal of the voter from the rolls under Ohio R.C. § 3501.19, is mailed to the voter's address.

115.    No notice of this additional procedure appears in the voter registration form or in the nonforwardable notice to be mailed out to voters after the initial registration form is completed, and the statute gives no indication as to how this additional written notation is to be used.

116.    There is no relationship between recording the last four digits of the voter's driver's license or state identification number with any of the other statutes providing for identification, and this adds an additional step in the voting procedure that has the effect of voter intimidation and disenfranchisement.

117.    Under § 3503.16(B)(1)(b), any registered voter who changes "the name of the registered elector and remains within a precinct on or prior to the day of a general, primary, or special election and has not filed a notice of change of name with the board of elections may vote in that election by going to the registered elector's assigned polling place, completing and signing a notice of name change, and casting a provisional ballot under section 3504.181 of the Revised Code."

118.    The disparity in treatment of a voter who moves within a precinct and a voter who remains within the precinct but has a name change disparately impacts women voters, who are more likely to have a name change than male voters, especially female lower income, disabled, and young voters as well as African Americans and other minority groups.

119.    Upon information and belief, two separate forms for registering to vote have been circulated by the Secretary of State's office since the effective date of the identification requirements in H.B. 3.  The first one instructs registrants that they "must" provide their driver's license number, and in small print indicates, "Whoever commits election falsification is guilty of a felony of the fifth degree."  The second registration form lists the identification requirements on the back of the form.  Following this identification list, the form states in large capital letters, "Whoever commits election falsification is guilty of a felony of the fifth degree."

120. This prominent notice of possible felony prosecution for registering to vote, which is required by H.B. 3, has the effect of presenting voting registration as a possible criminal act, resulting in voter intimidation and disenfranchisement.

121. The cumulative effect of this prominent notice of possible felony prosecution for registering to vote, following upon the lengthy paragraph enumerating permissible forms of identification, has the effect of criminalizing the voting registration process, resulting in voter intimidation and disenfranchisement.

122. Upon information and belief, the application for an absentee ballot mailed to registered voters in Franklin County is four-pages long, includes notice of the identification requirement in two separate places, contains confusing and/or misleading information on what identification is required to validly cast an absentee or provisional ballot, and states in large capital letters, "Whoever commits election falsification is guilty of a felony of the fifth degree."

123. This prominent notice of possible felony prosecution for applying for an absentee ballot has the effect of presenting absentee ballot applications as a possible criminal act, resulting in voter intimidation and disenfranchisement.

124. Ohio R.C. § 3505.18, "Voting procedure," provides in part:

(A) (1) When an elector appears in a polling place to vote, the elector shall announce to the precinct election officials the elector's full name and current address and provide proof of the elector's identity in the form of a current and valid photo identification, a military identification that shows the voter's name and current address, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document, other than a notice of an election mailed by a board of elections under section 3501.19 of the Revised Code or a notice of voter registration mailed by a board of elections under section 3503.19 of the Revised Code, that shows the name and current address of the elector.

125. The statutory identification language, "Identification may include a current and valid photo identification, a military identification that shows the voter's name and current address, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document other than this notification or a notification of an election mailed by a board of elections, that shows the voter's name and current address," does not provide sufficient notice to electors or to poll workers as to what form of identification may be valid to register to vote or to vote.

126. The statutory identification language, "Identification may include a current and valid photo identification, a military identification that shows the voter's name and current address, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document other than this notification or a notification of an election mailed by a board of elections, that shows the voter's name and current address," invests inordinate discretion in Boards of Elections in determining if the voter has properly registered to vote and in poll workers in determining if an voter has presented a valid form of identification.

127. The statutory identification language vests discretionary authority in the poll workers to deny a ballot to a voter upon presentation of insufficient identification, which triggers both a suspicion of election falsification as well as the complex provisional ballot procedures.

128.   Ohio R.C. § 3505.182 enacts a new provisional voter affirmation form.  The second paragraph of this affirmation provides:  "I understand that, if the above-provided information is not fully completed and correct, if the board of elections determines that I am not registered to vote, a resident of the precinct, or eligible to vote in this election, or if the board of elections determines that I have already voted in this election, my provisional ballot will not be counted.  I further understand that knowingly providing false information is a violation of law and subjects me to possible criminal prosecution."

129.   The third paragraph of the provisional ballot affirmation provides: "I hereby declare, under penalty of election falsification, that the above statements are true and correct to the best of my knowledge and belief."

130.   The bottom of the provisional ballot affirmation repeats, in large capitals letters, "Whoever commits election falsification is guilty of a felony of the fifth degree."

131.   These repeated notices of possible criminal felony prosecution have the cumulative effect of criminalizing the provisional ballot voting procedure, resulting in voter intimidation and disenfranchisement.

132.   The lengthy provisional ballot affirmation requires an examination of the voter by the poll worker that carries with it possible criminal consequences.

133.   The effect of the provisional ballot affirmation is voter intimidation and disenfranchisement.

134.   Ohio R.C. § 3505.18(B), "Voting Procedure," requires a three-step procedure that must be completed before the voter can cast a ballot:  "After the elector has announced the elector's full name and current address and provided any of the forms of identification required under division (A)(1) of this section, the elector shall write the elector's name and address at the proper place in the poll lists or signature pollbook provided for the purpose . . . . "

135.   This three-step procedure has the effect of prolonging the voting process, resulting in voter intimidation and disenfranchisement.

136.   This three-step procedure has the effect of requiring more voters to vote provisionally than otherwise.

137.   In the 2004 election, many provisional ballots were not counted under the directive of Defendant Secretary of State Blackwell.

138.   The confusing, misleading, and/or contradictory provisions in H.B. 3 for determining whether a provisional ballot will be counted based on the identification supplied and the affirmation vests inordinate discretion in the Board of Elections.

139.   For example, Ohio R.C. § 3505.183(B)(1) provides that "If the individual declines to execute such an affirmation under 3505.181(B)(2), the individual's name, written by either the individual or the election official at the direction of the individual, shall be included in a written affirmation in order for the provisional ballot to be eligible to be counted."

140. This contradictory and superfluous section suggests the legislation governing provisional ballots was written hastily in order to become partially effective on the date of the May primary election and entirely effective before the November 7, 2006 election.

141. To the extent the law is required to give voters fair notice of when and how their provisional ballots will be counted, the provisional ballot sections of the Ohio Revised Code have the effect of confusing and/or misleading voters, poll workers, and members of Board of Elections, unduly burdening the right to vote, and intimidating or disenfranchising voters.

142. Even if voters, poll workers, and Boards of Elections do not rely on the provisional ballot sections of  the Ohio Revised Code, the statutory language: "Identification may include a current and valid photo identification, a military identification that shows the voter's name and current address, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document other than this notification or a notification of an election mailed by a board of elections, that shows the voter's name and current address" is ambiguous and misleading as the clause that specifies "voter's name and current address" follows several clauses behind the clause "identification may include a current and valid photo identification."

143.    Because the military identification requires a current address, but the photo identification does not, a voter may read the first line of this identification requirement as permitting any valid photo identification.  Voters could legitimately read this language as permitting a current and valid photo identification such as a student identification or work identification that does not contain the current address of the voter, increasing voter confusion, intimidation, and disenfranchisement.

144.    Given the common procedures for the use of photo identification to verify identity only and not address, such as the use of photo identification at security checkpoints at the airport or when using a debit or credit card, such a reading of the statute's ambiguous and misleading identification language is even more probable.

145.    No military identification provides the voter's residence.  This provision disparately impacts young and/or first time voters returning from Iraq and other overseas deployments, and it has the effect of voter intimidation and disenfranchisement.

146.    The identification language to register to vote and to vote does not provide sufficient notice of what identification is acceptable.

147.    Because of this ambiguity and conflict in the identification language, voters can be expected to try to present a driver's license or state identification.  Voters who do not have a driver's license or state identification may incur the additional expense of securing one before the 2006 November election.

148.    Upon information and belief, Ohio provides no method for lower income people to obtain a state identification card without a fee. The current fee for a state identification card is $7.00.   Ohio R.C. § 4507.50.

149.     Upon information and belief, applications for a state identification card are processed through the Ohio Bureau of Motor Vehicles.  If a person has a license but it has been suspended or revoked, that license number will still appear on the state identification card.

150.     Upon information and belief, over 600,000 people in the State of Ohio are under license suspension or revocation through the Ohio Bureau of Motor Vehicles.

151.     Upon information and belief, once a person obtains a state identification card, the updated address can be coordinated with the state Law Enforcement Automated Data System (LEADS), and such information can be used to execute warrants for failure to pay child support and other warrants, including but not limited to bench warrants for failure to appear in traffic court.

152.     Thus, one procedure for complying with the identification requirements converts the voting registration process into a means for enforcing civil and criminal penalties unrelated to voting.

153.     Upon information and belief, license suspension and revocation disparately impacts African Americans, other minority groups, young people, and lower income people.

154.     Upon information and belief, notice of this change has not reached all voters, and it is to be expected that some voters will arrive at the polls on November 7, 2006 without either a driver's license or state identification.

155.    Thus, voters who have not updated their license or state identification or who do not have such identification will be required to provide "a copy of a current utility bill, bank statement, government check, paycheck, or other government document other than this notification or a notification of an election mailed by a board of elections, that shows the voter's name and current address."

156.    This statutory language requires a voter to present private information such as a utility bill, a government check such as a social security check or social security disability check, or their paycheck, to a pollworker who may be a neighbor or may be a stranger, in front of other voters waiting in line, in order to vote.

157.    If the voter is unable to produce these private documents, or if the pollworker decides these private documents or what other "government document" the voter presents is insufficient or invalid, the voter then is required to begin the complex and quasi-criminal provisional voting process.

158.    The identification requirements for voting have the effect of humiliating voters, intimidating voters, disenfranchising voters, and producing both long lines and other obstacles to voting at the polls on election day.

159.    The identification requirements for registering to vote and voting invidiously discriminate against young and first-time voters and minority voters.

160.    The identification requirements have the effect of discouraging voter registration and voting, and they have the effect of a caging process to confuse, intimidate, and disenfranchise voters.

161.    The identification requirements for registering to vote and voting have the effect of intimidating or disenfranchising voters on a partisan basis.

162.    Specifically, the identification requirements for registering to vote and voting have the effect of intimidating or disenfranchising young and first-time voters as well as African-American voters.  These voters have been historically more likely to vote for the party that did not enact H.B.3.

163.    The identification requirements reveal an ongoing conspiracy and recurring pattern of vote suppression and voter intimidation and disenfranchisement based upon invidious racial and youth status characteristics and will further intimidate and disenfranchise these voters.

164.    The confusing and/or misleading language of H.B. 3 in reference to registering to vote, voting, casting and counting of provisional ballots bears no rational relationship to the stated purpose of preventing voter fraud.

165.    The signature comparison prevents voting fraud and is the most effective way of preventing voter fraud.

166.    The confusing and misleading language of H.B. 3 in reference to registering to vote, voting, and casting and counting of provisional ballots subverts the purpose of the provisional vote.

167.    Over 100,000 voters could be disenfranchised because of this act; 357,000 Ohioans 18 and over have neither a driver's license nor a state identification card.

168.    Even of the Ohioans who do have a driver's license that is not under suspension or revocation, at least 406,376 of them will have licenses with their former address, subjecting them to the gratuitous notation process of section 3503.16(B)(1)(a) or possibly subjecting them to the provisional ballot process.

169.    The driver's license identification requirement for registering to vote and for voting disparately impacts low-income, disabled, young and/or first-time voters as well as African Americans and other minority groups.

170.    The history of H.B. 3 and the effect of these provisions suggest that these provisions are an intentional subterfuge for vote suppression and voter intimidation and disenfranchisement along partisan lines and with invidious discriminatory animus.

171.    The effect of this subterfuge is confusion and long lines at the polls, resulting in vote suppression and voter intimidation and disenfranchisement.

172.    The cumulative effect of these identification requirements for registering to vote and voting places an immeasurably heavy burden on voting rights. These requirements convey to many citizens in Ohio that voting is a complicated and possibly dangerous act and that their presence at the polls is not welcome.

## LEGAL ALLEGATIONS

173.    Plaintiffs have been disenfranchised or otherwise severely burdened in their right to vote as a direct and proximate result of Defendants' actions and inactions.  Plaintiffs reasonably anticipate that, absent injunctive relief, they may be disenfranchised or severely burdened in the exercise of their fundamental right to vote in the future.

174.    Unless there are public findings and official acknowledgment of the manifest vote suppression and vote rigging in the 2004 presidential election, that experience and the continuing official indifference to it is likely to have a chilling effect upon those, such as the Plaintiffs, who were and continue to be targets of such tactics.

175.   Absent candid recognition of the lack of integrity in the voting system that was utilized in the 2004 general election with respect to the most important race in that election, there is not likely to be corrective action proportionate to the ongoing threat that this presents.

176.   If Ohio proceeds to administer its election system in 2006 and beyond, where Defendants who engaged in fraudulent activity in 2004 continue to be an undetected and unacknowledged part of that system, without any more controls than those that existed in the past, there is a reasonable basis to believe that fraudulent activity and gaming of that system will continue.

177.   There were candidates for federal office in the November 2004 election and there are candidates for federal office in the November 2006 election.

178.   There is an actual and justiciable controversy as to which the Plaintiffs require a declaration of their rights.

179.   Unless the requested injunctive relief issues, the constitutional and statutory rights of Plaintiffs and other eligible voters will continue to be infringed.

180.   Plaintiffs have no adequate remedy at law for Defendants' violations of their rights.

**FIRST CLAIM**

**VIOLATION OF EQUAL PROTECTION CLAUSE, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

181.   Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

182.    Defendants, acting under color of state law, have created an election process in which fair standards and lawful procedures are not enforced, which

severely burdens and denies equal access to the right to vote, and results in arbitrary and disparate treatment of voters from county to county, precinct to precinct.

183.    As a result, Ohio citizens eligible and desiring to vote do not have fair access to the franchise, nor is each legitimate vote counted equally.

184.    Defendants, acting under color of state law, have deprived and severely burdened and threaten to deprive and severely burden Plaintiffs of their fundamental right to vote.

185.    The current system of voting administration in Ohio with its vulnerabilities to manipulation for purposes of targeted vote suppression and corruption serves no compelling state interest, lacks any substantial relationship to any important state interest, and is not rationally related to any legitimate state interest.

186.    The ongoing system of discretionary or arbitrary use of alternative sets of numbers for absentee ballots presents an ongoing vulnerability for selective double counting of absentee ballots for partisan advantage in the tabulation, reporting, and certification of all vote results in Ohio elections.  The practice of selectively double counting absentee ballots for partisan advantage deprives under color of state law the right of Plaintiffs to have their votes be given the same weight as the votes cast by others in elections.

187.    The current system of registering to vote and voting serves no compelling state interest, lacks any substantial relationship to any important state interest, is not rationally related to any legitimate state interest, and deprives the Plaintiffs of equal protection of law.

## SECOND CLAIM

## VIOLATION OF DUE PROCESS CLAUSE, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

188.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

189.    Upon information and belief, acting under color of state law, Defendants have created an election process that deprives eligible Ohio citizens, including individual Plaintiffs, of their liberty interest in voting and does so without due process before or after an election.  The lack of adequate process has frustrated the individual Plaintiffs in registering to vote, casting a vote, and having their votes properly and equally counted, and has frustrated the purposes of the organizational Plaintiffs in ensuring that their members are able to register to vote, cast ballots, and have their votes properly and equally counted, and violates procedural due process under the Fourteenth Amendment to the U.S. Constitution.

## THIRD CLAIM

## COMMON LAW CONSPIRACY CLAIM PURSUANT TO 42 U.S.C. § 1988(a)

190.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

191.    Upon information and belief, acting under color of state law, Defendants conspired and agreed to violate Plaintiffs' rights secured under the Due Process and the Equal Protection Clauses of the Fourteenth Amendment and under the Thirteenth Amendment of the United States Constitution.  Upon information and belief, Defendants and each of them have conspired and agreed to devise, implement, enforce,

encourage, sanction, and/or failed to establish, rectify, or enforce policies and practices under which the Plaintiffs were and will be denied the right to vote and to have their votes fairly counted. Defendants committed at least one overt act in furtherance of this conspiracy.

## FOURTH  CLAIM

### ACTIONS TAKEN PURSUANT TO INVIDIOUS RACIAL ANIMUS IN VIOLATION OF THE THIRTEENTH AMENDMENT AND 42 U.S.C. § 1985(3)

192.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

193.    Section 1985(3) prohibits conspiring to prevent "by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States."

194.    At all times herein the Defendants conspired to act and did act pursuant to that conspiracy to violate the rights of the Plaintiffs, secured by the Constitution and laws of the United States, as set forth above.


## FIFTH CLAIM

### VIOLATION OF DUE PROCESS CLAUSE, FOURTEENTH AMENDMENT AND THE FIRST AMENDMENT

195.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

196.    Defendants, acting under color of state law, have created an election process that severely burdens and denies the Plaintiffs' First Amendment rights

to ballot access, freedom of choice, and freedom of association.

## SIXTH CLAIM

## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE TWENTY-SIXTH AMENDMENT

197. Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

198. Defendants, acting under color of state law, have created an election process that severely burdens and denies equal access to the right to vote, and results in arbitrary and disparate treatment of young voters.

## SEVENTH CLAIM

## VIOLATION OF 42 U.S.C. § 1971(a)(2)(A)

199. Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

200. Defendants, acting under color of state law, have created an election process that on the condition of race or color violates 42 U.S.C. § 1971 (a)(2)(A), which prohibits, "in determining whether any individual is qualified under State law or laws to vote in any election," the application of "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote."

## EIGHTH CLAIM

## VIOLATION OF 42 U.S.C. § 1971(a)(2)(B)

201.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

202.    Defendants, acting under color of state law, have created an election process that on the condition of race or color violates 42 U.S.C. § 1971(a)(2)(B), which prohibits the denial of  "the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

## NINTH CLAIM

## VIOLATION OF 42 U.S.C. § 1971(a)(2)(C)

203.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

204.    Defendants, acting under color of state law, have created an election process that on the condition of race or color violates 42 U.S.C. § 1971(a)(2)(C), which prohibits the employ of "any literacy test as a qualification for voting in any election" unless such test meets the stringent qualifications of  § 1971(a)(2)(C)(i) & (ii).  A "literacy test" includes any test of the ability to read, write, understand, or interpret any matter, § 1971 (a)(3)(B).

## TENTH CLAIM

## VIOLATION OF 42 U.S.C. § 1971(b)

205.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

206.    Defendants, acting under color of state law and in their individual capacity, have created an election process that on the condition of race or color violates 42 U.S.C. § 1971(b), which provides:  "No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate."

## ELEVENTH CLAIM

## VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT OF 1965

207.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

208.    Defendants, acting under color of state law and in their individual capacity, have created an election process that violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973(a), which provides, in part: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by

any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."

## TWELFTH CLAIM

## VIOLATION OF THIRTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

209.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

210.    Defendants, acting under color of state law and in their individual capacity, have created an election process that violates the Fifteenth Amendment, which provides that "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

## THIRTEENTH CLAIM

## VIOLATION OF FOURTEENTH  AND TWENTY-FOURTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

211.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

212.    Defendants, acting under color of state law and in their individual capacity, have created an election process that incorporates a poll tax on eligible voters in violation of the Fourteenth and Twenty-Fourth Amendment, section one, which provides, "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."

213.    The identification requirements in H.B. 3 reinstate long-outlawed property requirements for voting and pose an undue burden on the right to vote.

## FOURTEENTH CLAIM

## VIOLATION OF FOURTEENTH AND FIRST
## AMENDMENTS TO THE UNITED STATES CONSTITUTION

214.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

215.    Defendants, acting under color of state law and in their individual capacity, have created an election process that violates the Fourteenth and First Amendment guarantees of right of privacy.

216.    The identification requirements in H.B. 3 violate the right to privacy and pose an undue burden on the right to vote.

## FIFTEENTH CLAIM

## VIOLATION OF FOURTEENTH AND FOURTH
## AMENDMENTS TO THE UNITED STATES CONSTITUTION

217.    Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

218.    Defendants, acting under color of state law and in their individual capacity, have created an election process that violates the Fourteenth and Fourth Amendment guarantees to be free from unreasonable search or seizure.

219.    The procedures required to enforce the identification requirements in H.B. 3 violate the right to be free from unreasonable search or seizure and pose an undue burden on the right to vote.

## SIXTEENTH CLAIM

## VIOLATION OF THE FOURTEENTH AND THE NINETEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

220. Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

221. Defendants, acting under color of state law and in their individual capacity, have created an election process that violates the Fourteenth and Nineteenth Amendment guarantee of the right to vote without regard to sex.

222. The process for enforcing the identification requirements in H.B. 3 denies and/or abridges the right to vote by women, disparately impacts them, and poses an undue burden on their right to vote.

## SEVENTEENTH CLAIM

## VIOLATION OF 42 U.S.C. § 2000d

223. Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

224. Defendants, acting under color of state law and in their individual capacity, have created an election process that violates 42 U.S.C. § 2000d, which prohibits "exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin."

225. The State of Ohio received and receives federal assistance under HAVA for the election process.

## EIGHTEENTH CLAIM

## VIOLATIONS OF ARTICLE V, THE OHIO CONSTITUTION
## AND STATE LAWS

226.   Plaintiffs hereby incorporate and reallege all of the allegations contained in the paragraphs above.

227.   Defendants, acting under color of state law and in their individual capacity, have created an election process that violates Article V, Section One of the Ohio Constitution, which provides, in part, "Every citizen of the United States, of the age of eighteen years, who has been a resident of the state, county, township, or ward, such time as may be provided by law, and has been registered to vote for thirty days, has the qualifications of an elector, and is entitled to vote at all elections."

228.   Upon information and belief, Defendants, acting under color of state law and in their individual capacity, engaged in, directed others to engage in, and/or neglected to ensure the proper procedures were in place and followed so that violations of Ohio R.C. § 3505.31, "Disposition of ballots, pollbooks, poll lists or signature pollbooks, tally sheets," and Ohio R.C. § 3599.26, "Tampering with ballots," were committed.

229.   Upon information and belief, Defendant Blackwell failed in his statutory duty as Ohio Secretary of State and deprived the Plaintiffs of fair and honest government.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

230.    Declaring on the basis of specific findings of fact based upon the evidence presented that the integrity of the Ohio 2004 general presidential election was compromised by the following:

> A.  Vote suppression tactics in the administration of the election that targeted demographic groups such as minorities and college students and voting precincts likely to vote for the Democratic candidate; and

> B.  Vote rigging and tampering through the manipulation and electronic counting of paper ballots and by the programming of electronic voting machines.

231.    Declaring that large numbers of African Americans were deprived of the right to vote and the equal protection of the laws because Defendants, in a selective and discriminatory manner, unfairly allocated voting machines, purged voter registrations, failed to set precinct boundaries in a timely manner, maintained faulty voting machines in precincts containing high numbers of African Americans, and maintained an unfair system of provisional ballots that disproportionately and negatively affected African-American voters.

232.    Declaring that no audit, recount, or contest procedure as administered by Defendants within the existing Ohio legal system was sufficient to detect, prevent, or correct the compromises to the integrity of the Ohio voting system in the context of the presidential election.

233.     Declaring that absent a strengthening of the security of Ohio's election system, Plaintiffs have a reasonable basis to believe that the integrity of future Ohio elections will be compromised.

234.     Declaring that absent a strengthening of the administration of Ohio elections system that will assure backup mechanisms to facilitate prompt access to vote, Plaintiffs have a reasonable basis to believe that targeted vote suppression tactics will continue to be employed.

235.     Declaring that the targeted vote suppression tactics and vote rigging that were manifest in the 2004 Ohio presidential election undermine the most fundamental constitutional and statutory voting rights provided under the Constitutions and statutes of the United States and the State of Ohio.

236.     Permanently enjoining Defendant Blackwell as Ohio Secretary of State and other Defendants prior to the next statewide general election from violating Plaintiffs' constitutional rights, including the right to vote and the right to equal protection of the laws, and ordering, under the supervision of a special master appointed by the Court:

(A) enhancements in the election security and audit procedures for the State of Ohio that would provide for independent technical review of machines and software before and after their use in the Ohio election process; and that such security and audit procedures include audits sufficient under generally accepted accounting standards to detect unauthorized access and/or hacking of electronic machines and to provide for post-election cross-checking between machine-reported results and the

voter-verified paper trail for any and all precincts;

(B) implementation of a security bar code system by which optical scanners would distinguish between regular and absentee ballots, as the Hamilton County Board of Elections has done and has had in place for punchcard ballots over the past 30 years, and a uniform system of accounting for the number of absentee ballots cast in Ohio elections;

(C) the availability of paper ballots and adequate means of utilizing such paper ballots at polling stations for any voter who desires to use them, and prompt availability at any time the use of the electronic voting machines causes a delay of more than an hour in the voting process;

(D) the evaluation of Ohio election practices and procedures to ensure that Ohio's elections are administered fairly, that uniform practices and procedures are put in effect for the administration of Ohio's elections, and that these uniform practices and procedures are carried out in a neutral and effective manner; and

(E) the authority of the Special Master to hear emergency motions related to this case.

237. Preliminarily and permanently enjoining Defendant Blackwell as Secretary of State from enforcing the identification requirements for registering to vote and casting a vote in Ohio R.C. §§ 3501.01 *et. seq.*, specifically the following: §§ 3501.01(A)(A); 3503.14; 3503.16(A)(1)(a) & (b); 3503.19(C)(1) & (2); 3503.28(A)(6); 3505.18(A)(1); 3505.181; 3505.182; and the applicable identification requirements in §§ 3505.183 and 3505.20; and ordering for circulation of this notice of injunction to the

Board of Elections officials in all eighty-eight counties.

238.  Appointing a special prosecutor pursuant to F.R.Crim.P.42(b) to prosecute criminal contempt of this injunctive relief.

239.  Awarding Plaintiffs their reasonable attorneys fees and costs in bringing this action pursuant to 42 U.S.C. §§ 1988(a) and 1973gg-9(c) and other applicable statutes and laws.

240.  Providing such other and further relief as the court may deem just and proper.

Dated: Columbus, Ohio         Respectfully Submitted,
       October 9, 2006

By:    /S/ Clifford O. Arnebeck, Jr.
       Clifford O. Arnebeck, Jr. (0033391)
       (*arnebeck@aol.com*)
       341 South Third Street, Ste. 10
       Columbus, Ohio  43215
       Phone:  (614) 224-8771
       Fax:    (614) 224-8082
       Trial Attorney for Plaintiffs

       Henry W. Eckhart (0020202)
       (*henryeckhart@aol.com*)
       50 W. Broad St., #2117
       Columbus, Ohio 43215
       Phone: (614) 461-0984
       Fax:    (614) 221-7401
       Co-Counsel

OF COUNSEL:

Robert J. Fitrakis (0076796)
*(truth@freepress.org)*
341 S. Third St., Ste. 10
Columbus, Ohio 43215
Phone: (614) 253-2571
Fax:    (614) 224-8082

## CERTIFICATE OF SERVICE

This is to certify that the foregoing amended complaint was filed electronically on the 9th day of October 2006 in accordance with the Court's Electronic Filing Guidelines.  Notice of this filing will be sent to Larry H. James, Crabbe, Brown & James, Counsel for Defendant J. Kenneth Blackwell, Ohio Secretary of State, by operation of the Court's Electronic Filing System.

/S/  Clifford O. Arnebeck, Jr.
Clifford O. Arnebeck, Jr.