# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

2008 JUL 10 P 3: 27

KING LINCOLN, ET AL.                          :

                **PLAINTIFFS,**     :

AND                                           :

                                     :     **Civil Action No. C2 06 745**

THE OHIO ELECTION JUSTICE CAMPAIGN, :
PADDY SHAFFER, MARLYS BARBEE,          :   **JUDGE ALGENON**
VIRGINIA BROOKS, MARK BROWN,           :   **MARBLEY**
BRUCE DUNCANSON, MARIAN LUPO,          :
PETER JONES, AND TIMOTHY KETTLER,      :   **MAGISTRATE**
                                       :   **JUDGE KEMP**

individually and as CLASS REPRESENTATIVES :
under Fed.R.Civ.P. 23,                 :

                                       :

v.                                            :

                                       :

JENNIFER BRUNNER, ET AL.                      :

                **DEFENDANTS.**     :

                                       :

## INTERVENOR-PLAINTIFFS OHIO ELECTION JUSTICE CAMPAIGN AND NAMED PLAINTIFFS' MOTION PURSUANT TO 18 U.S.C. §§ 401-402 AND 18 U.S.C. §§ 3331-3334 FOR CRIMINAL CONTEMPT AND SPECIAL GRAND JURY PROCEEDINGS

The Ohio Election Justice Campaign (OEJC) and Named Plaintiffs hereby respectfully move this Court to initiate criminal contempt proceedings pursuant to 18 U.S.C. §§ 401- 402 and to impanel a special grand jury pursuant to 18 U.S.C. §§ 3331- 3334 in the above action. The grounds for this motion are presented in the memorandum below and attached exhibits.

1

## MEMORANDUM

**Introduction**

The Plaintiff-Intervenors OEJC and Named Plaintiffs bring this motion for criminal contempt and special grand jury proceedings because of the gravity and scope of the violation of this Court's order(s) to preserve the 2004 ballots from the federal general election in Ohio. Plaintiff-Intervenors do not waive or intend to foreclose any civil contempt proceedings or remedies this Court may find appropriate on its own or by motion of the parties at a later time.

## I. Facts

On August 31, 2006, Plaintiffs, a collection of civic organizations and individuals, filed a complaint in federal court against Defendants, J. Kenneth Blackwell, the Secretary of State for the State of Ohio, and various unnamed public election officials and private contractors who provided services to the State of Ohio, alleging that Defendants had violated Plaintiff's civil and constitutional rights during the November 2004 presidential election. After they filed this lawsuit, Plaintiffs, on that same day, August 31, 2006, sent a letter to each of Ohio's eighty-eight (88) county boards of elections that notified them to preserve the election ballots from the November 2004 presidential election. (Ex. B) The Plaintiffs had previously sent a letter entitled "Document Hold Notice – 2004 Election Ballots" by hand and facsimile delivery to Secretary of State Blackwell on August 23, 2006, and a copy to each board of elections by facsimile and electronic mail. (Ex. C) This letter specified the importance of saving all ballots, including unvoted ones.

Both of Plaintiffs' letters were also circulated by Aaron Ockerman, lobbyist for the Ohio Association of Election Officials (OAEO), by e-mail on Friday, September 1, 2006, apparently to the leadership of the OAEO, in a pdf attachment that included the complaint filed on August 31, 2006. (Ex. D, pp. 1 to 4)

On September 1, 2006, Monty Lobb, Assistant Secretary of State, issued Directive 2006-59 to the county boards of elections, copied to the county prosecutors and the state auditor, Betty Montgomery. The directive begins: "I have received several inquiries from Boards of Elections regarding access to and retention of ballots and pollbooks from the 2004 general election," and continues by providing guidance to the boards regarding the status of the ballots as public records, as detailed in Attorney General Opinion 2004-50 (issued December 2004 in response to an opinion request by Secretary of State Blackwell) (ballots must be made available to public for inspection and must be carefully preserved pursuant to R.C. § 3505.31) as well as detailed instructions on the retention and disposal of ballots and pollbooks pursuant to R.C. § 149.38. According to Directive 2006-59, a copy of it was sent to each county prosecuting attorney. (Ex. E, includes full copy of AG Opinion 2004-50, which was not attached to Directive 2006-59)

Ohio has adopted specific procedures for the retention and destruction of public records: O.R.C. § 149.38 (creating county records commission) and O.R.C. § 149.333 (the disposal or transfer of public records requires the approval, rejection, or modification by the auditor of state). As also detailed in Directive 2006-59, O.R.C. § 149.38 requires that before the destruction of *any* public record, the county records commission must approve the disposal, and the auditor of state must be given a sixty-day window in which

3

to disapprove of the destruction.[1] There is especially no lack of direction in Ohio law on the retention, disposal, and inspection of election records: O.R.C. § 3599.161, which establishes that prohibiting the inspection of election records is a misdemeanor; O.R.C. § 3599.34, which establishes prohibitions on the destruction of election records, which is a felony; and O.R.C. § 3505.31, providing for 22 month retention of ballots used in federal election. Furthermore, the records retention schedule for the county boards of elections specifies, in large print, that "No records shall be retained, transferred or destroyed in violation of this schedule. No record shall be destroyed if it pertains to any pending case, claim, or action." (Ex. F)

On September 7, 2006, following arguments of counsel and memoranda, this Court ordered the "Boards of Election for each of the 88 Counties for the State of Ohio forthwith to preserve *all ballots* from the 2004 Presidential election, on paper or in any other format, including electronic data, unless and until such time otherwise instructed by this Court." (emphasis added) This Court furthered ordered, "Pursuant to O.R.C. §§ 3501.04, 3501.05 and 3501.31, the Secretary of State is hereby ORDERED to serve forthwith a copy of this Order upon each county's Board of Elections."

On September 11, 2006, this Court issued another order requiring the 88 boards of elections to preserve their 2004 ballots, authorizing the Secretary of State to issue a directive to that effect, and drawing upon its inherent authority to protect its judgment, enjoined the 88 county boards of elections directly:

> It is beyond peradventure that the 2004 election ballots, which are presently in the custody of Ohio's 88 county boards of elections, are at issue in this case and should be preserved. Indeed, the parties so agree. If the 2004 election ballots are destroyed or disposed of now, it clearly

---

[1] The Ohio historical society and the county historical society are also to be afforded the opportunity to select records of historical value for preservation. O.R.C. § 149.38

4

would disturb the adjudication of rights and obligations between Plaintiffs and Defendants. This Court concludes that the most effective way to preserve those election ballots during this litigation is for it *to enjoin directly each Ohio county's board of elections from destroying them. See* In re *N.A.A.C.P.*, 849 F.2d at \*4; *Hall*, 472 F.2d 261, 265–66. In the event the Court discovers that any Defendant or any non-party to this case, such as an employee of a county's board of elections, has destroyed or disposed of 2004 presidential election ballots in violation of this Order, it may impose an appropriate discovery sanction. FED. R. CIV. P. 37(b)(2)(D) (authorizing a court to hold a person in contempt of court when the person fails to obey an order) (emphasis added).

*King Lincoln, et al. v. Blackwell*, 448 F. Supp. 2d 876, 880 (S.D. Ohio 2006)

On April 6, 2007, this Court entered an order, upon agreement of the parties, that the Secretary of State pursuant to R.C. § 3501.05 would issue a directive requiring all 88 county boards of elections to transfer to the custody of the Secretary of State all ballots preserved in accordance with the above order. This Court further ordered all 88 county boards of elections to comply with the Secretary's directive regarding transfer of custody of the ballots.

On April 9, 2007, the Secretary of State issued Directive 2007-07 entitled, "All Ballots from the 2004 Presidential Election." This directive specified the procedure for transfer of custody of the ballots "to insure the ballots remain secure until the resolution of the court proceeding" and to insure "proper chain of custody." It was accompanied by this Court's order dated April 6, 2007 and an inventory list to account for all ballots. (Exhibit G) Boards of elections were to comply within three days.

On April 18, 2007, David M. Farrell, Deputy Assistant Secretary of State and Director of Elections and Eleanor Speelman, General Counsel, issued a letter to all 88 county boards of elections regarding "Collection of 2004 General Election Ballots" requiring those boards not in possession of their ballots to submit a letter of explanation

by Wednesday, May 16, 2007 detailing, *inter alia*, whether their ballots were intentionally or accidentally destroyed and a statement indicating whether they had received notice of this Court's September 11, 2006 order. (Exhibit H) Boards of elections were to comply by May 16, 2007.

On July 10, 2007, Attorney General Marc Dann, in a letter signed by Richard Coglianese, Principal Assistant Attorney General, sent a letter to counsel for the Plaintiffs King Lincoln, *et al.* that also enclosed a copy of some of the responses the Boards of Elections gave the Secretary of State on missing ballots. (Exhibit I) All of these responses have been submitted to the Court as Exhibit A. There is no explanation in the letter for the length of time that elapsed between the due date of Mr. Farrell's letter and the date Plaintiffs' counsel was notified of the missing ballots.

On July 20, 2007, in response to a public records request, Brian Green, Assistant General Counsel for the Ohio Secretary of State, sent a two-page summary of what the 88 boards of elections submitted to the office in response to Directive 2007-07. (Exhibit J) This summary was compiled from the inventory list submitted by the boards of elections, not by an inventory of the actual ballots in the custody of the office of the Ohio Secretary of State.

According to this summary, 34 boards of elections destroyed some of their ballots and submitted a letter of explanation; 7 boards of elections destroyed all their ballots and submitted a letter of explanation; and 15 boards of elections destroyed some of their ballots and submitted no letter of explanation. (Exhibit J) Although the facts and explanations surrounding the destruction for each of these counties varies, there is no question that at least 56 boards of elections violated the court's orders, although upon

6

closer examination, that number may be much higher. In spite of the Secretary of State's office's letter (Ex. H), which provides a means for the boards of elections to exculpate themselves, and by implication, the Office of the Secretary of State itself, there is also no question that the boards of elections received a copy of the orders and were otherwise on notice of their affirmative duty to refrain from destroying their ballots by virtue of the repeated notices they received from the Plaintiffs. Further, it is a matter of public record that this election was contested, that each county conducted a recount, and that the recount was contested.[2] There is no question that the boards of elections were on notice of their affirmative and sworn duty to refrain from destroying the ballots and to follow the lawful process for destroying public records pursuant to the Ohio Revised Code, Attorney General Opinion 2004-50, Secretary of State Directive 2006-59, and their own records retention schedule.[3]

On August 21, 2007, according to the meeting minutes of the Voting Rights Institute, which met that day in Shaker Heights, Ohio, Secretary of State Jennifer Brunner told the members in attendance, which included members representing The League of Women Voters, People for the American Way, the NAACP, and the Ohio Election Justice Campaign, and several election officials, that "every county sent an inventory and a letter of explanation to Columbus with the ballots. . . . This information was all turned

---

[2] It is also a matter of public record that Ohio's electoral college votes were challenged in Congress during the count of the votes to certify the presidential election, and that this was the first time in the history of the United States that an entire state's electoral college votes were challenged.

[3] O.R.C. § 3501.08 provides: "Before entering upon the duties of his office, each member of the board of elections shall appear before a person authorized to administer oaths and take and subscribe to an oath that he will support the constitutions of the United States and of the state, will perform the duties of the office to the best of his ability, will enforce the election laws, *and will protect and preserve the records and property pertaining to elections.* Such oath shall be filed with the clerk of the court of common pleas of the county wherein the officer resides within fifteen days from the date of appointment." (emphasis added)

over to Judge Marbley. We have had no updates from his court as of today." (Ex. K, p. 4)

On August 28, 2007, Paddy Shaffer, Director, OEJC, pursuant to a public records request, requested copies of the fifteen letters of explanation referenced in the above minutes, and was informed by Brian Green, Elections Counsel, that letters of explanation from the fifteen boards of elections that had destroyed ballots but had not submitted letters of explanation had not arrived and no more ballots had been delivered to the office. (Ex. L) Paddy Shaffer then made public records requests to the 15 boards themselves asking for the letters of explanation referenced in the above minutes. *See* Ex. MM. None have been forthcoming.

Several of the boards of elections were not only well-aware of the need to save their ballots in advance of this Court's orders on September 7 and 11, but also publicly mocked the notion in an e-mail conversation sent to every county board of elections. In an e-mail conversation dated August 7, 2006, begun by the Guernsey County BOE and coped to "All Counties," "subject: save the ballots," Jacqueline J. Neuhart, Director, asks if "anyone else heard about this [http://savetheballots.org]? The Lorain County Board of Elections responds, in part, "Someone should tell them to give it up." (Ex. M, p. 2) Brown County Board of Elections responds, "Yes Brown County had heard about it." (Ex. M, p. 3) The Allen County Board of Elections responds, "I'm sorry, I'm just a little too busy trying to figure our how the government killed John Kennedy to deal with this. KC." (Ex. M, p. 3) "KC" refers to Keith Cunningham, Director of the Allen County Board of Elections.

These mocking comments, publicly circulated to all boards of elections, were made by the leadership of the Ohio Association of Election Officials. Keith Cunningham was President of the Ohio Association of Election Officials in 2005. (Ex. O) In response to his comment that figuring out how the government killed John Kennedy precludes dealing with retention of the ballots, the Lorain County Board of Elections responds, "The Trilateral Commission did." The current vice-presidency of the OAEO is held by the Lorain County Board of Elections Deputy Director Marilyn A. Jacobcik. This e-mail conversation continues with further derisive comments between the Lorain County Board of Elections and Allen County Board of Elections regarding the retention of the 2004 ballots. The Ashtabula Board of Elections concludes the conversation with comments regarding the 2004 election, including, "get over it already." (Ex. M)

A review of the ballots submitted and letters of explanations demonstrates the depth and scope of defiance of this Court's orders and suggests that some of the county boards of elections have concealed and/or misrepresented *why* the ballots were destroyed, the *dates* the protected materials were destroyed, or even *what* they delivered to the Ohio Secretary of State.

For example, under the leadership of the former OAEO president, Keith Cunningham, Allen County destroyed the majority of their ballots (voted, unvoted, absentee, provisional, and soiled), allegedly due to water damage, "on or about August 20, 2006," a few weeks after the above e-mail exchange but, according to their letter, before receiving notice of this Court's orders. In the picture Keith Cunningham submitted to the Secretary of State to verify the water damage, there is a child's swimming pool on top of the damaged ballot boxes. (Ex. P, also in Ex. A) It remains

9

unclear why a small swimming pool, set on its side, rests on the ballot boxes in this photograph taken to document water damage. Lorain County failed to produce their unused ballots and ballot pages. (Ex. Q, also in Ex. A) It has submitted no letter of explanation.

Steven Harsman, currently Director of the Montgomery Board of Elections, was president of the OAEO in 2006. Montgomery County allegedly destroyed *all* its ballots. (Ex. R, also in Ex. A) Mr. Harsman claims reliance upon the records destruction form he signed, which is dated August 31, 2006, the very date the boards of elections received notice from Plaintiffs' counsel to retain the records. (Ex. R, p. 2) According to his letter of explanation, the Montgomery County Board of Elections "contacted our county prosecutor for further authorization." (Ex. R, p. 3)

Matthew Damschroder, Director, Franklin County Board of Elections, was president of the OAEO in 2007. Contrary to the SOS inventory, which shows all ballots submitted for Franklin County, Mr. Damschroder does not submit unvoted ballots nor a letter of explanation. (Ex. S, p. 5, also in Ex. A) The Franklin County Board of Elections has been alleged to play a key role in the 2004 election in the instant action; Mr. Damschroder's unwillingness to comply with previous orders from this Court is a matter of public record.[4]

Mahoning County, which produced the OAEO president in 2004, Michael Sciortino, currently Mahoning County Auditor, and Director of the Mahoning Board of Elections from 1999 to September 2005, allegedly shredded most of their 2004 ballots on

---

[4] Mr. Damschroder was ordered by this court to provide paper ballots to voters due to excessively long lines in select areas of Franklin County. This order was appealed to the Sixth Circuit by the Franklin County Board of Elections, which affirmed this Court's order. It is a matter of public record that no paper ballots were provided. *Ohio Democratic Party v. Blackwell, et al.*, C2 04 1055, Nov. 2, 2004 (Marbley, J.)

March 23, 2007. (Ex. T, also in Ex. A) Shannon Leininger, Ashland County Board of Elections Director, is currently President of the OAEO. The Ashland County Board of Elections allegedly destroyed all their unvoted ballots, claiming reliance on the records retention schedule. (Ex. U, also in Ex. A)

Coshoctan County also failed to submit unvoted ballots; it submitted no letter of explanation. (Ex. V, also in Ex. A) Morgan County, no unvoted ballots, no letter of explanation. (Ex. W, also in Ex. A) Marion County allegedly destroyed *all* ballots before notice of court order, no letter of explanation. (Ex. X, also in Ex. A)

A day after this Court's order of April 6, 2007, according to the letter submitted by the Holmes County Board of Elections, a shelf fell on a table in their offices, spilling a full carafe of coffee and leading to the destruction of voted ballots, stubs, soiled and defaced ballot envelopes, and ballot accounting charts from the 2004 General Election. (Ex. Y, also in Ex. A) The Ashtabula Board of Elections, which wrote on August 7, 2006, in reference to the discussion over the save the ballots website, "Get over it already, "allegedly destroyed all ballots "just prior to receipt by the Board of Judge Marbley's order," according to the letter submitted by Thomas L. Sartini, the prosecuting attorney for Ashtabula County (Ex. Z, p. 1, also in Ex. A) This contradicts the board's own explanation, which states the ballots were disposed of "before the May 2006 primary." (Ex. Z, p. 2).

Finally, the Guernsey County Board of Elections, which started the above e-mail exchange, reports that the unvoted ballots as well as the punch card ballot pages were accidentally picked up as trash by a county maintenance worker; the day or period of time is not mentioned. (Ex. AA, also in Ex. A)

Jacqueline Neuhart, Director of the Guernsey County Board of Elections, also submitted "all documentation that this office has surrounding the events that involve the notices received from the Secretary of State's office concerning the order to maintain the 2004 ballots." (Ex. AA, p. 5)  She includes Directive 2006-69, which provides the records retention policies, the facsimile transmission from counsel for Plaintiffs on August 23, 2006, marked "urgent," as well as the entire text of the August 23, 2006 letter. She also submits an e-mail from Ed Pankus, Statewide Advocacy Consultant at Secretary of State Blackwell's office, dated Friday, September 1, 2006 and marked high importance, advising her, "It seems it is ultimately up to the board to consult with the county prosecutors office to receive the guidance on the destruction of ballots in light of the letters you referenced." (Ex. AA, p. 12). Ms. Neuhart, on Friday, September 8, circulates another e-mail to "All Counties," subject, "any word yet?" and copies the link to an online article from examiner.com reporting on this Court's order requiring preservation of the ballots.  She is instructed that the September 1 directive is relevant to the order.  Further, that the Secretary of State Blackwell's office is "working on another communication to send out to the boards." (Ex. AA, p. 13).

Another e-mail exchange occurs on Friday, September 8, 2006.  It is begun by Lisa Brooks, is marked of high importance, and its subject is "SOSKL Court Order Granting Ds Memo of Law." It does not indicate what "Ds" signifies. Attached is this Court's order of September 7, 2006.  The boards are advised to "contact and share this information with your local prosecuting attorney." (Ex. AA, pp. 14-18)

The Ohio Association of Election Officials plays a significant role in the policies and procedures of the Ohio Secretary of State's office and for Ohio's 88 county boards of

elections. For example, it drafts at least some of the actual policies and procedures for the Secretary of State's office. An October 20, 2004 memorandum to all county boards of elections, entitled "Challenger and Witnesses" was jointly issued by Pat Wolfe, the staff member at the Secretary of State's Blackwell's office in charge of directing elections, and Michael Sciortino, the President of the OAEO. The Memorandum specifically states: "The Ohio Association of Elections Officials (OAEO) has recommended policy and procedures for handling challengers at the polling place which are included in this memorandum." (Ex. BB, p. 2). Mr. Ockerman, the association's lobbyist, is also copied along with J. Kenneth Blackwell, staff member Pat Wolfe, and other secretary of state staff on e-mails dealing with the policies and procedures of the Secretary of State's office. For example, he is copied on a e-mail and memorandum sent to all counties on June 22, 2004 regarding voting information to be posted at the polls and on a June 10, 2004 e-mail and memorandum sent to all counties regarding polling place accessibility. (Exs. CC and DD) Mr. Ockerman is also copied, along with high-ranking staff in Secretary of State Blackwell's office, on a statement issued by Mr. Blackwell in reference to U.S. District Judge James G. Carr's ruling on provisional ballots. (Ex. EE)

Further, the OAEO, through its lobbyist Mr. Ockerman, also plays a critical role in communications among the boards of elections. For example, it was Mr. Ockerman who circulated an e-mail on April 13, 2004, to the majority of the county boards of elections regarding OAEO's response to the recommendations of the Ohio Legislative Ballot Security Committee, then studying the security of the electronic voting machines. (Ex. FF)

Attached to the e-mail was a letter from the leadership of the Ohio Association of Election Officials at that time (Michael Sciortino, Director of Mahoning County Elections, and President of OAEO in 2004, and Keith Cunningham, Director of Allen County Elections, and First Vice-President of OAEO in 2004). In this letter to the leadership of the Ohio Legislature, Speaker of the House Larry Householder and Senate President, Doug White, they write:

> Congressman Bob Ney, the primary sponsor of the Help America Vote Act and former member of the Ohio General Assembly, has expressed to us his apprehensions with the committee's recommendations. The OAEO shares many of those same concerns. We ask you to quickly, but deliberately, remove the doubts developed unintentionally by the Ballot Security Committee . . . . (Ex. FF, p. 2) [5]

The above e-mail is also copied to Paul Tipps. (Ex. FF, p. 1). Paul Tipps and Neil S. Clark are founders of State Street Consultants, and Mr. Clark was a lobbyist for Election Systems and Software (ES & S), 2002 and 2003, and for Diebold, 2004 and 2005. Mr. Ockerman, who is with State Street Consultants, was also a registered lobbyist for ES & S in 2003. Clark is currently a registered OAEO lobbyist. (Ex. GG) The OAEO itself is a

---

[5] Bob Ney subsequently pled guilty to a conspiracy to commit multiple offenses, including honest services fraud, making false statements, and violations of his former chief of staff's one-year lobbying ban, and with making false statements to the U.S. House of Representatives. Ney admitted that he engaged in a conspiracy beginning in "approximately 2000 and continuing through April 2004, wherein he corruptly solicited and accepted a stream of things of value from Abramoff, Abramoff's lobbyists, and a foreign businessman, in exchange for agreeing to take and taking official action to benefit Abramoff, his clients, and the foreign businessman." http://www.usdoj.gov/opa/pr/2007/January/07_crm_027.html. The date of this e-mail (April 2004) falls within the time period of his admitted conspiracy.

The e-mail from lobbyist Ockerman circulated to the majority of election officials at the county level also includes articles written across the state to support the position of the OAEO. Many are editorials with no author name: *Cincinnati Enquirer, Mansfield News Journal, Toledo Blade,* and *Akron Beacon Journal.* (Ex. FF, pp. 3 to 9)

501(c)(6) non-profit corporation, formed to "foster a closer association and better understanding between Members, Directors, and Deputy Directors . . . . to establish and maintain uniformity and certainty in the customs of the various Boards of Elections and the interpretation of the laws of Ohio relating to elections . . . ." (Ex. HH, p. 3). It was incorporated in the State of Ohio in 1991. (Ex. HH, p. 2) Jody Beall O'Brien, who is also copied on the above e-mail (Ex. FF, p. 1) is the statutory agent. (Ex. II)

The OAEO meets physically twice a year, usually in Columbus, in conjunction with staff and officials from the Ohio Secretary of State's office. Dues and travel expenses for participating in the twice yearly conferences are paid for from public funds, and election officials, including staff, attend these conferences while on the public payroll. (Ex. JJ) The winter OAEO conference, held on January 23, 2004, included a session on record retention. (Ex. KK) Mr. Ockerman is in regular communication with the leadership of the OAEO on both specific legislative matters and broader matters on election-related activities in Ohio. (Ex. C, pp. 5 to 8) Mr. Ockerman continues to serve in an official capacity with the Ohio Secretary of State's office as the OAEO lobbyist. For example, he met with the current Secretary of State Jennifer Brunner to suggest the names of those officials to be involved in the Project EVEREST study, a study of the reliability of the electronic voting systems. (Ex. LL)

Although the instant motion is not brought to enforce Ohio's public records laws, the Intervenor-Plaintiffs have met with limited success in obtaining public records from the boards of elections, Ohio State Auditor Mary Taylor's office, and Ohio Secretary of State Brunner's office in reference to the 2004 ballots. Although several of these requests are admittedly detailed, there has especially been a failure by the majority of boards of

elections to respond, and the majority of records requests remain unfilled. (Ex. MM) Further, the Intevenor-Plaintiffs have made several public records requests to the boards of elections regarding the OAEO. On February 19, 2008, Paddy Shaffer, Director, OEJC was notified by Mary Amos Augsburger, of Squire, Sander & Dempsey, L.L.P., that, *inter alia*, correspondence between the current president of the OAEO, Shannon Leininger, Ashland County Board of Elections and Mr. Ockerman were not public records. (Ex. NN). Further, at least one prosecutor has publicly advised a board of elections not to send records requested as discovery in a lawsuit. (Ex. OO)

It is also undisputed that the Defendant Blackwell himself and his staff were aware of their affirmative and sworn duty and role in the destruction of the ballots as well as their affirmative duty to preserve all records that would be discoverable in the instant action. As the above facts and supporting exhibits demonstrate, his office and staff were in constant communication with the boards of elections regarding counsel's letters and this court's orders. As the state's chief elections officer, the secretary of state's office is necessarily in constant communication with the boards of elections. For example, the office of Ohio Secretary of State Blackwell held daily conference calls for every board of elections in the time period leading up to the 2004 election. (Ex. PP).

Finally, the issue of retaining 2004 election material was also raised in *League of Women Voters, et al. v. Blackwell, et al.*, Case No. 3:05-CV-7309 (U.S. District Ct. N.D. Ohio, J. Carr) in early 2006 when Intervenor-Plaintiff White requested a preservation order for material related to the election. In its Memorandum in Opposition to Intervenor-Plaintiff White's Motion to Lift the Discovery Stay and for a Preservation

Order (March 2, 2006), the Defendants in that case, which includes Defendant Blackwell, acknowledged that they

> already have a duty to take appropriate measures to preserve documents and information which are reasonably calculated to lead to the discovery of admissible evidence and likely to be requested during discovery. Issuing an order ordering the Defendants to comply with the federal discovery rules would be a superfluous and unnecessary undertaking. (Exhibit QQ, pp. 2 – 3)

As the facts in this case demonstrate, such an order was indeed rendered superfluous despite the safeguards in place at multiple branches and levels of state and county government, including the attorney general's and state auditor's office, and despite this Court's repeated orders.[6]

## II. Analysis

### a. Criminal Contempt

Article III courts and the judges appointed pursuant to Article III are vested with the "judicial power," which is the power to decide those cases and controversies that fall under one of the enumerated categories of jurisdiction. U.S. CONST. art. III, §§ 1, 2; 28 U.S.C. § 1331. The Supreme Court has consistently stated that the power to punish contempt is part and parcel of the judicial power. *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 800, 107 S. Ct. 2124, 2134 (1987); *Michaelson v. United States ex rel. Chicago, St. P., M., & O. Ry. Co.*, 266 U.S. 42, 65-66, 45 S. Ct. 18, 19-20 (1924):

> Courts of the United States, when called into existence and vested with jurisdiction over any subject, at once possess the inherent authority to initiate contempt proceedings for disobedience of their orders, and such power is a necessary and integral part in insuring that the judiciary has a

---

[6] Because the instant action is a section 1983 suit against Defendant Blackwell in both his official and individual capacity, he remains a Defendant in this suit.

> means to vindicate its own authority without complete dependence on
> other branches and is absolutely essential to the performance of the duties
> imposed on courts by law.

*Young*, 481 U.S. at 800, 107 S. Ct. at 2134.

*See also International Union, UMW v. Bagwell*, 512 U.S. 821, 833, 114 S. Ct. 2552,

2560, 129 L. Ed. 2d 642 (1994). To warrant a finding of civil contempt, the moving party

must prove by clear and convincing evidence that the party to be held in contempt

violated a court order. *See Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1241 (6th Cir.

1996). The order in question must be "definite and specific," and "ambiguities must be

resolved in favor of persons charged with contempt." *Id.* (internal quotation marks and

citations omitted). *U.S. v. Conce*, 507 F.3d 1028 (6th Cir. 2007), *cert. denied*, 2008 U.S.

Lexis 3988 (U.S., May 12, 2008) (defendant incarcerated until he complied with post-

judgment discovery).

This Court's order could not have been more definite and specific: it enjoined

"directly each Ohio county's board of elections from destroying" the ballots; it further

specified that failure to comply may give rise to contempt sanctions pursuant to Fed. R.

Civ. P. 37(b)(2)(D). In its opinion, the Court also specifically noted that the inherent

authority to "exercise personal jurisdiction over a nonparty is through its 'inherent

jurisdiction to preserve [its] ability to render judgment' and 'make a binding adjudication

between the parties properly before it.' *In re NAACP, Special Contribution Fund*, 849

F.2d 1473, at *4 (6th Cir. June 13, 1988) (quoting *United States v. Hall*, 472 F.2d 261,

265 (5th Cir. 1972))." In its opinion, this Court drew particular attention to the inherent

authority of the Court to "issue orders tailored to the exigencies of the situation" and the

past use of such authority to hold a defendant in criminal contempt:

The NAACP court further explained that federal courts can exercise their inherent jurisdiction and enjoin a non-party if the non-party's actions would "disturb in any way the adjudication of rights and obligations as between the original plaintiffs and defendants.". . . In *Hall*, the Fifth Circuit upheld a defendant's criminal contempt conviction after the defendant was found to have violated willfully a court-ordered injunction to not interfere with school desegregation. . . . In describing a district court's fundamental power to enjoin the actions of a non-party, the court held:

> School orders are, like in rem orders, particularly vulnerable to disruption by an undefinable class of persons who are neither parties nor acting at the instigation of parties. In such cases, *as in voting rights cases,* courts must have the power to issue orders similar to that issued in this case, tailored to the exigencies of the situation and directed to protecting the court's judgment.

*King Lincoln, et al. v. Blackwell*, 488 F. Supp. 2d 876, 880 (2006) (emphasis in original)

Under 18 U.S.C § 401, "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as— ... (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3). § 402 of Title 18, entitled "Contempts Constituting Crimes," provides:

> Any person, corporation or association willfully disobeying any lawful writ, process, order, rule, decree, or command of any district court of the United States or any court of the District of Columbia, by doing any act or thing therein, or thereby forbidden, *if the act or thing so done be of such character as to constitute also a criminal offense under any statute of the United States or under the laws of any State in which the act was committed,* shall be prosecuted for such contempt as provided in § 3691 [providing for jury trial in case not brought by, nor on the behalf of, the United States] of this title and shall be punished by a fine under this title or imprisonment, or both. 18 U.S.C. § 402 (emphasis added).[7]

---

[7] As provided by 18 U.S.C. § 3285, "No proceeding for criminal contempt within section 402 of this title shall be instituted against any person, corporation or association unless begun within one year from the date of the act complained of; nor shall any such proceeding be a bar to any criminal prosecution for the same

As specified in this Court's order and opinion, and as provided by O.R.C. § 3599.16, the members, directors, and employees of the board of elections are already under an affirmative obligation, by virtue of their positions of public trust, to perform their duties imposed by law and to refrain from hindering the objects of law. O.R.C. § 3599.16 provides, *inter alia*:

> No member, director, or employee of a board of elections shall:
>
> (A) *Willfully or negligently* violate or neglect to perform any duty imposed upon him by law, *or willfully perform or neglect to perform* it in such a way as to hinder the objects of the law, or willfully disobey any law incumbent upon him to do so; . . . [or]
> (F) In any other way willfully and knowingly or unlawfully violate or seek to prevent the enforcement of any other provisions of the election laws.
>
> *Whoever violates this §* shall be dismissed from his position as a member or employee of the board and *is guilty of a felony of the fourth degree.* Ohio Rev. Code § 3599.16, quoted on p. 4 of this Court's order and opinion issued September 11, 2006 (emphasis added); *King Lincoln, et al., supra* at 879, n. 4.

Thus, the violation by the boards of elections of this Court's order is of such character as to warrant criminal contempt proceedings pursuant to § 402.

Further, the violation by the boards of elections of this Court's orders is also of such character as to constitute a criminal offense under the following statutes of the United States: 18 U.S.C. § 1509 (obstruction of court orders); 18 U.S.C. § 371 (conspiracy to commit offense or to defraud the United States); 18 U.S.C. § 4 (misprision of felony); 18 U.S.C. § 241 (conspiracy against rights); and 18 U.S.C. § 242 (deprivation of rights under color of state law).

act." Because of continuing acts of concealment and/or misrepresentation, the Plaintiff-Intervenors assert that proceedings for criminal contempt are timely.

While a court has the authority to initiate a prosecution for criminal contempt, its exercise of that authority must be restrained by the principle that "only 'the least possible power adequate to the end proposed' should be used in contempt cases." *Young, supra,* at 754-55, 107 S.Ct. at 2134, citing *United States v. Wilson,* 421 U.S. 309, 319 (1975) (quoting *Anderson v. Dunn,* 6 Wheat., at 231). However, the ability to punish disobedience to judicial orders is regarded "as essential to ensuring that the Judiciary has a means to    vindicate its own authority without complete dependence on other Branches." *Id.* at 796, 2132. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls 'the judicial power of the United States' would be a mere mockery." *Id.* quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 450 (1911). As a result, "'there could be no more important duty than to render such a decree as would serve to vindicate the jurisdiction and authority of courts to enforce orders and to punish acts of disobedience.'" *Id.,* quoting *Gompers, supra.*

Plaintiffs submit that the county boards of elections made themselves their own judges of the validity of this Court's orders and had determined to disobey the orders, in many cases, even before they were issued, rendering the Court into a "mere board of arbitration whose judgments and decrees would be only advisory." *Id.,* quoting *Gompers, supra.* Criminal contempt sanctions, which are punitive, are appropriate in this case to vindicate the authority of this Court for disobedience that is past, a completed act, a deed that no sanction can undo. *Id.; Gompers, supra* at 441-443. The boards of elections were enjoined individually from destroying the 2004 ballots; ballots that were destroyed cannot be remade or reconstructed. Criminal contempt sanctions are also appropriate

21

because "such punishment tends to prevent a repetition of the disobedience." *Gompers, supra* at 443. Preventing the boards of elections from disobeying future court orders is of paramount importance since the boards of elections are responsible for conducting day-to-day election activities, including sensitive and critical election day matters, in full conformance with the law, including court orders. Specifically, criminal contempt would have the effect of preventing boards of elections from destroying protected election materials in the future. Finally, the underlying litigation in this case raises issues of significant public interest. Criminal contempt is appropriate because it inures not to the benefit of the Plaintiffs in this case, but to the public, since criminal contempt proceedings arising out of civil litigation "are between the public and the defendant, and are not a part of the original cause." *Young, supra* at 756-57, 107 S.Ct. at 2134, citing *Gompers*, 221 U.S. at 445.[8]

Intervenor-Plaintiffs submit that this Court would be well within its inherent authority to initiate criminal contempt proceedings against those individuals in positions of public trust who behaved in an illegal manner and disobeyed this Court's orders, thus thwarting resolution of the suit under this Court's jurisdiction and its accompanying request for redress of violated civil and constitutional rights.

**b. 18 U.S.C. §§ 3331-3332**

---

[8] *See also Chambers v. Nasco, Inc.* 501 U.S. 32, 41-42, 111 S. Ct. 2123, 2131 (1991) (upholding impositions of sanctions based on inherent authority to reach "acts which degrade the judicial system," including "attempts to deprive the Court of jurisdiction, fraud, misleading and lying to the Court."); *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 510, 517 (6th Cir. 2002), *aff'g First Bank v. Hartford Underwriters Ins. Co.*, 115 F. Supp. 2d 898 (S.D. Ohio 2000) (Marbley, J.) ("*Chambers* leaves to the district court's 'informed discretion' whether the applicable statutes or rules are 'up to the task' given the circumstances of the particular conduct. . . . [W]e likewise trust in the district court's 'informed discretion' when the circumstances require the exercise of its inherent authority."); *Kasper v. Brittain*, 245 F.2d 92 (6th Cir. 1957) (upholding criminal contempt sanction for violation of court order).

22

Given the complexity of the issues raised by this case, including the great number of boards of elections who violated this Court's order, the varying degrees of culpability that may be assigned to each board member, director, or employee, the significant public interest in promoting confidence in our public officials, especially those sworn to uphold the law in the administration of our elections, and finally, the considerable depth and breadth of the multiple violations of this Court's orders in preventing this Court from performing the duties imposed on it by law, the Plaintiffs move this Court to impanel a special grand jury pursuant to 18 U.S.C. § 3331(a).[9] As enumerated by 18 U.S.C. § 3332, the powers and duties of the special grand jury are as follows:

> (a) It shall be the duty of each such grand jury impaneled within any judicial district to inquire into offenses against the criminal laws of the United States alleged to have been committed within that district. Such alleged offenses may be brought to the attention of the grand jury by the court or by any attorney appearing on behalf of the United States for the presentation of evidence. Any such attorney receiving information concerning such an alleged offense from any other person shall, if requested by such other person, inform the grand jury of such alleged offense, the identity of such other person, and such attorney's action or recommendation.
>
> (b) Whenever the district court determines that the volume of business of the special grand jury exceeds the capacity of the grand jury to discharge its obligations, the district court may order an additional special grand jury for that district to be impaneled.

---

[9] 18 U.S.C. § 3331(a) provides, in part: "In addition to such other grand juries as shall be called from time to time, each district court which is located in a judicial district containing more than four million inhabitants . . . shall order a special grand jury to be summoned at least once in each period of eighteen months unless another special grand jury is then serving. The grand jury shall serve for a term of eighteen months unless an order for its discharge is entered earlier by the court upon a determination of the grand jury by majority vote that its business has been completed. If, at the end of such term or any extension thereof, the district court determines the business of the grand jury has not been completed, the court may enter an order extending such term for an additional period of six months. No special grand jury term so extended shall exceed thirty-six months, except as provided in subsection (e) of section 3333 of this chapter."

23

In addition to considering indictments, such special grand jury is authorized to issue a report, which may then become public, "concerning noncriminal misconduct, malfeasance, or misfeasance in office involving organized criminal activity by an appointed public officer or employee as the basis for a recommendation of removal or disciplinary action" 18 U.S.C. § 3333(a)(1).[10]  *See, e.g.,* In Re *Grand Jury Proceedings, Special Grand Jury 89-2* (Rocky Flats Grand Jury), 813. F. Supp. 1451, 1460; 1992 U.S. Dist. LEXIS 20812 (N.D. Colo. 1992) (special grand jury inquiry at Rocky Flats Nuclear Weapons Plant; "The power to release a report permits the special grand jury to publicize violations of the public trust where a public official's misconduct may be insufficient to establish a violation of criminal law." ); *see generally,*  Buchwald, Michael F., *Of the People, By the People, For the People: The Role of Special Grand Juries in Investigating Wrongdoing by Public Officials,* 5 Geo. J.L. & Pub. Pol'y 79 (Winter 2007) (reviewing legislative history and discussing Rocky Flats and Enron special grand juries).

According to the *Department of Justice's Criminal Resource Manual*, Reports of Special Grand Juries 159:

> The wording and the legislative history of 18 U.S.C. §§ 3332(a) and 3333(b)(1) indicate that a special grand jury should not investigate for the sole purpose of writing a report; the report must emanate from the criminal investigation. At bottom, then, a special grand jury functions essentially like a regular grand jury. It is only after the "completion" of the criminal investigation, when the time is near for discharging the jury, that a report may be submitted to the court under 18 U.S.C. § 3333(a). The grand jury will by that time have exhausted all investigative leads and have found all appropriate indictments.
>
> The "misconduct," "malfeasance," or "misfeasance" that may be the subject of a report (provided it is related to organized criminal activity) must, to

---

[10] "Public officer or employee" means "any officer or employee of the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any political subdivision, or any department, agency, or instrumentality thereof." 18 U.S.C § 3333(f)

some degree, involve willful wrongdoing as distinguished from mere inaction or lack of diligence on the part of the public official. Nonfeasance in office, however, if it is of such serious dimensions as to be equatable with misconduct, may be a basis for a special grand jury report. *See* S.Rep. No. 617, 91st Cong., 1st Sess. (1969), *reprinted in* 1970 U.S.C.C.A.N. 4007.

Reports involving public officials must connect "misconduct," "malfeasance," or "misfeasance" with "organized criminal activity." "Organized criminal activity" should be interpreted as being much broader than "organized crime;" *it includes "any criminal activity collectively undertaken."* This statement is based upon the legislative history of 18 U.S.C. § 3503(a), not of 18 U.S.C. § 3333, but both §s were part of the Organized Crime Control Act of 1970, making it logical to construe the term the same way for both §s. *See* 116 Cong. Rec. 35,290 (October 7, 1970).

. . . .

When appropriate, United States Attorneys will deliver copies of grand jury reports, together with the appendices, to the governmental bodies having jurisdiction to discipline the appointed officers and employees whose involvement in "organized criminal activity" is the subject of the report. *See* 18 U.S.C. § 3333(c)(3). . . .

U.S. Dep't of Justice, *Title 9 Criminal Resource Manual*, "Reports of Special Grand Juries" 159 (1997) (emphasis added).

The Plaintiffs submit that the actions of the individual members, directors, and employees

in defying this Court's order in spite of their affirmative and sworn duties as election

officials was not random but was criminal activity collectively taken, and is precisely the

type of collective criminal activity by public officials that the special grand jury

legislation was adopted to address. Further, at a minimum, the failure of the boards of

elections to comply with this Court's orders is equatable with criminal incompetence. As

detailed above, the boards of elections do not operate in an autonomous vacuum, but have

self-organized themselves under the umbrella of a quasi-private organization, the OAEO,

whose leadership demonstrated a public hostility to the subject of this Court's orders and

whose lobbyist provides regular communications not simply on matters of legislation, but

also on legal matters, and has served as a conduit for coordinating information and activity as well as served as a *de facto* agent and official of the Ohio Secretary of State's office since at least 2004.

Further, boards of elections are collective entities that work in concert with their local prosecutor, who frequently serves the boards by attending their meetings and rendering legal advice. That engaging in white collar criminal activity collectively taken may have become the banal custom for the OAEO or for the county boards of elections in concert with their prosecutor does not immunize it, its member boards, director, and employees, or county boards of elections and their prosecutors from compliance with the law, which includes Court orders, and which is indispensable for our constitutional system to be workable. That they acted as agents and/or under the direction of the Ohio Secretary of State or its staff in acting in concert with their prosecutors further does not immunize them. Compliance with the law, especially in the arena of elections administration, "is necessary if our freedoms and our democracy are to prevail." *Powell v. McCormack*, 395 U.S. 486, 548-49, 89 S. Ct. 1944 (1969); *Edwin Mundo-Rios v. Carlos Vizcarrondo-Irizarry*, 228 F. Supp. 2d 18 (D. Pr.R. 2002) (contempt sanctions against Puerto Rican legislators).

## III. Conclusion

For the foregoing reasons, Intervenor-Plaintiff OEJC and Named Plaintiffs respectfully request that their motion for Criminal Contempt and Special Grand Jury Proceedings be GRANTED.

Dated: July 9, 2008

Respectfully submitted,

*Paddy Shaffer*

Paddy Shaffer, *Pro Se*

2408 Sonnington Drive

Dublin, Ohio 43016

614-266-5283

paddy@columbus.rr.com

Dated: July 2, 2008

Respectfully submitted,

*Marlys Barbee*

Marlys Barbee, *Pro Se*
8137 W. Sharps Ridge Road
McConnelsville, OH 43756
740-962-2741
mjbarbee@emypeople.net

Dated: July 9, 2008

Respectfully submitted,

*Virginia Brooks*

Virginia Brooks, *Pro Se*

1196 Twp. Rd. 2116

Ashland, Ohio 44805

419-685-0299

varctormsl@bright.net

JUL-09-2008 10:25 From:THE UPS STORE 4695

Dated: July 7, 2008

Respectfully submitted,

Mark P Brown

Mark Brown, *Pro Se*
83 Hanford Street
Columbus, Ohio 43206
614-449-1989

Dated: July 7, 2008

Respectfully submitted,

Bruce Duncanson, *Pro Se*
947 E. Weber Road
Columbus, Ohio 43211
bruce@redpeacecross.com
614-747-4533

Dated: July 9, 2008

Respectfully submitted,

Marian Lupo

Marian Lupo, *Pro Se*
310 S. Eureka Avenue
Columbus, Ohio 43204
614-276-0948
marianlupo90@msn.com

Dated: July 8, 2008

Respectfully submitted,

Peter Jones, Ph.D., *Pro Se*
4098 Wagner Rd.
Dayton, OH  45440
937-320-9680
peter@poetics.org

Dated: July 9, 2008

Respectfully submitted,

Timothy Kettler, *Pro Se*
29674 Township Road 30
Warsaw, Ohio 43844
740-502-6453
tmkettler@aol.com



## Certificate of Service

I hereby certify that on July 10, 2008, the foregoing Motion to Intervene
was filed on paper in person with the clerk of court pursuant to U.S. District Court,
S.D.Ohio local Civil Rule 5.1( c). A true copy of this motion and accompanying exhibits,
except Exhibit A, which is already in their possession, was delivered by hand to the
following counsel of record:

Clifford O. Arnebeck, Jr.
Robert J. Fitrakis
1000 East Main Street, Suite 102
Columbus, Ohio 43215

Richard W. Coglianese, Trial Attorney
Damian W. Sikora, Assistant Attorney General
Constitutional Offices §
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
Counsel for Defendants

Paddy Shaffer, *Pro Se*
2408 Sonnington Drive
Dublin, Ohio 43016
614-266-5283
paddy@columbus.rr.com