# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KING LINCOLN BROWNSVILLE
    NEIGHBORHOOD ASSOCIATION,
*ET AL.*

                                          **CASE NO. 2:06-CV-00745**

            **PLAINTIFFS,**

**v.**                                       **JUDGE MARBLEY**

                                       **MAGISTRATE JUDGE KEMP**

**J. KENNETH BLACKWELL, ET AL.**

            **DEFENDANTS.**

## PLAINTIFFS' BRIEF ON JURISDICTION, DISCOVERY AND EVIDENCE  ISSUES IDENTIFIED BY THE COURT

### Statement of Facts and Background of this Case

On August 24 and 25, 2006, plaintiffs sent document hold notices to Ohio Secretary of State Kenneth Blackwell, by hand delivery, and to the boards of elections of all 88 counties, by fax and email, for the preservation of the 2004 ballots as evidence relevant to the issues in this impending litigation.

Plaintiffs filed this case on August 31, 2006, as a civil rights case by African-Americans and young people, as groups and individuals whose voting rights were adversely affected by the

-1-

conduct of the Ohio 2004 presidential election.  The suit sought declaratory and injunctive relief against an ongoing civil rights conspiracy.  The New York Times ran an exclusive story of the filing of this case on the front page of its national news section on the day the case was filed.

In early September 2006, two stories on this case issued from the national desk of the Associated Press.  The first story on September 1, 2006, reported on the press conference held by the plaintiffs on the previous day outside the federal court house.  The second AP story appeared on September 8, 2006, reporting on the court's issuance of  its order filed the previous day to Ohio's 88 Board of Elections to preserve the 2004 ballots.  Both of these AP stories were carried by the New York Times.

On October 9, 2006, Plaintiffs filed an Amended Complaint with additional plaintiffs -- Rainbow PUSH Coalition, Columbus Coalition on Homeless, additional named defendants, more civil rights violations and a constitutional civil rights challenge to Ohio's House Bill 3 voter ID provisions.

On October 26, 2006, by joint order, this Court associated this case with the case of *NEOCH v. Blackwell*, Case No. C2-06-896, filed for the sole purpose of challenging the constitutionality of House Bill 3's voter ID provisions.  With NEOCH taking the lead role in the prosecution of that claim, on October 26, 2006, this Court issued a temporary restraining order against the enforcement of House Bill 3's voter ID provisions.  The State of Ohio appealed to the 6th Circuit and obtained a reversal of this Court's TRO.  On remand this court worked with the parties to clarify and harmonize the interpretation and administration of the voter ID provisions of House

Bill 3 with the Constitution, and approved a consent order for that purpose on November 1, 2006.

On November 6, 2006, this court conducted an oral hearing on Plaintiffs' motion for injunctive relief seeking appointment of a special master to oversee the 2006 election. While declining to issue such an order, this Court made itself informally available to the parties to terminate the practice, in violation of the provisions of House Bill 3 and the consent order in the Northeast Ohio Coalition of the Homeless Case, of requiring inner city and university student voters to vote provisionally if their drivers license address did not match the address on their voter registration form.

This litigation was covered and reported by the Ohio state house press corp. Extensive press coverage had also been given, prior to the 2006 election, to Republican campaign finance scandals involving: 1) the illegal expenditures of the Ohio and U.S. Chamber of Commerce in Ohio Supreme Court elections between 2000-2004,[1] 2) a major joint investigation by the IRS and

[1]In 2005 Plaintiffs' trial counsel completed a four-year litigation project through two complete cycles in state and federal court. Because of the citizen groups Common Cause/OH and the Alliance for Democracy's success in this litigation in obtaining favorable rulings from the Ohio Elections Commission, they were joined in appellate litigation by the Constitutional Offices Section of the Ohio Attorney General's office. See Columbus Dispatch, January 29, 2005, by Jon Craig, "Funders of election attack ads revealed, TV spots aimed to sway voters against Resnick."

The first paragraph of this front page story of the Sunday, January 29, 2005, Columbus Dispatch described the case as follows:
    "One of the most strenuously fought for political secrets in Ohio history became public yesterday when the list of those who bankrolled the controversial campaign against Ohio Supreme Court Justice Alice Robie Resnick in 2000 was unveiled."

The story included a graphic listing of the corporate contributors by date, by amount and by

the FBI, under the supervision and coordination of the Public Integrity Section of the United

States Justice Department, which had assigned its top gun litigator to the case of a major

campaign finance conspiracy under the leadership of the same group responsible for the Ohio

Chamber of Commerce attack upon Justice Resnick in the 2000 election, namely: Larry

Householder, Bret Buerck and Kyle Sisk,[2] and 3) After the DOJ dropped that broader

investigation which implicated the entire Ohio Republican Party, it proceeded against the Tom

Noe campaign finance scandal in which a team of federal, state and county prosecutors obtained

a successful conviction.

    The Democratic Party swept most of the Ohio statewide offices in 2006 and gained control of

the Ohio House of Representatives. Paul Krugman of the New York Times, in *Conscience of a*

*Liberal* (2007), discusses at page 163 the existence of "a vast right-wing conspiracy" in the

United States that took control of the Republican Party. After noting the change of fortunes for

---

name. Citizens for a Strong Ohio spent a total of $4.2 million in the 2000 Ohio Supreme Court
race. The U.S. Chamber of Commerce spent an additional $3 million in companion ads, which
was confirmed by the testimony of Chip McConville of the Ohio Chamber of Commerce in a
hearing before the Ohio Elections Commission, that found Citizens for a Strong Ohio in violation
of the corporate expenditure law and false statement laws of the State of Ohio.

[2]Prompted by a letter from an anonymous tipster with detailed inside information, a team of FBI,
IRS and U.S. Department of Justice over the course of 2004 through 2006 investigated the same
Republican fundraisers: Larry Householder, Brett Buerck and Kyle Sisk who were involved in
the $7 million attack upon Ohio Supreme Court Justice Resnick, for their illegal fundraising
practices in 2002 and 2004. Plaintiffs' trial counsel met with the FBI leader of the Department of
Justice team for this case to share information in regard to the Common Cause/OH and Alliance
for Democracy litigation against the Ohio and U.S. Chamber of Commerce for their gross
violations of Ohio's campaign finance laws with respect to the Ohio Supreme Court elections.

Ultimately the public integrity section of United States Department of Justice declined to proceed
with criminal indictments in this particular major investigation.

the Republican Party in the 2006 elections, as an apparent corrective trend in the United States,

Krugman at page 196 states as follows in regard to the possibility of election theft through the

manipulation of DRE voting machines:

> The truly frightening question is whether electoral cheating has gone or will go
> beyond vote suppression to corruption of the vote count itself. The biggest
> concern and hope involves touch-screen electronic voting machines. In August
> 2007 the state of California sharply restricted the use of touch-screen machines
> after an audit by the University of California researchers confirmed voting
> activists' worst fears: machines from Diebold, Sequoia, and other major suppliers
> are, indeed, extremely vulnerable to hacking that alters election results. This
> raises the question -- which I won't even try to answer -- of whether there was in
> fact electronic fraud in 2002 and 2004, and possibly even in 2006. More
> important, there is the disturbing possibility that the favorable political trends I'll
> discuss in the next chapter might be offset by increased fraud. And given the
> history of movement conservatism, such worries can't simply be dismissed as
> crazy conspiracy theories. If large-scale vote stealing does take place, all bets are
> off -- and America will be in much worse shape than even pessimists imagine.

Not long after their election in November 2006, Ohio Secretary of State Brunner and Ohio

Attorney General Dann, at a public meeting convened by Professor Vernon Sykes, expressed

interest in settling cases of merit that had been filed against Ohio Secretary of State Blackwell.

Senior staff of the Attorney General's Office, First Assistant Tom Winters and Deputy Ohio

Attorney Gen. Brian Laliberte[3], and counsel for the plaintiffs met and agreed upon a settlement

concept, on the basis of which they agreed to stand still in this litigation and joint file a motion to

stay the case. The settlement concept included a consent order correcting a long list of Ohio

election administrative practices that discriminated against the plaintiffs, and also launching an

---

[3] At that time Brian Laliberte was in charge both of the election cases filed against the Secretary
of State and the criminal division of the Ohio Atty. Gen.'s office.

investigation under the AG's new power to investigate election fraud in the 2004 election.  The idea of the Attorney General's office exercising its new power granted by House Bill 3, to investigate and prosecute election fraud, was in recognition of the major scale of such an investigation and its importance to deter future attempts to steal Ohio elections.  As a candidate, Marc Dann had specifically referred to this provision as the one good thing about House Bill 3.

Because of plaintiffs' work with the U.S. House of Representatives in 2004-2005, plaintiffs agreed to work on gaining federal support for the needed criminal investigation of the theft of the 2004 election of which Ohio was the national epicenter.[4]  There was mutual acknowledgment of the inadequacy of resources on the part of both plaintiffs and the state to criminally litigate the presidential election theft.

On February 5, 2007, the Ohio Atty. Gen. on behalf of the Ohio Secretary of State and plaintiffs filed a joint motion to stay this case, which was granted by the Court on February 15, 2007.

---

[4]John Conyers had regained the chairmanship of the U.S. House Judiciary Committee in the 2006 election.  Conyers' staff and Conyers personally had worked closely with the plaintiffs' counsel Arnebeck and Fitrakis in the assembling of facts and witnesses in the aftermath of the 2004 election, and Conyers had formally requested and obtained the opening of an FBI investigation of the apparent violations of state and federal laws in the 2004 election.  Conyers and his colleagues published a one hundred page report to Congress that provided the factual basis for the historic challenge of U.S. Rep. Stephanie Tubbs Jones and U.S. Senator Barbara Boxer to the Ohio Electoral College vote.

Plaintiffs' counsel Arnebeck and Fitrakis and President of plaintiff Rainbow PUSH,  Rev. Jesse Jackson met with Stephanie Tubbs Jones on January 2, 2005, at the offices of Rev. Otis Moss in Cleveland, Ohio to seek her commitment to make the challenge to the Ohio electoral college vote before the United States Congress.  Stephanie Tubbs Jones had previously served both as a judge and a United States attorney for Northern District of Ohio.  Stephanie Tubbs Jones publicly made that commitment the following day January 3, 2005 at the Riffe Center rally as she gave a vigorous speech before departing for Washington, D.C.

Following Laliberte's completion of the organization of the criminal division of the Ohio Attorney General's Office under his supervision, plaintiffs provided its special prosecutions section with copies of, literally, books of  documentation of the theft of the 2004 Presidential election with Ohio at the center.[5]

On April 6, 2007, the Court approved an agreed order to allow the Secretary of State to bring all the 2004 ballots into Columbus for centralized storage under her supervision.

A front page Aug 12, 2007, article in the Cincinnati Enquirer, "Order to preserve ballots ignored, Result of 2004 vote cannot be verified," reported upon the widespread destruction of Ohio 2004 ballots, irrespective of federal law and this Court's order.

On December 14, 2007, the Ohio Secretary of State's office released the results of the Evaluation & Validation of Election-Related Equipment, Standards & Testing (EVEREST) study which concluded that touchscreen electronic voting machines were insecure and highly vulnerable to hacking with relative ease.  Based on this combined scientific/academic and industry study Secretary of State Brunner recommended that touchscreen electronic voting machines no longer be used in the state of Ohio elections.  The EVEREST Study received national press coverage and earned OSOS Brunner a prestigious Profiles in Courage Award from the Kennedy family in May 2008.

---

[5] *What Went Wrong In Ohio: The Conyers Report on the 2004 Presidential Election* (2005), Bob Fitrakis et al., *What Happened in Ohio? A Documentary Record of Theft and Fraud in the 2004 Election* (2006), Steven F. Freeman et al., *Was the 2004 Presidential Election Stolen?* (2006),, and a major investigative piece by Robert Kennedy, Jr. "Was the 2004 Presidential Election Stolen?" in the June 2006 issue of the Rolling Stone Magazine, and Richard Hayes Phillips, *Witness to a Crime* (2007).

Early in the second week of May 2008, plaintiffs' trial counsel had dropped by the office of Paul Scarsella, Section Chief for Special Prosecutions Ohio Attorney General's Office, to deliver a hard copy of Richard Hayes Phillips, *Witness to a Crime* (2007).  Plaintiffs' trial counsel was asked: "Whom do you want us to indict?"

Essentially no discovery had occurred in either the  *Moss v Bush* voter contest action before the Ohio Supreme Court nor in this *King Lincoln v. Blackwell* case*.*   Secretary of State Brunner's motion to lift the stay to obtain the ballots and an accounting of the ballots from the 2004 election for a state depository in Columbus had revealed the widespread destruction of 2004 ballots, in violation of both federal law and the specific order of this Court that the ballots be retained until further order of the court.

 A group of academic researchers functioning under the rubric of ePluribus Media discovered and reported, shortly after the 2006 election, that a partisan Republican company, SmarTech, was hosting the Ohio Secretary of State's vote count for both the 2004/2006 elections.  Collaborative research with a member of this network, holding a PhD in a scientific field, and establishment of a fact/expert relationship with Stephen Spoonamore led to plaintiffs' counsel Arnebeck and Fitrakis meeting with U.S. House Representatives Chairman of the House Judiciary Committee, John Conyers, and U.S. House Representatives Chairman of the Subcommittee on Government Operations Oversight, Kucinich, to discuss the possibility of bringing witnesses Stephen Spoonamore and Michael Connell before their respective committees.   This was in fulfillment of plaintiffs' commitment to help gain federal involvement in the inquiry into the election theft of 2004 as part of the settlement concept for this case.

This collaboration was also the basis upon which plaintiffs were able to establish relationship between Michael Connell's work on behalf of Karl Rove in elections, and Connell's work on behalf of the tobacco industry, the U.S. Chamber of Commerce and other industry groups, including the front group, Swift Boat Veterans for Truth, that operated as a purportedly independent expenditure group in the 2004 presidential election.  Plaintiffs' trial counsel had previously been involved in successful litigation against the Ohio and United States Chamber of Commerce in connection with their illegal expenditures of secret corporate money to influence the outcome of Ohio Supreme Court elections over the 2000 through 2004 election cycles.

Plaintiffs' counsel proceeded with research necessary for a targeted discovery plan that would enable them to answer the question of who was criminally responsible for the theft of the 2004 Presidential election.  This was in collaboration with the research staff of ePluribus Media and in consultation with Plaintiffs' new cyber security expert, who was a professional and political colleague of Michael Connell, the foremost expert in his fields of Web design and the interfacing of different computer systems and programs, and top computer guru for Karl Rove.

 The Ohio Chamber, with and through its Citizens for a Strong Ohio between 2000 and 2004, and with and through its Partnership for Ohio's Future since 2006, had been functioning as the Ohio conduit for the United States Chamber of Commerce and its various affiliates under the leadership of its President Tom Donahue.  An OEC finding of making illegal corporate expenditures had been rendered against the US Chamber in 2001 and became final shortly after the court's decision in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).  A similar findings  against the Citizens for a Strong Ohio along with a finding of having made false

and defamatory statements against Justice Resnick in the 2000 election was made by the Ohio Elections Commission on November 10, 2005.  During this period the primary role of the Ohio Chamber of Commerce and its various affiliates had been to finance expenditures to determine Ohio Supreme Court elections in favor of Republican candidates, so that legislation enacted in favor of business interests and detrimental to the interests of the general public would not be found unconstitutional.

On July 17, 2008, plaintiffs held a news conference coincident with their filing of a motion to lift the stay to conduct limited discovery and serving of document hold notices for Rove's Emails and the U.S. Chamber's documents.  Plaintiffs identified Rove as the principal perpetrator of a RICO conspiracy and Connell as the key witness.  Plaintiffs' cyber security expert Stephen Spoonamore participated by speaker phone in an hour long conference that the Chief of AP's Columbus Statehouse Bureau, the Columbus Dispatch and the Columbus Examiner reporters attended.

Within days an anonymous informant, identifying himself as from within the McCain Campaign and having issues with the campaign, advised Plaintiffs they were correct in targeting Rove, that Rove had made threats against Connell, not directly but through an intermediary.  The informant also reported that the center of the vote stealing activity was not Ohio, but rather, was Enterprise, Alabama.

An agreed order lifting the stay for the limited purpose of conducting a discovery  deposition of Michael Connell and others as agreed upon between Ohio Secretary of State Brunner and the plaintiffs was filed on September 9, 2008.

Connell came into his office for the specific purpose of personally accepting service of plaintiffs' deposition subpoena.

Plaintiffs' subpoena to Michael Connell asked for the architecture maps for the 2004 and 2006 elections.  These were produced, in advance of Connell's deposition, by the Ohio Attorney General's office.  The  importance of the 2004 election IT architecture map, Attachment 1 hereto, was set forth in Stephen Spoonamore's declaration, submitted to the Northern District Ohio Court, describing this exhibit as indicating an apparent set up of a classic "man-in-the-middle"/"kingpin" attack upon the integrity of the 2004 election.  Case: 1:08-mc-00105-SO  Doc #: 2-8  Filed:  10/29/08  1 of 4.  PageID #: 49.  At paragraphs 6-7 Spoonamore declared as follows:

> The SmartTech system was set up precisely as a KingPin computer used in criminal acts against banking or credit card processes and had the needed level of access to both county tabulators and Secretary of States computers to allow whoever was running SmartTech's computers to decide the output of the county tabulators under its control.

> After reviewing the system architectures provided last week, I again state that analysis is correct, and the architecture further confirms how this election was stolen.   The computer system at SmartTech had the correct placement, connectivity, and computer experts necessary to change the election in any manner desired by the controllers of the SmartTech computers

On November 3, 2008, plaintiffs took Connell's deposition.  (Attachment 2 hereto).   Mike Connell testified that SmarTech, the company that was servicing the Republican National Committee and the Bush Cheney campaign in the 2004 election, also had been selected by

-11-

Secretary Blackwell to mirror the election function of the Ohio Secretary of State's office on

its servers located in Chattanooga Tennessee.  According to Connell's testimony this included the

entire Secretary of State election function. That would include the real time statewide voter

database housed in the Ohio Secretary of State's office[6] as well as the vote tabulation system

housed on the Secretary of State's computer system using an Oracle database. (Connell Dep. Tr.

p. 20, l. 19-p.22, l. 18)

   It appears from Connell's testimony that he was responsible for creating the necessary

interface between the Oracle database of the Secretary of State's office and  the SmarTech

servers.  Oracle is typically used by banks, and is to that extent a "resource hog" as described by

Connell, because of the security features including creating an audit trail of persons making

authorized entries or accessing the information in the database.   (Connell Dep. Tr. p. 16, l. 20-p.

19, l. 12)

   When asked about the security features with respect to this data while it was on the

SmarTech servers Connell stated that he had nothing to do with that.  His function was simply

the operation of the Web site for the public presentation of data on the election.  (Connell Dep.

Tr. p. 27, l. 8-18)

---

[6] The personal service contract, Secretary of State contract No. 124, in which GovTech was
retained by the Ohio Secretary of State to assist in developing the request for proposals defining
an optimal statewide voter list application that is HAVA compliant, and assisting in the selection
of a HAVA compliant application was dated March 2003.  (Attachment 3 hereto) This contract
was independently obtained by the group Velvet Revolution pursuant to a public records request
to the Office of the Ohio Secretary of State.

Michael Connell was emphatic about Blackwell being responsible,  rather than Connell,  for

the presence of SmarTech in the 2004 Ohio election system.   (Connell Dep. Tr. p. 20, l. 19- p.

22, l. 2)  He testified that he included SmarTech in most of his contracts where his clients

required a server.  However, when asked about government contracts, he quickly stated that they

normally housed their own servers so that his reference to including them in his contracts

would have referred to his partisan political contracts with partisan political clients through

New Media Communications, rather than through the GovTech.   (Connell Dep. Tr. p. 45, l. 19-

p. 48, l. 8)

 The contract between the Ohio Secretary of State's office and GovTech dated 7-1-03

attached hereto as Attachment 4 hereto [7] is consistent with Connell's recollection that SmarTech

was placed in GovTech's contract as a subcontractor in paragraph 3.07.  It also contains

a provision that if GovTech desired to change the identity of its subcontractor for a mirror

function it would require the approval of the Ohio Secretary of State' s office.   Furthermore,

what purports to be the Exhibit B of that contract (Attachment 5 hereto), suggests that the

architecture of the set up for the tabulation, control and reporting of the 2004 Ohio election was

designed and proposed by AirNet, another name under which SmarTech does business.

The implications of this set up are that the Republican partisan entity, SmarTech, was

positioned to take full competitive advantage with computerized micro targeting of voters based

upon their historical and most current voting information -- for direct mail, telephone calls, help,

---

[7]This contract was independently obtained by the group Velvet Revolution pursuant to a public
records request to the Office of the Ohio Secretary of State which in turn provided it to the
plaintiffs.  Plaintiffs received Exhibit B from the same source.

obstruction or alterations in their voting experience and votes.

An exclusive McClatchy national news story issued on November 3, 2008, the day of Michael Connell's deposition, reporting on the deposition as well as the report of threats against Connell after he had been identified by the plaintiffs as a key witness in a racketeering claim against Karl Rove.

On December 19, 2008, six weeks after his deposition by the plaintiffs, Michael Connell's private airplane crashed coming into his home Akron-Canton Airport.  A national CBS/AP story reported on  the crash of Michael Connell's airplane against the background of his role as a key witness in this case.  A news release describing Mike Connell's airplane crash against the back drop of reported threats against him was published in the business section of  the online edition of the New York Times.  Then, in the December 28, 2008 "Year in Review" edition of the Cleveland Sunday Plain Dealer, Amanda Garrett wrote a front page news story "Mystery lingers on: GOP adviser's death in plane crash breeds speculation," saying the unfolding case "sounds like the plot of a John Grisham thriller."

Since that event Plaintiffs' counsel followed the lead given by the anonymous tipster that the election theft operation was based in Enterprise, Alabama.  Counsel proceeded to gather evidence from multiple witnesses with inside information concerning the high-tech criminal enterprise reportedly involved with the theft of elections in the U.S. over the past decade.

 The existence of a criminal enterprise, as suggested by the anonymous informant, centered in Enterprise, Alabama is not a matter of speculation or theory.  The FBI and Department of Justice

have successfully prosecuted elements of this enterprise over the years, including the prosecution

of the head of its major drug running operation, attorney Cliff Wentworth, the prosecution of

Billy Grice, responsible for the illegal theft and sale of advanced avionics from Fort Rucker,

Alabama, and of Walter Moody for his role in the assassination of the 11th Circuit Court of

Appeals Judge Robert Vance.

John Caylor, the leading private investigative reporter of this criminal enterprise, was

responsible for developing and publishing evidence of what was initially reported by the Georgia

police as the suicide of Florida Department of Transportation investigator Ray Lemme.  Ray

Lemme, two weeks before his reported suicide, had advised Clint Curtis, formally employed by

Yang Enterprises, that he had solved the mystery of election corruption and other forms of

corruption that Curtis had observed while working as an employee of Yang Enterprises.  Curtis

testified that while at Yang as a senior programmer he was asked by the Republican Speaker of

the Florida House of Representatives Tom Feeney, also functioning as a lobbyist for Yang

 Enterprises, to develop software that could switch the outcome of an election without being

detected.[8]

In 2009, a CIA expert on the rigging of elections in foreign countries described at a meeting

of the Election Assistance Commission just such a man-in-the-middle attack in the notorious

2004 Ukraine presidential election.  The unraveling of the Ukrainian presidential election fraud

---

[8] Plaintiff's counsel, Arnebeck and Fitrakis on December 13, 2004, presented Clint Curtis as a
witness before a group of Democratic members of the United States Congress at a hearing
convened by ranking member of the House Judiciary Committee,  US Representative John
Conyers.  Curtis was called at a segment of the hearing that was chaired by Charleta Tavares.

had the help of overheard cell phone conversations directing the cover-up of the rigging operation.

On March 3, 2009, the German Federal Constitutional Court declared that the electronic voting machines used in the 2005 Bundestag elections for the German national parliament were outside of the bounds of the German Constitution.

British journalist Simon Worrall spent a year developing his story about Mike Connell, originally intended for the Times of London but ultimately published in Maxim Magazine in 2010.  The story included the report to the FBI by an informant using the pseudonym of Watergate's "Deep Throat," of what purported to be a detailed after action report of the assassination of Mike Connell under the pretense that he was a national security risk.

Ohio Secretary of State Brunner proposed a bipartisan legislative approach to the elimination of DRE voting machines, but received no cooperation, and therefore, Ohio in the 2010 cycle, had its votes counted on hackable machines.  Exit polls, the gold standard for detecting election fraud, suggests those elections were hacked again.[9]

While the national political press presented a number of articles indicative of coordination

---

[9]  The "red shift" phenomenon is discussed in depth in Steven F. Freeman et al., *Was the 2004 Presidential Election Stolen?* (2006).  Professor Freeman, who  has continued to collaborate with Jonathan Simon, Executive Director of the Election Defense Alliance, maintains an election integrity blog on the ongoing exit poll discrepancy and problem of vote theft. Richard Charnin has written a book entitled *Proving Election Fraud Phantom Voters, Uncounted Votes, and the National Exit Poll,* in which he documents the extent of both pre-DRE forms of election fraud, involving the manipulation of punchcard ballots, and DRE machine manipulation of vote counts.

between Rove, on behalf of the 2010 Republican campaign, and various purportedly independent groups, no one other than plaintiffs' counsel have taken the position in litigation that there was coordination of expenditures sufficient to constitute in-kind contributions to the candidate's campaigns.

In the 2010 Ohio elections the Ohio Chamber of Commerce, with and through its Partnership for Ohio's Future, made undisclosed expenditures to influence Ohio elections.  In 2010 Ohio elections for both federal and state offices were being subjected to a high-tech state-of-the-art Jim Crow vote suppression and vote switching strategy across the ticket in favor of Republican candidates and to the detriment of Democratic candidates.

The strategic value of this litigation which seeks to expose the fraud in Ohio elections, a central target of such fraud in the United States, is indicated by the mainstream media coverage it has received.[10]

This case is unique within the United States in attempting to litigate election fraud in the counting of votes and secret coordination and money laundering in campaign contributions and expenditures to bring the margin of votes in the targeted elections close enough to be reversed by

---

[10]  These journalists must contend with the combined propaganda of Fox News and allied editorial boards preaching that electronic voting machines are wonderful, there is no such thing as electronic vote count fraud, and those who suggest otherwise are "conspiracy theorists." Conspiracy theorist is a term that originated, according to NYU Professor Mark Crispin Miller (Miller is the author of *Fooled Again* (2005) on the 2004 presidential election) from a CIA memo intended to counter books questioning the Warren Commission's account of the assassination of President John F. Kennedy.  In former Minnesota Governor Jesse Ventura's book, *American Conspiracies* (2010), co-author Richard Russell reports at page 134 on his 2008 conversation with Sen. John Kerry in which Kerry told Russell: "I know I won the election.  But by the time my lawyers could come up with a smoking gun in Ohio, it was too late."

a not too obvious fraudulent shifting of votes.

In conjunction with proceeding with this case plaintiffs are in the process of setting up a briefing with the US Department of Justice concerning the witnesses and evidence of the civil rights and RICO violations gathered by the plaintiffs in connection with this case.  This is necessary for the protection of witnesses having personal knowledge of criminal activity, the parties, and others in recognition that the level of organization and influence of the reported racketeering conspiracy requires the active awareness, monitoring and involvement to whatever extent deemed necessary and appropriate by the US Department of Justice.

## Issue (1): Whether the Eleventh Amendment of the United States Constitution precludes subject matter jurisdiction before this Court

"The Eleventh Amendment and the principle of state sovereignty, which it embodies . . . are necessarily limited, by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976).

In December of 2006 Ohio Secretary of State J. Kenneth Blackwell filed a challenge to this Court's jurisdiction on grounds of mootness.  The voters of the state had elected both a Democratic Secretary of State Jennifer Brunner and a Democratic Atty. Gen. Marc Dann. The plaintiffs and the new Secretary of State moved to stay this case for the purpose of pursuing a settlement before a response was due to Secretary of State J. Kenneth Blackwell's previous motion.  Now, with the change of both the Secretary of State and Atty. Gen. offices back to Republicans, Jonathan Husted

and Michael DeWine, respectively, counsel for the defendants moved to proceed with the case by setting a case schedule.

Pursuant to Civil Rule 15 (a) (2) plaintiffs should be permitted in the interest of justice to amend their complaint, including modifying their request for relief as would be appropriate in relation to developments since the case was stayed.   Furthermore, pursuant to Civ. R. 15 (d) plaintiffs should be permitted to supplement their complaint to set out transactions, occurrences, or events that have happened after the date they first amended their complaint.

While Secretary of State Jennifer Brunner conducted a major review of the reliability and security of electronic voting machines, the EVEREST study, and recommended to the Governor and Legislature that they be replaced, she did not decertify them. Secretary of State Brunner did remove from the Secretary of State's office GovTech, the company then run by Michael Connell, and SmarTech, the company owned by Mercer Reynolds, the Bush-Cheney campaign finance chairman for the 2004 presidential election, and run by Jeff Averbeck. Averbeck, had been identified as Karl Rove's principal implementor of electronic vote rigging by the anonymous informant who, after plaintiffs July 17, 2008, news conference called to report Rove's threat against Michael Connell.

The Columbus Dispatch reported that Secretary of State Husted has no problem with or concern about touchscreen electronic voting machines.

With respect to the argument that plaintiff's allegations of civil rights violations in the 2004 election and the request for relief made in 2006 should be treated as moot, and therefore outside the subject matter jurisdiction of the United States District Court, plaintiffs would make two points:

1) The irregularities, voter suppression, and vote rigging evidence in the 2004 election were and are capable of repetition, have been and are planned to be repeated in subsequent elections substantially conducted with electronic technology which evades review. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911).

The Help America Vote Act of 2002 mandated shift away from punch card ballots which were the preponderant method of voting in Ohio at the time. The Ohio legislature was persuaded not to allow the utilization of touchscreen electronic voting machines without a paper trail. This delayed the introduction of such machines until after the 2004 election. Thus, there was a paper trail of the fraudulent manipulation of the 2004 election. In subsequent elections, the use of the touchscreen electronic voting machines made the election substantially unauditable. Exit polling shows that vote shifting has continued to occur. However because of the prevalence of touchscreen electronic voting machines being used in the subsequent Ohio elections, the fraud is much more difficult to detect and subject to judicial review.

2) Plaintiffs should be permitted to amend their request for relief. To request seek injunctive relief against the continued use of touchscreen electronic voting machines except for use for handicapped voters. This would enable Ohio to follow the lead of California which did not have exit poll discrepancies in the 2010 election.

-20-

In their document hold notices issued coincident with their filing of a motion for relief from stay in this case, on July 17, 2008, plaintiffs stated  their intention to bring a claim in this case under the Ohio Corrupt Practices Act commonly referred to as Ohio RICO.   The Ohio statute adopted the federal RICO statute as its model, including all of the federal definitions of predicate acts and supplemented them, created a national scope of coverage comparable to the jurisdictional scope of the federal RICO statute.  It also adopted a specific statute of limitations which brings within its coverage every act that was part of the common pattern of corrupt activity where the last act in that pattern was committed within five years of the filing of the claim. This is an important improvement upon the federal RICO statute which did not have its own specific statute of limitations, and which has been subject to a narrowed scope through judicial interpretation.

Trial Counsel for the Secretary of State suggested that the United States District Court would not have jurisdiction over the state RICO claim being suggested by the plaintiffs.  However, under the statutory rules for determining allowable supplemental jurisdiction of the federal courts over state claims, plaintiffs believe their prospective state RICO claim addresses the same pattern of activity which is a part of their civil rights claim, and meets the other criteria for discretionary federal jurisdiction over such a claim.

This court would have discretionary supplemental jurisdiction over a prospective State of Ohio Corrupt Practices  Act claim with respect to which plaintiffs have previously issued document hold notices in regard to the Emails of Karl Rove and election related materials of the Ohio and U.S. Chamber of Commerce pursuant to 28 U.S.C. § 1367.

The Ohio Corrupt Practices Act claim does not raise a novel or complex issue of state law. Indeed the act has been utilized on behalf of the Lucas County Republican Party in an alleged election fraud context in *Mark Rubick, et al. v. America Coming Together, et al.*, Wood County, Ohio Common Pleas Case No. 04 CV 650, in which the Wood County Common Pleas Court denied a motion to dismiss on grounds that the act was not intended to apply in the context of alleged election fraud. The act was again utilized in *Miller, et al. v. ACORN*, United States District Court for the Southern District of Ohio Western division, Case Number 1:08 – CV – 797.  Republican plaintiffs sued ACORN for alleged election fraud in the Warren County, Ohio Common Pleas Court. The case was removed to federal court on diversity of citizenship grounds by ACORN. The burden of this litigation appears to have been a factor in shutting down ACORN, a major public interest group in the voter registration of minorities, the young and the poor.

The state act incorporates and extends the federal RICO definition of predicate acts, and essentially seeks to strengthen the reach of the federal act by its own specific and liberal statute of limitations. The Ohio Act was intended to be the strongest act in the United States in the nation's fight against the power and influence of organized crime, incorporating within its definition criminal acts committed in other states that are part of a common pattern of corrupt activity.

However, the supplemental jurisdictional issue is not ripe.  Plaintiffs intend to submit the considerable RICO evidence to the FBI, Department of Justice and state special prosecutors. Karl Rove has twice been criminally targeted by the Department of Justice.  The fact that he was

not indicted in the course of those special prosecutorial reviews is not an indication of innocence. The reviews would not have occurred, and he would not have been a target of them were there not reasonable grounds to believe that he was criminally culpable.

This is a civil rights case under 42 USC §1983 in which the burden upon the plaintiffs is to show that the practices of persons acting under color of state law are denying plaintiffs, their civil rights and equal protection and equal treatment under the Constitution and laws of the United States.

The practice of permitting the use of touchscreen electronic voting machines in partisan elections, when such machines are, according to every scientific test and measure are insecure against hacking, and in the face of abundant evidence that Jim Crow, that is the misuse of law and practice to curtail and obliterate the votes and the voting power of African-Americans, is sufficient to meet plaintiffs' burden of proof in the civil rights case.

**Issue (2): The Factual and Legal Bases for Deposing Local Chamber Of Commerce Members**

The civil rights claims set forth in the complaint and the first amended complaint relate to voter suppression, vote rigging and changing the outcome of elections so as to deprive the plaintiffs of honest government.  The purpose of the voter suppression and the vote rigging alleged in the amended complaint is not for spite, but rather is for the purpose of changing the outcome of elections by targeting the class of voters, of which the plaintiffs are representative, to obtain a government which is prejudicial to the rights and interests of the plaintiffs.

There are practical limits to how many voters can be suppressed and how many votes can be switched, even as part of a high-tech state-of-the-art Jim Crow vote suppression and vote switching strategy.  This is so, whether that strategy is being implemented by SmarTech operating within the office of the Ohio Secretary of State in the 2004 and 2006, or operating outside the office of the Ohio Secretary of State as in the 2008 and 2010 elections. High volume partisan commercial advertising is a means by which public opinion, as measured by pre-election polling, can be driven in the direction of the range within which voter suppression and vote rigging can potentially change the outcome of elections.

Evidence of the Chamber of Commerce as a nonparty funding elections and coordinating such funding, with those who are engaged in stealing elections to bring margins within the range that can be switched, is relevant to proving that elections are not just hackable, but are also being hacked, to the detriment of the plaintiffs.

Disclosure, as reaffirmed by the U.S. Supreme Court in *Citizens United v. FEC,* 558 U. S. 50, (2010) at page 55, is fundamental to enabling the press, the public and law enforcement authorities to follow the money, connect the dots and detect and expose corruption.

> With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. Shareholders can determine whether their corporation's political speech advances the corporation's interest in making profits, and citizens can see whether elected officials are " 'in the pocket' of so-called moneyed interests." 540 U. S., at 259 (opinion of Scalia , J.); see MCFL , supra , at 261. The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.

**Issue (3): The Evidentiary Basis for the Secretary Of State to Continue Storing Ballots Retained from the 2004 Election**

The evidence gathered thus far by the plaintiffs generally has been gathered without the benefit of normal litigation discovery processes. The exit poll discrepancy based upon unadjusted exit poll data, gathered and analyzed by consultants and expert witnesses to the plaintiffs in the citizen contest of the 2004 election before the Ohio Supreme Court, was the basis for which there was compelling reason to believe that the national popular vote and the popular vote in key electoral states, including Ohio, had been stolen. What the Rev. Jesse Jackson coined as the "Connally anomaly" was discovered by a Democratic operative, whom the general counsel of the Ohio Democratic Party had asked to report any signs of irregularity immediately after the 2004 election. The 12 southwestern Ohio counties that were included in this category had the anomaly of the presidential candidate, John Kerry, underperforming, in actual votes, the Democratic candidate for the Ohio Supreme Court Chief Justice position, Ellen Connally, as well as most other losing Democratic candidates in these predominantly Republican counties. The reason for the focus upon these 12 counties was that this single anomaly strongly indicated that the vote count manipulation in the presidential race in those 12 counties alone was sufficient to change the outcome of the popular vote in the state of Ohio in the 2004 presidential election. Secretary of State J. Kenneth Blackwell declined to make himself available for deposition in the Ohio Supreme Court election contest.

The best, concise, and graphical presentation of the state of the evidence of the 2004 presidential election is contained in the article written by Robert Kennedy Junior for the Rolling

-25-

Stone magazine, entitled, "Was the 2004 Presidential Election Stolen? Attachment 6 hereto.  Co-counsel Robert Fitrakis served as the primary fact checker of this extensively researched and documented summary of the evidence. Fitrakis was also the principal author of *What Happened in Ohio?* published by the New Press. Even the subsequent work of Richard Hayes Phillips in *Witness to a Crime* reflects a sampling of the ballot evidence selected on the basis of anomalies which stood out within the massive amounts of election data. There has to this date been no hand count of the Ohio ballots from the 2004 election[11] in the presidential race as was done in the case of Florida in the 2000 election.

The clearest indication of the geographical breadth of the irregularities in Ohio ballots in the 2004 election is the widespread destruction of parts or all of those ballots accounted for to the Ohio Secretary of State Brunner, when pursuant to order of this court, she directed the shipment of the ballots to her office, with an accounting of any missing ballots including missing unused ballots. In a paper ballot system a discrete number of ballots are printed for each county as part of the election audit process.  This is to account for all the ballots that were printed for each precinct as evidence for the fact that ballots unused by actual voters were not fraudulently substituted for ballots as cast by actual voters.

The major evidentiary discovery subsequent to the June 2006 article by Robert Kennedy, Jr. was made by investigators associated with E Pluribus Media shortly following the November 2006 election, that the vote count for the Ohio Secretary of State's office in that election was

---

[11] Green and Independent Parties filed for recounts in all precincts of all 88 counties of the state of Ohio for the 2004 presidential election at a cost to them in excess of $100,000.

being presented from servers located in Chattanooga, Tennessee owned by SmarTech. The November 2008 deposition of Michael Connell revealed that SmarTech mirrored the entire election computer system in the Ohio Secretary of State's office at its office in Chattanooga, Tennessee. Thus, the top Republican technical operatives for the 2004 presidential candidate appear to have had access to the voter database and the vote count information surrounding the 2004 election. The implication of this kind of partisan access to this important information is that Republican technical operatives were able to micro target, down to the individual voter, activities designed to either encourage or discourage voting, and activities designed to shift votes in a manner that would achieve the desired result for the Republican candidate in the election. Further, this means that such manipulations could be orchestrated by computer programming applied on a statewide basis.

Because of these circumstances all of the surviving ballots from the Ohio 2004 election should be retained during the pendency of this litigation. There is specific evidence of irregularities in all of Ohio's urban counties and in a substantial majority of all of Ohio's counties. The technical capability to micro target vote rigging activity down to the individual precinct level, and the evidence that the 2004 Ohio election was comprehensively manipulated strongly suggest that all the evidence should be retained at least until the discovery process and trial has been completed.

Plaintiffs have been informed by persons with inside knowledge of the identity of persons who directed the rigging of vote counts in the 2004 election. Plaintiffs should have the

opportunity to question those witnesses to determine the scope of their activity before it can be assumed that any county in Ohio went untouched.

Furthermore, as in the case of the Florida election from 2000, the ballots from the 2004 Ohio election should be preserved for historic purposes, to enable researchers even after this litigation has been completed to conduct further investigation and analysis.

Because of the importance of the issues in this litigation in relation to taking appropriate steps to ensure the integrity of future elections in Ohio and the nation, this litigation should proceed toward a speedy and just resolution as indicated in the Court's order of May 12, 2011. The $12,000 cost of storing all the ballots during this period is de minimis in relation to normal costs associated with litigation in federal court.

**Conclusion**

For the reasons set forth above plaintiffs request that the Court: 1) find that it has continuing jurisdiction in this matter, 2) allow plaintiffs to obtain the limited discovery they requested of the Ohio Chamber of Commerce and its in-state affiliates, and 3) order the Ohio Secretary of State to retain all of the 2004 Ohio ballots and other related materials that the court previously ordered to be preserved, continue to be preserved during the pendency this litigation.

Respectfully submitted,

*/s/Clifford O. Arnebeck, Jr.*
Clifford O. Arnebeck Jr. (0033391)
Trial Attorney for Plaintiffs
clifford.arnebeck@gmail.com
1021 East Broad Street

Columbus, Ohio 43205
614-224-8771

Robert J. Fitrakis (0076796)
robertfitrakis@gmail.com
1021 East Broad Street
Columbus, Ohio 43205
614-374-2380


Henry W. Eckhart (0020202)
henryeckhart@aol.com
Eckhart Law Offices
1200 Chambers Road, Suite 106
Columbus, OH  43212
614-461-0984
Counsel for Plaintiffs


## CERTIFICATE OF SERVICE

A copy of the foregoing was served upon counsel through the court's electronic filing system, this 15th day of July 2011.

/s/ Clifford O. Arnebeck, Jr.

_____

Clifford O. Arnebeck, Jr.