# COURT REPORTERS
## OF AKRON CANTON AND CLEVELAND

## Transcript of the Testimony of
# Michael L.  Connell

**Taken On:** November 3, 2008
**Case Number:** 2:06 CV 745

**Case:** King Lincoln Bronzeville Neighborhood Assn., et al., vs.
Ohio Secretary of State Jennifer Brunner, et al.,

Court Reporters of Akron Canton and Cleveland
Phone: 800-804-7787
Fax: 330-666-9833
Email: reporters@courtreportersinc.com
Internet: www.courtreportersinc.com

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

SOUTHERN DIVISION

- - -

KING LINCOLN BRONZEVILLE        )
NEIGHBORHOOD ASSN., et al.,     )
            Plaintiffs,         )
        vs.                     ) CASE NO.
OHIO SECRETARY OF STATE         ) 2:06 CV 745
JENNIFER BRUNNER, et al.,       )
            Defendants.         )

- - -


        Deposition of MICHAEL L. CONNELL, a witness
herein, called by the Plaintiffs for Examination
pursuant to the Federal Rules of Civil
Procedure, taken before me, the undersigned,
Binnie Purser Martino, a Registered Diplomate
Reporter, Certified Realtime Reporter and Notary
Public in and for the State of Ohio, pursuant to
Notice and agreement of counsel at the law
offices of Benesch, Friedlander, Coplan &
Aronoff, LLP, 200 Public Square, Suite 2300,
Cleveland, Ohio, on Monday, the 3rd day of
November, 2008, commencing at 12:03 o'clock p.m.

2

1    **APPEARANCES:**

2

3         On Behalf of the Plaintiffs:

4                 ARNEBECK LAW OFFICES

5         BY:     Clifford O. Arnebeck, Attorney at Law

6                 341 South Third Street, Suite 10

7                 Columbus, Ohio 43215

8                 614/224-8771

9                 AND

10                Robert J. Fitrakis, Attorney at Law

11                1240 Bryden Road

12                Columbus, Ohio 43205

13                614/253-2571

14

15        On Behalf of Defendant Ohio Secretary of

16        State Jennifer Brunner:

17                NANCY ROGERS, ATTORNEY GENERAL FOR

18                THE STATE OF OHIO

19        BY:     Aaron D. Epstein, Attorney at Law

20                Constitutional Offices

21                30 East Broad Street, 16th Floor

22                Columbus, Ohio 43215-3420

23                614/728-4735

24

25

3

1    APPEARANCES (CONTINUED):

2

3        On Behalf of the Witness:

4            BENESCH, FRIEDLANDER, COPLAN &

5            ARONOFF LLP

6    BY:    James L. Ervin, Jr., Attorney at Law

7            41 South High Street, 26th Floor

8            Columbus, Ohio 43215-6150

9            614/223-9300

10

11                        - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          I N D E X

2

3

4     EXAMINATION (By Mr. Arnebeck)              5

5

6

7      Plaintiff's Exhibit 1                    30

8      Plaintiff's Exhibit 2                    31

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1               MICHAEL L. CONNELL

2   of lawful age, a witness herein, having been

3   first duly sworn, as hereinafter certified,

4   deposed and said as follows:

5                    EXAMINATION

6   **BY MR. ARNEBECK:**

7   **Q.**   Good morning, Mr. Connell.

8   **A.**   I do.  I guess, yes.

9   **Q.**   Good afternoon, rather.  Thank you for

10  being here today.  Would you please state your

11  full name for the record?

12  **A.**   Michael L. Connell.

13  **Q.**   Would you give us your address?

14  **A.**   3046 Brecksville Road, Richfield, Ohio,

15  44286.

16  **Q.**   And just for the routine, would you

17  describe your education subsequent to high

18  school.

19  **A.**   I attended the University of Iowa,

20  graduated '86, no postgraduate work.

21  **Q.**   And subsequent to your graduation from

22  college, would you briefly just summarize your

23  work experience?

24  **A.**   1986, worked for Congressman Jim Leach in

25  Iowa.  1987, I went to work for the Bush for

6

1    President campaign in Iowa, then was transferred

2    to the Washington office, worked for the

3    inaugural in '88.  Is this the level of detail

4    you are looking for?

5    **Q.**    Yeah.

6    **A.**    Okay.  Worked for the inaugural in 1988,

7    1989, worked a year in the Department of Energy,

8    then went to work for Dan Coats for Indiana.

9         Then in 1991, I returned to Iowa and worked

10   for a group called Iowans against

11   Gerrymandering, for redistricting, then went to

12   New Hampshire, worked for the Bill Hatch

13   campaign.  Then after -- let's see, that would

14   have been the '92 cycle.

15        After the '92 election cycle, went to

16   Capitol Hill, worked for Congressman Martin

17   Hoke, and after that election cycle, I started

18   New Media Communications.

19   **Q.**    And where do other entities in which you

20   are a key player fit into the history of

21   GovTech, for example?

22            **MR. ERVIN:**        Are you asking just

23   about GovTech?

24   **BY MR. ARNEBECK:**

25   **Q.**    Were you going to continue?  I just

7

1   wanted --

2   **A.**   No, I mean -- I worked for New Media ever

3   since starting it.

4   **Q.**   Is GovTech a sister company, or what is the

5   relationship between New Media and GovTech?

6          **MR. ERVIN:**     And we are -- just

7   off the record real quick?

8          **MR. ARNEBECK:**   Sure.

9          (Thereupon, a discussion was held off

10          the record.)

11  **BY MR. ARNEBECK:**

12  **Q.**   If you don't mind, would you explain where

13  GovTech fits into the picture?

14  **A.**   There were governmental opportunities, and

15  we felt it made more sense to do that in a

16  separate company, as opposed to under the same

17  company as New Media Communications.

18      So really, a spin-off is a legal term, but

19  really a separate entity emerged and that was

20  GovTech.

21  **Q.**   Okay.  And when did that emerge?

22  **A.**   I believe we started doing GovTech --

23  government work in maybe -- I think it was '99,

24  I think is when we started; and I think it was

25  around 2000 that we decided to form GovTech and

8

1   get it formally incorporated, or formally -- it

2   is an LLC.  So I guess it would still be

3   incorporated.  So 2000, 2001.

4   **Q.**   And then you were involved in similar kinds

5   of activities politically in one forum, New

6   Media, and working for different governmental

7   entities under the GovTech umbrella?

8              **MR. EPSTEIN:**     Object to the form

9   of the question.  You can go ahead and answer.

10  I just have to say that for the record.

11             **MR. ERVIN:**     He can object to a

12  question and I can object to a question.

13             **THE WITNESS:**     Oh.  Then what

14  happens?

15  **BY MR. ARNEBECK:**

16  **Q.**   You can go ahead and answer.

17             **MR. ERVIN:**     You can go ahead

18  and answer, unless I tell you otherwise.

19             **THE WITNESS:**     Okay.

20             **MR. ERVIN:**     If you understand

21  the question.

22             **THE WITNESS:**     Yes, I just can't

23  remember what it was.

24             Similar, but different.  The GovTech,

25  for instance, you know, pursued and obtained a

9

1 GSA, a schedule, which is a fairly in-depth

2 process where they kind of check you out, make

3 sure that you have got competitive rates, the

4 whole nine yards.

5    It is really to keep Federal

6 Government contracting, you know, aboveboard and

7 prevent cronyism, quite frankly.

8    So similar activities, but different,

9 I guess.  Am I -- I mean, government, the

10 purpose of government is very different than the

11 purpose of a national organization or a campaign

12 or a different entity.

13    So, you know, but the programming

14 skill sets that were used at both were similar.

15 **BY MR. ARNEBECK:**

16 **Q.** Do you want to just briefly capsulize, as

17 you were doing up to 2000, follow that same

18 pattern of the basic kind of work that you are

19 doing, starting in 2000, where you are

20 functioning both in a New Media -- under a New

21 Media umbrella and GovTech's umbrella?

22   **MR. ERVIN:**  Can you be more

23 specific when you say what type of functioning?

24 **BY MR. ARNEBECK:**

25 **Q.** For example, you are working on which

10

1   political campaigns and which governmental

2   entities from 2000 to present?

3   **A.**   GovTech was not involved in any campaigns.

4   GovTech, again, is governmental.  I can't --

5   quite frankly, I don't get passionate about

6   governmental work usually the way I do about

7   more of the types of work, the political work,

8   the national organization work that is done by

9   New Media.

10       So I would be more hands off in terms of my

11   day-to-day involvement, if that is what you are

12   drilling on, my day-to-day involvement.

13   **Q.**   Sure.  I mean, just a sense for your

14   background.

15           **MR. ERVIN:**      Can you be more

16   specific?  I don't understand the question that

17   you are asking.

18           **MR. ARNEBECK:**      Well, I thought he

19   was doing a good job explaining his professional

20   activity over the course of time since college.

21   We got to 2000, we get the creation of GovTech,

22   and I was hopeful he could briefly capsulize the

23   same as he did before, from graduation to 2000,

24   just carry the timeline forward.

25           **MR. ERVIN:**      You want him to

11

1    talk about every person he has worked for since

2    2000?

3              MR. ARNEBECK:    No.  Let me just

4    ask specifically.

5              THE WITNESS:    Okay.

6    BY MR. ARNEBECK:

7    Q.   Are we correct in understanding that you

8    did do work both in the Jeb Bush campaign for

9    governor of Florida and then subsequently, as

10   GovTech, do work for the State of Florida?

11             MR. ERVIN:    Objection.  We are

12   here about the Ohio 2004 and 2006 election.  The

13   judge was --

14             MR. ARNEBECK:    Jim, we have all

15   this stuff, so we don't have to do this.  But in

16   terms of just a normal introduction, and if you

17   have an objection, we will go on.

18             MR. ERVIN:    Please.

19   BY MR. ARNEBECK:

20   Q.   Okay.  Well, as you know, Mr. Connell, we

21   have some questions that we would like your help

22   in addressing.

23        The threshold question that we have is,

24   have you been threatened in regard to giving

25   truthful testimony about the election of 2004 in

12

1   Ohio?

2           **MR. ERVIN:**        Before he answers,

3   this portion and that question must be sealed.

4           **MR. ARNEBECK:**     And that is agreed.

5   We are sealed from this point forward.

6           **THE WITNESS:**      No.

7   **BY MR. ARNEBECK:**

8   **Q.**   And when I say "threatened," this is any

9   form of expression, even if it is, you know, in

10  hypothetical terms or subtle terms, anything to

11  cause you to believe that Mr. Rove, through

12  communicating through someone else, is telling

13  you that if you were to expose certain aspects

14  of the 2004 election that might implicate him or

15  others in improper activity, criminal activity,

16  nothing of that sort has been communicated to

17  you?

18  **A.**   That's correct.

19  **Q.**   And specifically, Mr. Jeff Averbeck has not

20  had any communications with you in regard to

21  testimony which you might give concerning the

22  2004 election in Ohio?

23          **MR. ERVIN:**        Don't answer that.

24  Who is Jeff Averbeck?

25          **MR. ARNEBECK:**     Jeff Averbeck is

13

1    President of SmarTech.

2              MR. ERVIN:        You can answer the

3    question, if you know.

4              THE WITNESS:      To the best of my

5    recollection, Jeff and I have not discussed

6    this.

7    BY MR. ARNEBECK:

8    Q.   Okay.  So were you aware that we -- you

9    have read the materials that we had received a

10   tip from someone purporting to be within the

11   McCain campaign, indicating that such a threat

12   had been communicated to you?

13             MR. EPSTEIN:      Objection.

14             MR. ERVIN:        Objection.  What

15   materials are you -- objection to form.  What

16   materials are you referencing?

17             MR. ARNEBECK:     When we filed in

18   opposition to your motion to compel, and our

19   request for the immediate hearing, we attached

20   the declaration of Brett Kimberlin, part of

21   which he recited the series of tips that had

22   come into him, anonymous tips that had come into

23   him.

24   BY MR. ARNEBECK:

25   Q.   I am just asking if you read that or are

14

1    familiar with that?

2         **MR. ERVIN:**        Don't answer that

3    question.  The judge said this is not about the

4    2008 election.  This is about 2004 and 2006.

5    The judge indicated you had some leeway as it

6    pertained to Mr. Rove, but asking about the

7    McCain campaign involves the 2008 election.

8    That is outside the scope of the judge's order.

9         **MR. ARNEBECK:**     My specific

10   question was in regard to testimony concerning

11   the improper activity in the 2004 Ohio election

12   that would implicate Mr. Rove or others in

13   improper activity.

14        **MR. ERVIN:**        And Mr. Connell

15   answered no.  Your follow-up question was

16   whether he had knowledge about a tip regarding

17   the McCain -- from the McCain campaign.  That

18   deals with the 2008 election.

19        **MR. ARNEBECK:**     No, the tip, I am

20   asking if he is familiar with the tip, the fact

21   that we received a tip, and that the tip was in

22   reference to Mr. Rove attempting to intimidate

23   Mr. Connell in regard to testifying about the

24   2004 Ohio campaign.

25        **MR. ERVIN:**        So you are asking

15

1  if he read the information contained on the

2  memorandum in opposition?

3          MR. ARNEBECK:    Yes.

4          MR. ERVIN:       Did you read the

5  memorandum in opposition?

6          THE WITNESS:    I read what you

7  provided to me.  But there was nothing in there

8  about this.

9  BY MR. ARNEBECK:

10  Q.   So you are not familiar --

11  A.   No.

12  Q.   -- by that means or any other means --

13          MR. ERVIN:      Let him ask the

14  question.

15          THE WITNESS:    Okay.

16  BY MR. ARNEBECK:

17  Q.   -- that we were -- people working with us

18  received a tip indicating that you were being

19  threatened?

20          MR. ERVIN:      Objection.  Don't

21  answer that.  Asked and answered.  You are

22  asking -- you asked him if he was threatened.

23  He said "no."  Now you are asking him if he

24  knows whether you got a tip.  He indicated he

25  didn't read -- he doesn't know about that, and

16

1    he only read what I provided him.

2              MR. ARNEBECK:    Okay.  Are you

3    instructing him not to answer?

4              MR. ERVIN:      I am instructing

5    him not to answer.

6    **BY MR. ARNEBECK:**

7    **Q.**  All right.  Would you describe how you were

8    involved in the 2004 Ohio Presidential election?

9    **A.**  You are asking my personal involvement?

10   **Q.**  Yeah.

11   **A.**  Through New Media Communications, we were

12   the Web site developer to the Bush campaign, as

13   well as a vendor to the Republican National

14   Committee.

15   **Q.**  And how else?

16   **A.**  I am sorry, you asked --

17   **Q.**  Any further involvement?

18   **A.**  You mean -- I am sorry, ask the question

19   again.

20   **Q.**  How were you involved in the 2004 Ohio

21   Presidential election?

22              MR. ERVIN:      Personally or

23   professionally?

24              MR. ARNEBECK:   Both.

25              MR. ERVIN:      How were you

17

1   personally involved?

2           **THE WITNESS:**      I am just trying to

3   think of how else.  I mean, you know, I mean,

4   you know -- GovTech had --

5           **MR. ERVIN:**      You can answer that

6   question.

7           **THE WITNESS:**      Okay.  As I think

8   you know, the election night reporting system

9   was -- GovTech was involved in the election

10  night reporting.

11  **BY MR. ARNEBECK:**

12  **Q.**   And how were they involved?

13  **A.**   Basically, the Secretary of State needed

14  help in a system that, one, would stay up on

15  election night.  There had been problems

16  previously with the system being able to perform

17  under high traffic, and they also wanted

18  something that was attractive, that represented

19  the office well.

20      So it was a public -- I want to be clear on

21  this, it was a public reporting system, public

22  data.

23  **Q.**   And in designing or helping, providing the

24  help that the Secretary of State wanted, would

25  you elaborate on what the sequencing of that was

18

1    and how you were involved personally and

2    professionally in that work.

3              **MR. ERVIN:**       His answer must be

4    sealed from here on out.

5              **MR. EPSTEIN:**       I am going to

6    object to the form of the question.

7              **THE WITNESS:**       A number of pieces

8    were in place from previous elections.

9    Previously, it had been done internally by the

10   Ohio Secretary of State IT staff.  And if memory

11   serves, the problem was, everything was in

12   Oracle and they were trying to allow Oracle

13   queries to be done in real-time, and it was

14   something, quite frankly, that it wasn't

15   designed to do.  It wasn't -- it was a

16   resource -- quite frankly, it was a resource

17   hog.

18   **BY MR. ARNEBECK:**

19   **Q.**   Resource hog?

20   **A.**   Resource, resource hog.  It was designed

21   for, you know, one person to go in and do

22   queries, so it uses up a lot of computer

23   resources.

24          So they wanted something, you know --

25   **Q.**   I am sorry, was it resource hog, h-o-g?

19

1    **A.**    Hog, yeah.

2    **Q.**    Okay.  Thank you.

3    **A.**    So they wanted something so that the

4    public, the general public, the media, whoever

5    else, could come and, in real-time, get sort of

6    a snapshot or close to real-time, get a snapshot

7    of kind of the aggregate numbers that were

8    occurring in Ohio.

9          As I believe you know, many, if not all, of

10   the individual boards of elections can and will

11   publish their own results.  And this was really

12   an aggregation of that data.

13   **Q.**    In the work in that regard, were you

14   interacting with other contractors at the

15   Secretary of State's office?

16   **A.**    Yes.

17   **Q.**    And who were those contractors you were

18   interacting with?

19   **A.**    I am trying to remember, because we did

20   this over a couple of different -- there were a

21   couple of different elections we did this.  I am

22   trying to remember.  I think GCR was there

23   starting in 2004.  As I said, the Ohio Secretary

24   of State IT staff, SmarTech had been contracted

25   for the failover mirroring.

20

1  **Q.**   I am sorry?

2  **A.**   The failover, because there had been a

3  problem in the past, when they reached the point

4  prior to our involvement in previous elections

5  where they had crushing traffic, the system

6  failed, which means that Web pages were not

7  available.

8       So members of the public, members of the

9  media, other interested parties, when they tried

10 to get the results, it came up with the site was

11 down, which is embarrassing for any public

12 official, or anybody for that matter.

13      A lot of people, the one night they really

14 need you to be there is on election night.  So

15 they needed to have a failover facility.  And

16 that was as if the primary system failed, there

17 was a secondary location where the results would

18 be mirrored.

19 **Q.**   And what was the evolution of the

20 involvement of that second location?  As I

21 understand it, it is SmarTech as the backup

22 location?

23      **MR. ERVIN:**      Objection; form.

24 You may answer, if you know.

25      **THE WITNESS:**      Hmm?

21

 1          **MR. ERVIN:**        You may answer the

 2   question.

 3          **THE WITNESS:**       He's just going to

 4   ask it differently.  Let's go back a bit.  We

 5   are in a post 9/11 environment, so a lot of

 6   governmental agencies started to look at their

 7   disaster planning a lot more carefully.  And so

 8   usually, it is pretty common in a disaster plan,

 9   is if you have got basically a smoldering coal,

10   your primary facility is, what is your backup.

11          So normally, you identify something

12   that is removed from the primary servers that

13   are hosting a Web site, or whatever, whatever it

14   is you are hosting, where the data can be

15   mirrored.  So it is like a real live backup.

16          And so my recollection is, like a lot

17   of different other government agencies,

18   Secretary of State's office looked to find a

19   facility that could mirror the data, discovered

20   it was very expensive.  They did, to their

21   credit, look to Ohio firms first.

22          My understanding, although I was not

23   directly involved, is that they were cost

24   prohibitive, and they took a look at additional

25   firms outside the State of Ohio, and I believe

22

1    that is where they first came into interaction

2    with SmarTech.

3           But that never, apparently for

4    budgetary reasons, there was never a decision

5    made to do a broad based mirroring or failover.

6    Does that make sense?

7    **BY MR. ARNEBECK:**

8    **Q.**   I didn't quite understand the broad based.

9    **A.**   Like everything.  If you took everything

10   that the entire agency, you know, everything

11   that is on the plain servers, and --

12   **Q.**   In other words, a complete duplication of

13   the office IT versus this election function?

14   **A.**   Yes.

15   **Q.**   As a specific backup?

16   **A.**   Yeah.  No, previously there had been --

17   they were looking for a complete solution.  And

18   that is how they kind of started down that road.

19   **Q.**   And are you involved in the management,

20   ownership, control of SmarTech?

21   **A.**   I am not.

22          **MR. EPSTEIN:**     Object to the form.

23          **MR. ERVIN:**      You may answer.

24          **THE WITNESS:**    I am not.

25

23

1   **BY MR. ARNEBECK:**

2   **Q.**   And were you involved in any fashion in

3   steering the business to SmarTech or

4   recommending it -- recommending that SmarTech

5   get the business?

6          **MR. ERVIN:**       Objection as to

7   form.  When you say "steering the business," can

8   you be --

9   **BY MR. ARNEBECK:**

10  **Q.**  To the extent you are in a professional

11  relationship as GovTech with the Secretary of

12  State, did you personally or professionally have

13  any role in recommending or speaking well of, or

14  helping SmarTech get this business?

15  **A.**   I mean, they got the business on their own

16  merit.  I want to be very clear on that.

17         I also want to be clear, I mean, SmarTech

18  is a vendor.  They provide a computer service,

19  just like Verizon, you know, provides cell

20  service and a lot of different people use

21  Verizon.  SmarTech is a professional services

22  firm.

23         I mean, I was not involved in the

24  selection; I can't recall how they entered into

25  the picture.  But an independent decision was

24

1    made to go with SmarTech.

2    **Q.**   Do you have any sense for whether that

3    decision would have been made at the political

4    level or at -- the professional contractors that

5    were already involved, like yourself, were they

6    making that decision?

7                **MR. ERVIN:**        Objection as to

8    form.

9                **MR. EPSTEIN:**       Objection; form and

10   foundation.

11               **MR. ERVIN:**        You can answer, if

12   you know.

13               **MR. ARNEBECK:**     Off the record a

14   minute here.

15               (Thereupon, a discussion was held off

16               the record.)

17               **MR. ARNEBECK:**      Mr. Ervin is

18   asserting that this discussion is under seal,

19   and we will reserve taking that up with the

20   judge whether that fits within trade secrets.

21   **BY MR. ARNEBECK:**

22   **Q.**   Okay.  If you recall the last question, go

23   ahead.  Otherwise, I will restate it.

24   **A.**   Just restate it, if you don't mind.

25   **Q.**   Yeah.  At the point -- you were already

25

1    working with the Secretary of State at the point

2    SmarTech comes into the picture?

3    **A.**   That is correct.

4    **Q.**   In your capacity of your business

5    relationship with the Secretary of State's

6    office, do you have a sense for whether the

7    selection of SmarTech to provide this backup

8    function originated with the internal Civil

9    Service folks at the Secretary of State's

10    office, or originated with the consulting

11    groups, including GovTech?

12            **MR. EPSTEIN:**    Objection; form and

13    foundation.

14            **THE WITNESS:**    My understanding --

15    and again, this is not firsthand -- is it was

16    based on professional capacity and cost and that

17    it was a nonpolitical decision.

18    **BY MR. ARNEBECK:**

19    **Q.**   A decision by whom?

20    **A.**   I believe it was the IT staff, Secretary of

21    State.

22    **Q.**   And who was that at the time?

23    **A.**   Joe Leonti was running it, Bob Mangan was

24    involved, Cliff -- I can't remember Cliff's last

25    name.  Wow.

26

1 **Q.** Were the contractors, if they were not

2 primarily involved, were they consulted in that

3 decision?

4    **MR. ERVIN:**  Objection; form and

5 foundation.

6    **MR. EPSTEIN:** Join in the

7 objection.

8 **BY MR. ARNEBECK:**

9 **Q.** You can answer.

10    **MR. ERVIN:**  Yes, you can

11 answer.

12    **THE WITNESS:** Does that mean -- I

13 am still confused.  If you guys both object, do

14 I have the right --

15    **MR. ERVIN:**  If we make an

16 objection, unless we tell you not to answer, you

17 may answer his question to the best of your

18 ability.

19    **THE WITNESS:** Okay.  What was the

20 question again?

21 **BY MR. ARNEBECK:**

22 **Q.** You have indicated in your previous answer

23 that you thought that the Secretary of State's

24 staff were the folks that made this decision.

25  My question was, were, to your knowledge,

1   were the -- was GovTech or other outside

2   contractors involved at all with the decision,

3   in terms of --

4              **MR. EPSTEIN:**      Objection.

5              **THE WITNESS:**      Not that I recall,

6   no.

7   **BY MR. ARNEBECK:**

8   **Q.**   To what extent did you focus on any

9   questions of security of the system for counting

10  the votes, tabulating the votes, reporting the

11  votes in the 2004 election?

12  **A.**   No, this was not a vote counting system.

13  It was just simply a reporting system.  Do you

14  understand the distinction I am making?

15  **Q.**   Yes.  You are indicating your role in what

16  we are talking about is strictly GovTech?

17  **A.**   Yes.

18  **Q.**   And GovTech is strictly focused upon a Web

19  display of results that are being generated out

20  of the system, which you are saying you are not

21  involved otherwise?

22  **A.**   Right, no.

23  **Q.**   All you are doing is Web posting.

24  **A.**   Right.

25  **Q.**   But Web posting is Web posting?

28

1    **A.**    Right.

2    **Q.**    Now, if there was a discussion at the

3    Secretary of State's office the week preceding

4    the election about the scheduling of personnel

5    that would be on site on election night -- well,

6    let me put it this way:  Were you at the

7    Secretary of State's office the week preceding

8    the election, at a meeting of both staff and

9    contractors in which there was a discussion

10   about who would be on site on election night?

11   **A.**    No, I have no recollection.  Quite frankly,

12   I don't think that would be the case.

13   **Q.**    Okay.  So to the best of your recollection,

14   you were not at a meeting where Bob Mangan was

15   informed that he would not be expected to be on

16   site on election night after 9:00?

17   **A.**    After 9:00?

18   **Q.**    Bob Mangan.

19   **A.**    A.m. or p.m.?

20   **Q.**    9:00 p.m.

21   **A.**    This is the first I have ever heard that.

22              **MR. ERVIN:**       Is that a "no"?

23              **THE WITNESS:**      That would be a

24   "no."

25

29

1    **BY MR. ARNEBECK:**

2    **Q.**   What is the extent of your knowledge of the

3    protocol with the hierarchy of control and

4    management at the Secretary of State's office on

5    election night?

6          **MR. EPSTEIN:**     Object to the form.

7    **BY MR. ARNEBECK:**

8    **Q.**   As I understand it from the exhibit, the

9    exhibit called the architecture map, there is a

10   little place where GovTech, in the box for

11   GovTech, there are some names of individuals and

12   names of other entities.

13        To what extent are you familiar with the

14   reporting relationships, who is giving direction

15   and exercising management control at the

16   Secretary of State's office on election night?

17        **MR. ERVIN:**     Objection as to

18   form.  Do you have that document?

19        **MR. ARNEBECK:**     Yes, yes.  I would

20   like to make copies of this and mark it to this

21   deposition as Exhibit A.

22        **MR. ERVIN:**     Do you want me to

23   make copies?  Off the record, please.

24             (Thereupon, a discussion was held off

25             the record.)

30

1             (Thereupon, Plaintiff's Exhibit 1 of

2             the M.L. Connell deposition was

3             marked for purposes of

4             identification.)

5  **BY MR. ARNEBECK:**

6  **Q.**  I have handed the witness what has been

7  marked for identification as Deposition Exhibit

8  1, and it is titled "SOS Election Production

9  System Configuration for Web Results Entry, EN

10  Staff Results Entry and Web Queries, 11/2/04."

11     Have you seen this exhibit, Mr. Connell?

12  **A.**  That is Exhibit I.

13  **Q.**  Right.

14  **A.**  And you guys had it on Friday.

15  **Q.**  Right.  And had you previously been

16  familiar with this document?

17       **MR. ERVIN:**     Before when?

18       **MR. ARNEBECK:**    Before last Friday.

19       **THE WITNESS:**    I think the staff

20  internally, I think it was produced by Ohio

21  Secretary of State IT staff, yeah.  Prepared by

22  Bob Mangan.  I am not sure that I have.

23  **BY MR. ARNEBECK:**

24  **Q.**  Okay.  While we are doing this, why don't

25  we mark the second exhibit as Exhibit 2 for the

31

1   election night -- or rather, as of 10/23/06 for

2   the 2006 election.

3               (Thereupon, Plaintiff's Exhibit 2 of

4               the M.L. Connell deposition was

5               marked for purposes of

6               identification.)

7   **BY MR. ARNEBECK:**

8   **Q.**   I would like to ask the witness if he is

9   familiar with Exhibit 2?

10              **MR. ERVIN:**        Again, is that

11  before last Friday?

12              **MR. ARNEBECK:**     Yes.

13              **THE WITNESS:**      I am not sure.

14              **MR. ERVIN:**        Just tell him that.

15              **THE WITNESS:**      All right.  I am

16  not sure that I have seen it in this form.  I

17  don't think I have seen this -- I don't know if

18  I have seen this.

19  **BY MR. ARNEBECK:**

20  **Q.**   Were there -- to your knowledge, were there

21  multiple iterations of these exhibits?  That is,

22  if they were being generated by the Secretary of

23  State's staff, were there a series of such

24  documents reflecting the development of the

25  plans for managing the system prior to these two

32

1   elections?

2              MR. ERVIN:        Objection.

3              MR. EPSTEIN:      Objection.

4              MR. ERVIN:        Form and lack of

5   foundation.

6              MR. EPSTEIN:      Same objections.

7              MR. ERVIN:        You can answer the

8   question.

9              THE WITNESS:      Again, I don't

10  know.  I suspect as much.  It is a common

11  practice.

12             MR. ERVIN:        Don't speculate.

13  If you know it, you know it.

14             THE WITNESS:      Okay.

15  BY MR. ARNEBECK:

16  Q.   Again, of your personal knowledge, if you

17  maybe don't recall these specific documents, do

18  you recall other architecture maps for elections

19  of this nature?

20             MR. ERVIN:        Objection as to

21  form and lack of foundation.  You may answer, if

22  you know.

23             THE WITNESS:      No.

24  BY MR. ARNEBECK:

25  Q.   You mentioned -- in the lead-up to your

33

1    engagement or to the SmarTech engagement, you

2    mentioned a failure problem in a prior election.

3    What was that?

4    **A.**    Essentially the system, the Web pages --

5    and this would have been prior to our

6    involvement, the internal staff was responsible

7    for the election night presenting the aggregates

8    to the public, and if memory serves, they were

9    doing a -- they were allowing the public to do

10   queries that were very resource intensive.

11       So if a lot of people came to the site all

12   at once and tried to take a look at a variety of

13   different counties, even though it was fairly

14   simple data, it overwhelmed the system, and the

15   Web site pages were not available.

16       So, again, you know, I want to be clear.

17   The primary objective here was to be up, to be

18   available to the public to see very simple

19   results, an aggregate of the counties.

20   **Q.**    And when did this prior failure occur, was

21   that the 2002 election?

22   **A.**    I believe it was -- I do not know for sure,

23   I think it was 2002.

24   **Q.**    And was there any failure of the primary

25   system in 2004?

34

1      **MR. ERVIN:**      When you say
2  "primary system," are we still talking about the
3  system that the public can view the results?
4      **MR. FITRAKIS:**      The Secretary of
5  State site which would cause you to go to the
6  mirror-over site in Chattanooga.
7      **THE WITNESS:**      None that I am
8  aware of.
9  **BY MR. ARNEBECK:**
10  **Q.**   So to the best of your knowledge, your
11  system, your Web face, or Web design and Web
12  display functioned without problems the election
13  night 2004 and the primary, Secretary of State's
14  primary tabulation computers in their office
15  functioned without failure or problems also?
16      **MR. ERVIN:**      Objection to form.
17  You have asked kind of two questions.  One was
18  about whether, what he did in terms of
19  addressing the public system, if that worked,
20  and then you asked the second question about
21  whether or not the Secretary of State's voting
22  tabulating system, and I would say as to the
23  first question, he can answer.  As to the second
24  question, I would object as to form and to lack
25  of foundation.

1          **MR. ARNEBECK:**    Okay.  Let's

2    rephrase.

3    **BY MR. ARNEBECK:**

4    **Q.**    Everything worked fine in your system, your

5    Web design and display for the 2004 election; is

6    that correct?

7    **A.**    Yes.

8    **Q.**    And to your personal knowledge, in your

9    professional role in managing, being part of a

10   team that is managing the data system of the

11   Secretary of State on election night, are you

12   aware of any overload problem or failure problem

13   in the primary computers at the Secretary of

14   State's office that would have triggered the

15   backup capability that you described that

16   SmarTech was providing?

17          **MR. ERVIN:**     Objection as to

18   form and foundation.  You may answer.

19          **MR. EPSTEIN:**    Join in the

20   objections.

21          **THE WITNESS:**    Again, so you

22   understand, it is important that you understand,

23   it is election night on a Presidential election.

24   Okay.  It is a simple reporting system.

25          **MR. ERVIN:**     If you could just

1    answer his question.

2              **MR. FITRAKIS:**      It is just the

3    real-time number system, I mean, reporting to --

4              **THE WITNESS:**      Just aggregating

5    county data, that is all it was doing,

6    aggregating county data, so the people could go,

7    media could go to one spot and see what the

8    totals were, you know, the most recent numbers

9    were for Ohio.

10             So, you know, it is not really where

11   my focus was that night.  You know, I think the

12   system performed fine.  It took a lot of

13   traffic, given the interest in the State of Ohio

14   on that particular evening.  But that is about

15   all I know.

16             To the best of my knowledge, there

17   was not a failover case scenario -- or it was

18   not a failover situation.

19   **BY MR. ARNEBECK:**

20   **Q.**   That you had previously described that

21   prompted bringing in a backup, SmarTech?

22             **MR. ERVIN:**       Objection.

23             **MR. EPSTEIN:**     Objection.

24             **MR. ARNEBECK:**    Maybe I could

25   rephrase.

37

1          **MR. ERVIN:**      I think you have

2    two different things.  There is the public

3    system that crashed, and that deals with just

4    reporting the aggregate numbers that come in

5    from the Board of Elections.

6          Then you asked a question about the

7    SmarTech system, and you asked that in reference

8    to tabulating the votes.  So I think that you

9    are talking -- I think you are asking two --

10          **MR. FITRAKIS:**     No, that is the

11   failover mirror, correct?  You said that the

12   SmarTech system was the failover mirror, right?

13   So it is not the tabulators, it is the

14   real-time.

15          **THE WITNESS:**     Well, don't use

16   "real-time," because we could spend the next

17   four weeks arguing about what real-time is.

18          **MR. FITRAKIS:**     Okay.

19          **MR. ERVIN:**      Stop.  Can we go

20   off the record for a minute, please?

21          **MR. ARNEBECK:**     Sure.

22          (Thereupon, a discussion was held off

23          the record.)

24   **BY MR. ARNEBECK:**

25   **Q.**   On the record, you had previously

38

1  described --

2  **A.**   Um-hum.

3  **Q.**   -- a failover, I think was the term you

4  used, that had resulted in bringing SmarTech

5  into the picture; and I guess my question was,

6  on election night 2004, was there a problem that

7  was solved by having the SmarTech rollover or

8  backup, whatever, mirror, come into play, so in

9  the larger sense, there was not a problem,

10  because it was covered by SmarTech?  Do you have

11  knowledge of whether that happened?

12         **MR. ERVIN:**        Objection as to

13  form and lack of foundation.  You may answer, if

14  you know.

15         **THE WITNESS:**       I don't know.

16  **BY MR. ARNEBECK:**

17  **Q.**   Okay.  Going back to the question of the

18  selection of SmarTech, do you have personal

19  knowledge as to the other work that SmarTech

20  does in terms of Web hosting, or the server

21  function for what is its client base, are you

22  familiar with that?

23  **A.**   They do hosting for us.  I mean --

24         **MR. FITRAKIS:**     Us being --

25         **THE WITNESS:**       -- New Media.  I

1    mean, I don't know really what you are asking.

2    I mean, again, it is like saying, "Do you know

3    who uses Verizon?"

4    **BY MR. ARNEBECK:**

5    **Q.**   Well, you are a smart man, sir, and I mean,

6    you are aware that SmarTech, when you say "is

7    hosting for us as New Media," New Media is

8    serving Republican organizations, and that if we

9    looked at the list of entities that are being

10   served by SmarTech, they are the bluebloods of

11   Republican politics, you will not find any

12   Democratic -- partisan Democratic organizations

13   on their list, are you aware of that?

14            **MR. ERVIN:**        Objection, move to

15   strike.  Do not answer that question.  This gets

16   outside the scope of what the judge set forth in

17   his order.  And he alluded to this type of

18   issue.

19            **MR. ARNEBECK:**      Well, what we are

20   talking about is --

21            **MR. FITRAKIS:**      Can we go off the

22   record?

23            **MR. ARNEBECK:**       -- is man in the

24   middle, which I was instructed to inquire

25   extensively about.  We are talking about the

40

1    presence in a system of someone with an

2    interest, a partisan interest and a possible

3    position to manipulate a process to the

4    advantage of that partisan interest.

5              And I don't think the record, you

6    would suggest that the record should exclude the

7    fact that Mr. Connell, in his position as CEO of

8    New Media Communications, is not aware that he

9    is only, in that capacity, only serving

10   Republican clients and also not aware that

11   SmarTech, which is providing this backup

12   function, is in a similar position to be a

13   company that only serves partisan Republican

14   clients.

15             **MR. ERVIN:**      I have no problem

16   with questions being asked about the man in the

17   middle concept, I will call it.

18             And clearly, the judge said that

19   could be asked.  The question you posed was more

20   of a statement than a question, one.

21             Two, you haven't asked a question

22   about the man in the middle, and you haven't

23   laid a proper foundation by which my client can

24   respond to that issue.

25             And three, the judge clearly said the

41

1  fact of whether or not they are Republicans or

2  Democrats is not pertinent to the scope of the

3  questions that you have.

4          So if you want to address my client's

5  political affiliation, religious affiliation,

6  whether or not he is a member of a political

7  party has nothing to do with the limited scope

8  of what you may inquire about of him.  And I

9  will instruct him not to answer questions that

10 begin or are framed in such a way.

11         If you want to ask about the man in

12 the middle, you are right, you have every right

13 to ask about that and explore that.

14         But when you lead off and attack my

15 client for being a Republican, that is outside

16 the scope of why we are here.

17         **MR. ARNEBECK:**    Jim, far be it from

18 me to attack your client for being a Republican.

19 It is a very fine party with great traditions.

20         The only point is, he was describing

21 SmarTech as like Verizon.  Verizon serves all

22 the political parties, it has no partisan focus

23 and if someone were to say that Verizon in the

24 way it is providing telephone services is

25 somehow slanting something in one partisan

1   direction or the other, in terms of its

2   affiliations or the client base it is serving,

3   there would be no basis.

4            He made the statement.  This is

5   cross-examination, and I am free to inquire,

6   because it begins to get into the question of

7   man in the middle.

8            **MR. ERVIN:**      I think he made the

9   statement as an analogy as to the best of his

10  knowledge what SmarTech does in serving a wide

11  variety of people.  But you have asked no

12  question to start this -- do you want to take a

13  break and speak to him?

14           **MR. FITRAKIS:**    Yes.

15           **MR. ERVIN:**      Let's go off the

16  record.  There is a conference room on the other

17  side, if you want to use that.

18           (Thereupon, a discussion was held off

19           the record.)

20  **BY MR. ARNEBECK:**

21  **Q.**   Mr. Connell, are you aware or not aware

22  that the Web site for the George W. Bush

23  campaign 2004 was being hosted on the SmarTech

24  servers in Chattanooga, Tennessee?

25  **A.**   Yes.

43

1    **Q.**   And were you aware or unaware that the

2    servers for the Republican National Committee

3    were being hosted -- in the 2004 election were

4    being hosted on the SmarTech servers in

5    Chattanooga, Tennessee?

6                **MR. ERVIN:**      One sec.

7                **THE WITNESS:**    I don't know.

8                **MR. ERVIN:**      Go ahead, answer

9    the question.   That is all right.   Go ahead and

10   answer.

11               **THE WITNESS:**    Do you want it

12   sealed, just because it is client?

13               **MR. ERVIN:**      No, answer the

14   question.

15               **THE WITNESS:**    Yes.

16               **MR. ERVIN:**      We are going to

17   seal the last two questions and those answers,

18   please.

19               **MR. ARNEBECK:**   And we are

20   reserving our disagreement with Mr. Ervin on

21   this being subject to seal.

22   **BY MR. ARNEBECK:**

23   **Q.**   Are you aware or unaware that e-mails from

24   Mr. Rove are being processed on the server of

25   SmarTech in Chattanooga, Tennessee?

44

1          **MR. ERVIN:**      Objection; lack of

2    foundation.  You may answer.

3          **MR. EPSTEIN:**     Join that

4    objection.

5          **MR. ERVIN:**      You can answer his

6    question.  This is under seal.

7          **THE WITNESS:**     No.

8    **BY MR. ARNEBECK:**

9    **Q.**   All right.  To be more specific, are you

10   aware or unaware that the GWBush43.com Web site

11   was being hosted on the SmarTech servers in

12   2004, Chattanooga, Tennessee?

13         **MR. FITRAKIS:**    GWB?

14         **MR. EPSTEIN:**     Objection.

15         **MR. ERVIN:**      Just answer his

16   question.  Just answer his question.

17         **THE WITNESS:**     I have heard

18   rumors, but I don't --

19         **MR. ERVIN:**      If you know.

20         **THE WITNESS:**     I have no direct

21   knowledge.

22   **BY MR. ARNEBECK:**

23   **Q.**   Does New Media have any involvement in this

24   Web site, GWB43.com?

25   **A.**   No, they do not.

45

1    **Q.**   Did New Media or GovTech or you, in any

2    other professional capacity, have any

3    involvement in -- a Web site in which -- and a

4    service in which Mr. Rove's e-mails were being

5    processed?

6              **MR. EPSTEIN:**    Object to the form.

7              **THE WITNESS:**    No.

8              **MR. ERVIN:**    Do you need to talk

9    to me?

10             **THE WITNESS:**    Yeah.

11             **MR. ERVIN:**    Can we go off the

12   record for a minute?

13             **MR. ARNEBECK:**    Yes.

14             (Thereupon, a recess was taken.)

15             **MR. ERVIN:**    Thank you.

16             **MR. ARNEBECK:**    Did we have a

17   question outstanding?

18             **MR. ERVIN:**    I don't believe so.

19             **THE WITNESS:**    I answered it.

20   **BY MR. ARNEBECK:**

21   **Q.**   Mr. Connell, was SmarTech at any time a

22   subcontractor or service provider to any of your

23   companies?

24   **A.**   Yes.

25   **Q.**   And what were they?

46

1   **A.**   SmarTech performs the vast majority of our

2   hosting, so all of our hosting services that we

3   provide would be via SmarTech, or the vast

4   majority for New Media, for New Media

5   Communications.

6   **Q.**   And with respect to GovTech, just some, not

7   all?

8   **A.**   Most governmental entities host their own

9   stuff.

10  **Q.**   So as to the GovTech relationship with

11  SmarTech in the Secretary of State's office,

12  that was their relationship, not your

13  subcontract, right?

14  **A.**   I just have to think.  I am not -- I am

15  looking -- I am not looking at you, I am looking

16  your direction.  I mean, they may have been a

17  subcontractor.  I would have to -- I don't know.

18  I would have to go back and look at the

19  contract.  Sometimes for contracting purposes,

20  they are structured that way.

21  **Q.**   Okay.  But this seems a little odd in

22  relation to our earlier discussion about your

23  role or GovTech's role in bringing SmarTech into

24  the picture.  Wouldn't you know if, in fact, at

25  the end of the day, regardless of how it

47

1  happened, they either were or were not a

2  subcontractor of your company?

3          **MR. ERVIN:**        Objection; form.

4  You may answer.

5          **THE WITNESS:**      No, I previously

6  said it is pretty common for us to use SmarTech

7  for hosting and that it is pretty common for us

8  to bundle that into a contract.

9          I mean, you are a vendor -- you want

10  a Web site, you come to us, you want a Web site

11  built, you want it hosted, you want to pay one

12  bill every month or whatever it is.

13          So I am not understanding why -- I am

14  not understanding your disconnect.

15  **BY MR. ARNEBECK:**

16  **Q.**   Well, I just thought we had an earlier

17  discussion about how SmarTech came into the

18  picture, and you had indicated that it came in

19  through, you thought, the IT staff at the

20  Secretary of State's office and was not -- you

21  did not bring them in, and now you are saying

22  that they may well have been part of a bundled

23  service that GovTech provided to the Secretary

24  of State's office.

25  **A.**   Your previous question really -- okay.  One

48

1    part is introduction and how SmarTech was

2    introduced into the equation.  Now we are moving

3    forward in time to 2004, and what I am saying is

4    I don't recall whether it was a direct contract

5    or it was through us.

6    **Q.**    Okay.

7    **A.**    But, again, it is not an uncommon practice

8    to ask a vendor who bundles services.

9    **Q.**    Okay.  Who was the point of contact or

10   points of contact at SmarTech for your work with

11   the Secretary of State?

12   **A.**    I believe Jeff Averbeck was the primary and

13   I believe Alvin Garrison.

14   **Q.**    Who worked -- Jeff Averbeck is the

15   President of SmarTech?

16   **A.**    I -- yes.

17   **Q.**    And what is Alvin Garrison's position, if

18   you know?

19   **A.**    I do not know.

20   **Q.**    Who worked on the project from SmarTech

21   with whom you or your firm interacted with?

22              **MR. EPSTEIN:**      Objection.

23              **MR. ERVIN:**       Objection as to

24   form.  Can you --

25

49

1    **BY MR. ARNEBECK:**

2    **Q.**   Besides Mr. Averbeck and Mr. Garrison, were

3    there others from SmarTech that you or other

4    personnel at GovTech would have regularly

5    interacted with?

6              **MR. ERVIN:**        In relation to --

7              **MR. ARNEBECK:**        -- the work with

8    the Secretary of State 2004.

9              **MR. ERVIN:**        Just GovTech's

10   work?

11             **MR. ARNEBECK:**     Right.

12             **THE WITNESS:**       I do not know who

13   all would have been involved beyond those two.

14   **BY MR. ARNEBECK:**

15   **Q.**   And who else besides yourself would be

16   involved in those -- in that work from GovTech

17   with SmarTech?

18             **MR. ERVIN:**        Objection; form,

19   asked and answered.  You may answer.

20             **THE WITNESS:**      The primary

21   individual with probably the most exposure, the

22   most contact, would have been Mike Henry, who

23   was a contractor.  Again, you know --

24   **BY MR. ARNEBECK:**

25   **Q.**   Contractor, he is a GovTech person or a

50

1    contractor?

2    **A.**    He was a contractor to GovTech.

3    **Q.**    From what company is that?

4    **A.**    It will come to me in a minute.  They

5    change -- just like so many IT firms, they

6    changed ownership, changed names.  It had

7    previously been Solutient.  That is the problem

8    with these IT firms, they all come up with these

9    names.  I will spell it to you on the next

10   break.

11        Anyway, the existing system relied heavily

12   on Oracle, and Mike Henry had an Oracle

13   background.

14   **Q.**   Did your firm, that is, GovTech, provide

15   services on election night to the Secretary of

16   State?

17   **A.**    Yes.

18   **Q.**   Did you or members of your firm or firms

19   interact with the staff from SmarTech on

20   election night?

21             **MR. ERVIN:**        Objection as to

22   form.  Can you describe what you mean by

23   "interact"?

24   **BY MR. ARNEBECK:**

25   **Q.**   Communicate, conduct business, coordinate

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**

51

1    work.

2    **A.**    Personally, no, for me, I did not.  You

3    know, the one person who was on site from our

4    staff was Mike Henry.  You know, he was down

5    there with the IT staff, basically he was doing

6    staff augmentation.  So I cannot speak to that.

7    **Q.**    And he would have been in Columbus at the

8    Secretary of State's office?

9    **A.**    Yes.

10   **Q.**    Would there have been anyone from your

11   company interacting with SmarTech in Tennessee

12   on election night?

13                **MR. ERVIN:**        Is this 2004?

14   **BY MR. ARNEBECK:**

15   **Q.**    Yes.

16   **A.**    Which, from GovTech?

17   **Q.**    GovTech.

18   **A.**    No.

19   **Q.**    And how about the media?

20   **A.**    Not that I recall.

21   **Q.**    Where were you on election night 2004?

22   **A.**    Cleveland.

23   **Q.**    Was Triad Corporation at any time a

24   subcontractor or service provider to any of your

25   companies?

52

1          **MR. EPSTEIN:**     Objection to the
2     form.
3          **MR. ERVIN:**     Objection; lack of
4     foundation as well.
5     **BY MR. ARNEBECK:**
6     **Q.**   You can answer.
7     **A.**   The only exposure to Triad was for a
8     centralized voter file project as a part of HAVA
9     compliance, to which we had a very minor role.
10    So the exposure would have been, you know, just
11    like our exposure to ES&S, and other people,
12    firms that had voter registrant applications,
13    software applications at the various Boards of
14    Elections, County Boards of Elections.
15    **Q.**   And what would be the -- how would that
16    have originated?
17    **A.**   Can you ask that differently?
18    **Q.**   Well, did you -- did you seek bids for some
19    project or did you just choose Triad, just go to
20    Triad and say, "We would like you to do this for
21    us?
22          **MR. EPSTEIN:**     Objection; no
23    foundation.
24          **MR. ERVIN:**     I join in that
25    objection.

53

1        **THE WITNESS:**      You are

2    misunderstanding.  There were 88 separate

3    counties, and they all had existing applications

4    in place, and this was early on.

5        **MR. FITRAKIS:**      By "applications,"

6    you mean --

7        **MR. ERVIN:**      I am sorry, I don't

8    mean to be rude, but we should just have one

9    person asking the questions, please.

10        **THE WITNESS:**      Voter registration,

11    voter files.  And so, again, the object was HAVA

12    required a real-time central voter file.  The

13    goal was to do that as cost effectively as

14    possible, without requiring a lot of retraining.

15        So the approach that was taken was to

16    leverage the existing applications, and

17    basically have them, basically, you know, mirror

18    all their data to one central file in Columbus.

19        So the ES&Ses and the Triads of the

20    world were picked by virtue of the market share,

21    by the fact that they had already gone out and

22    independently earned the business of individual

23    Boards of Elections.

24    **BY MR. ARNEBECK:**

25    **Q.**   And so you were, in effect, incorporating

54

1    their existing working relationships into the

2    project that you were undertaking as GovTech?

3    A.    Their existing applications were being --

4    and let me be clear.  This is a voter

5    registration system.  Okay?  Strictly voter

6    registration system.  Their voter registration

7    data was being basically consolidated in

8    Columbus into a centralized file.

9    Q.    And GovTech was managing that process?

10   A.    No.  We had -- our role was actually a

11   very, very, very minor role in the whole

12   process.  Again, the objective was to come up

13   with a cost effective solution that did not

14   require a lot of retraining, a lot of new

15   software, a lot of new hardware.

16   Q.    But this was a function that GovTech had

17   with the Secretary of State's office, above and

18   beyond the Web hosting, as you described it?

19   A.    It was a separate contract.

20   Q.    Okay.  And what precisely was the contract,

21   to centralize the -- assist the Secretary of

22   State's office in providing a centralized

23   database, voter registration database as

24   provided under HAVA?

25           MR. ERVIN:       We are still under

55

1    seal.

2              **THE WITNESS:**       It was really to,

3    you know, in the broadest sense, it was kind of

4    the big thought, "Okay, let's arrive --" there

5    was a lot of people out there that had very,

6    very, very expensive systems.

7              But HAVA had not been completely

8    defined.  It was kind of like, "Here is HAVA, go

9    implement HAVA."  However, there was -- the

10   Secretary of State wanted to be careful as to

11   not make a bad decision, invest a lot of money

12   in Solutient that might later prove not to be

13   HAVA compliant.

14             So the objective was to put them more

15   on a glide slope, so that they could be

16   compliant and minimize the risk of wasting a lot

17   of money.  So it was more in a big picture role

18   like that.

19   **BY MR. ARNEBECK:**

20   **Q.**   And what was the sequence, the Web design

21   contract or the registration database contract?

22   **A.**   Boy, I don't know.  What year did HAVA get

23   passed?  HAVA wasn't passed until -- can anybody

24   help me out here?

25   **Q.**   Well, it was after the 2000 election, 2002?

56

1    **A.**    Yeah, but the implementation wasn't -- by

2    the time it was passed --

3              **MR. ERVIN:**        HAVA was passed, I

4    think in 2002, I think.

5              **THE WITNESS:**      I don't remember

6    the sequence.  I mean, I can't -- I want to

7    think that this came later, after 2004.

8    **BY MR. ARNEBECK:**

9    **Q.**    Okay.  That makes sense, because my

10   understanding is Triad has a much heavier

11   responsibility in the registration database

12   currently than they did in 2004.  So that would

13   make sense.

14             **MR. EPSTEIN:**      Objection.

15   **BY MR. ARNEBECK:**

16   **Q.**    Who was your appointed contact, or points

17   of contact at Triad for your work with the

18   Secretary of State of Ohio?

19             **MR. ERVIN:**        Objection; form,

20   lack of foundation.

21             **THE WITNESS:**      We had limited

22   exposure to them.  I don't really -- I don't

23   recall.

24   **BY MR. ARNEBECK:**

25   **Q.**    Would it be safe to say it was a member of

57

1    the Rapp family?

2            **MR. ERVIN:**        Objection; lack of

3    foundation.

4            **MR. EPSTEIN:**      Same objection.

5            **MR. ERVIN:**        You may answer, if

6    you know.

7            **THE WITNESS:**      Now, when you say,

8    "You may answer," I don't --

9            **MR. ERVIN:**        If I make an

10   objection, unless I tell you specifically, "Do

11   not answer," you may answer his questions to the

12   best of your knowledge.

13           **THE WITNESS:**      Yeah, but "You may

14   answer," is different than, "You should or

15   should not answer."

16           **MR. ERVIN:**        Do you need to

17   speak with me?  If you do just -- do we need to

18   talk?

19           **THE WITNESS:**      No.

20           **MR. ERVIN:**        Could we go off the

21   record for a moment, please.

22           (Thereupon, a discussion was held off

23           the record.)

24   **BY MR. ARNEBECK:**

25   **Q.**   You were going to answer?

58

1    **A.**    Can you re-ask the question?

2    **Q.**    Who was the point of contact, or did you

3    answer that?  Would you read back the last

4    question?

5              (Thereupon, the Reporter read the

6              record as requested.)

7    **BY MR. ARNEBECK:**

8    **Q.**    Then I asked, would it be safe to say it

9    was a member of the Rapp family?

10             **MR. ERVIN:**        Objection; lack of

11    foundation.

12             **MR. EPSTEIN:**      Same objection.

13             **MR. ERVIN:**        You may answer.

14             **THE WITNESS:**      One of their

15    representatives was a Rapp, but I don't remember

16    his name.

17    **BY MR. ARNEBECK:**

18    **Q.**    And who worked on the project from Triad

19    insofar as your personal knowledge or your

20    understanding from your employees telling you

21    who they were working with?

22             **MR. EPSTEIN:**      Object to the form.

23             **THE WITNESS:**      We didn't -- it

24    wasn't that sort of project.  There wasn't

25    really -- our employees would not have had

59

1    exposure to Triad.  It was more of collecting

2    information surrounding their system

3    requirements.

4            Really what we were doing was making

5    sure that the various applications would be

6    compatible with the solution being discussed.

7    **BY MR. ARNEBECK:**

8    **Q.**  But you were not interacting with Triad

9    personnel as such, you are saying that it would

10   be -- like, it would be through the Secretary of

11   State staff that these communications would be

12   occurring?

13           **MR. ERVIN:**      Objection; form and

14   lack of foundation.  You can answer.

15           **THE WITNESS:**      We weren't an

16   implementer, so there really was no exposure

17   beyond the requirements gathering.

18   **BY MR. ARNEBECK:**

19   **Q.**   Okay.  Is the architecture map that we have

20   marked as Deposition Exhibit 1 an accurate

21   architecture of the system that was built for

22   the 2004 election, to the best of your

23   knowledge?

24           **MR. ERVIN:**      Objection; lack of

25   foundation.  You may answer.

60

1          **MR. EPSTEIN:**     Join the objection.

2          **THE WITNESS:**     I cannot speak to

3    the accuracy.  I mean, I didn't create this, my

4    staff didn't create it.

5    **BY MR. ARNEBECK:**

6    **Q.**   With respect to V.J. Masson, indicated as

7    primary and Alan Dillman as secondary for

8    technology issue escalation and resolution

9    decisions, do you know who those folks are?

10         **MR. ERVIN:**     I am sorry, where

11   are you?

12         **MR. ARNEBECK:**     At the top of the

13   page on Exhibit Number 1.

14         **MR. ERVIN:**     Oh, thank you.

15         **THE WITNESS:**     Yes.

16   **BY MR. ARNEBECK:**

17   **Q.**   And who are they?

18   **A.**   V.J. was a member of the staff for the Ohio

19   Secretary of State.  Alan Dillman was a

20   contractor.

21   **Q.**   And what company was Alan Dillman

22   associated with?

23   **A.**   His company is GCR, Limited.

24   **Q.**   And do you know if Mr. Dillman has any

25   other associations that you are personally aware

61

1    of?

2            **MR. EPSTEIN:**    Objection; form and

3    foundation.

4            **MR. ERVIN:**    I join in that

5    objection.

6    **BY MR. ARNEBECK:**

7    **Q.**   Are you aware of his role at Cedarville

8    University?

9            **MR. ERVIN:**    Objection; outside

10    the scope.  Do not answer that question.

11    **BY MR. ARNEBECK:**

12    **Q.**   Is this the kind of a map that you have

13    some sense for what it is describing and how it

14    purports to describe a system of which GovTech

15    was a part in 2004?

16            **MR. ERVIN:**    Objection; lack of

17    foundation.  You may answer.

18            **MR. EPSTEIN:**    Same objection, and

19    object to the form.

20            **THE WITNESS:**    I am familiar with

21    schematics like this in general, yes.

22    **BY MR. ARNEBECK:**

23    **Q.**   Can you identify where any security

24    features were built into the system by your firm

25    or anyone else to protect the accuracy of the

62

1    processing of votes?

2              **MR. ERVIN:**        Objection; form and

3    lack of foundation.  You may answer.

4              **MR. EPSTEIN:**       Same objection.

5              **MR. ERVIN:**        You may answer, if

6    you can.

7              **THE WITNESS:**       Again, I want to

8    reiterate, this is not a tabulation system.  All

9    this was designed to do is take the 88

10   individual county results, in total -- again,

11   the purpose of this was a brief window on

12   election night when all the world is kind of

13   following the horse race and trying to figure

14   out what the results are in Ohio.

15              So, you know, rather than -- members

16   of the media, citizens of Ohio, don't want to go

17   to 88 different sites and see the public

18   results, they want to go to one place.  So it is

19   taking the public results as they are currently

20   being reported and aggregating them into totals.

21              So, you know, it is not like we are

22   protecting nuclear secrets here, is what I am

23   trying to say.  But, you know, also, this is a

24   schematic diagram, it is not -- it is more of a

25   hardware configuration.  I don't think its

63

1    purpose is to convey security.

2    **BY MR. ARNEBECK:**

3    **Q.**   So you are saying that there could have

4    been security systems that are part of this

5    Secretary of State's data processing that are

6    not displayed on this map?

7            **MR. ERVIN:**      Objection; form and

8    lack of foundation.

9            **MR. EPSTEIN:**    Objection.

10           **MR. ERVIN:**      You can answer, if

11   you can.

12           **THE WITNESS:**    Yes.  I mean, it is

13   certainly possible that they -- I mean, the

14   purpose of this is not -- yes, it is a simple

15   diagram.

16   **BY MR. ARNEBECK:**

17   **Q.**   And are you aware of any such systems?

18           **MR. EPSTEIN:**    Objection;

19   foundation.

20           **MR. ERVIN:**      Systems being

21   security systems?

22           **MR. ARNEBECK:**   Yes.

23           **THE WITNESS:**    Does a major Ohio

24   agency have security in place to protect their

25   IT and data?  Absolutely.  But I cannot speak to

64

1    what is not on here.

2    **BY MR. ARNEBECK:**

3    **Q.**    Okay.  What is your understanding with

4    respect to the question of whether a SmarTech

5    computer in this configuration would be capable

6    of sending instructions, receiving instructions

7    and receiving information from both the county

8    level tabulators and the computers of the

9    Secretary of State's office?

10             **MR. ERVIN:**       Objection as to

11   form and lack of foundation.

12             **MR. EPSTEIN:**      Join the

13   objections.

14             **THE WITNESS:**      You need to break

15   that question up.

16             **MR. ERVIN:**       Do you understand

17   the question?

18             **THE WITNESS:**      No.

19   **BY MR. ARNEBECK:**

20   **Q.**    This goes to this man in the middle

21   concern.  It is the understanding of our expert

22   that the SmarTech computer shown in this

23   configuration would be capable of sending

24   instructions, receiving instructions and

25   receiving information from both the county level

65

1   tabulators and the computers at the Secretary of

2   State's office.  Is that your understanding of

3   this system as well?

4   **A.**   No.  Again, so you guys are clear, this is

5   not connected to the tabulators in any way.

6   **Q.**   Have you read Mr. Spoonamore's declaration,

7   either of his two declarations or both, that

8   were filed in regard to our litigation over your

9   motion to quash the subpoena?

10  **A.**   I have read the one that counsel provided

11  to me.  I am not sure I am aware of a second.

12  **Q.**   Okay.  You are familiar with his assertion

13  that this structure appears to be conducive to a

14  man in the middle manipulation that he sees in a

15  commercial context?

16          **MR. ERVIN:**     Just be clear, the

17  structure you are referring to is what is

18  conveyed in Exhibit 1.

19          **MR. EPSTEIN:**     I am going to

20  object for lack of foundation.

21          **MR. ERVIN:**     I join in that

22  objection.  Can you read that question back,

23  please.

24          (Thereupon, the Reporter read the

25          record as requested.)

66

1          **MR. ERVIN:**       Renew the objection

2    to form and foundation.

3          **MR. EPSTEIN:**      Same objections.

4          **MR. ERVIN:**        You may answer.

5          **THE WITNESS:**      No.

6    **BY MR. ARNEBECK:**

7    **Q.**   Did your firm hire any subcontractors or

8    work with any technology or consulting companies

9    or individuals beyond SmarTech and Triad?

10         **MR. ERVIN:**        This is under seal.

11   I am going to object to the lack of foundation.

12              I think he stated he did not hire

13   Triad.  And I guess I need some context when you

14   say "hired SmarTech."

15         **MR. ARNEBECK:**     He indicated that

16   he may have hired SmarTech and that he did hire

17   Triad and it may be later than the 2004

18   election.

19         **MR. FITRAKIS:**     There was also some

20   discussion about the GCR and Dillman as well,

21   that relationship, it was clearly on here.

22         **MR. EPSTEIN:**      So you are asking

23   about hires at any time?

24         **MR. ARNEBECK:**     No, we are talking

25   about the 2004 election.

1      **MR. ERVIN:**      He identified

2  Dillman as a contractor from a company GCR,

3  Limited.  If I am correct, I don't believe he

4  stated he hired Dillman.

5          **MR. ARNEBECK:**    I didn't say that.

6  I am asking, did he hire any subcontractors that

7  worked with any technology or IT consulting

8  company beyond SmarTech and Triad.

9          **MR. EPSTEIN:**    Object to the form.

10          **MR. ERVIN:**      I agree with that

11  objection.  You can answer it.

12          **THE WITNESS:**    I mean, again,

13  their points are valid, because your question

14  assumes something that is -- but, anyway,

15  Solutient was previously mentioned.

16  **BY MR. ARNEBECK:**

17  **Q.**   But not Dillman's company?

18  **A.**   No.

19  **Q.**   Was this architecture reflected on Exhibit

20  1 ever discussed or shared with any parties

21  outside the Secretary of State's office and any

22  subcontractor that you hired?

23          **MR. EPSTEIN:**    Objection.

24          **MR. ERVIN:**      Objection; lack of

25  foundation.  He has already indicated he didn't

68

1　prepare this document and he may not have seen

2　it prior to Friday.  You can answer the

3　question, if you can.

4　　　　　　　**THE WITNESS:**　　No.

5　**BY MR. ARNEBECK:**

6　**Q.**　When the Ohio recount for the 2004 election

7　was undertaken, were you or your firm asked to

8　make any changes to the Secretary of State's

9　systems or any related systems involved in the

10　Secretary of State's work on the recount?

11　**A.**　No.

12　**Q.**　Were you aware of the effort by Triad

13　Systems to remove hard drives from county

14　tabulators after the 2004 election, but before

15　the recount of the election?

16　**A.**　No.

17　　　　　　　**MR. EPSTEIN:**　　Objection.

18　　　　　　　**MR. ERVIN:**　　Objection; lack of

19　foundation.

20　　　　　　　**MR. EPSTEIN:**　　Lack of foundation.

21　　　　　　　**MR. ERVIN:**　　You may answer.

22　　　　　　　**MR. ARNEBECK:**　　He already did.

23　　　　　　　**THE WITNESS:**　　I said, "No."

24　**BY MR. ARNEBECK:**

25　**Q.**　Do you have any professional opinion in

69

1   regard to the propriety of removing hard drives

2   after the 2004 election?

3           MR. ERVIN:         Objection.  Do not

4   answer that question.

5           MR. EPSTEIN:       Objection.

6           MR. ERVIN:         It is outside the

7   scope of the judge's order.

8           MR. ARNEBECK:      I am sorry, did you

9   instruct him not to answer?

10          MR. ERVIN:         Yes.

11  BY MR. ARNEBECK:

12  Q.   Do you have any knowledge in any capacity,

13  personally or professionally, of what Triad did

14  with the removed hard drives in connection with

15  the recount of the 2004 election?

16          MR. ERVIN:         Objection; lack of

17  foundation.  He has already answered "no" to

18  that question in a different form.

19          MR. EPSTEIN:       Join the objection.

20          MR. ARNEBECK:      I didn't ask that

21  question.

22          MR. ERVIN:         You said if he was

23  aware of removing hard drives.  He said "no."

24          MR. ARNEBECK:      I am asking now, he

25  might not be aware of removing hard drives, but

70

1 I am asking if he is aware of what happened to

2 the hard drives.

3          MR. ERVIN:          You may answer, if

4 you know.

5          THE WITNESS:          No.

6 BY MR. ARNEBECK:

7 Q.   Are you aware of any computer systems

8 developed by your firm that are still in place

9 in the Ohio Secretary of State's office?

10 A.   No.

11 Q.   Are you aware of any system in place today,

12 through your contact in the industry, which is

13 capable of altering the outcome of a voting

14 result in an upcoming election?

15          MR. ERVIN:          Objection.  That

16 gets outside the scope of the judge's order.

17          MR. ARNEBECK:     I am not asking for

18 his expert opinion.  I am asking him of his

19 personal knowledge, is he aware of any system in

20 place today which is capable of altering an

21 outcome of a voting result in an upcoming

22 election.

23          MR. ERVIN:          I renew the

24 objection.  Answer the question, if you can.

25          THE WITNESS:     No.

71

1  **BY MR. ARNEBECK:**

2  **Q.**   To the extent that you have either direct

3  recollection of your conversations with

4  Mr. Spoonamore or from your understanding of

5  what he is saying about those conversations in

6  his declaration, do you share any of the

7  concerns that Mr. Spoonamore has expressed with

8  the security of electronic voting as in place in

9  2004, 2006 or in the upcoming election?

10         **MR. ERVIN:**      Objection; outside

11  the scope of the judge's order.  Do not answer

12  that question.

13  **BY MR. ARNEBECK:**

14  **Q.**   Let me rephrase that question and limit it

15  to the scope of the 2004 Ohio election.  Do you

16  share any of his concerns as he has expressed

17  directly to you or in his declaration that you

18  have reviewed as to the security of the system

19  that was in place in 2004 in Ohio?

20         **MR. ERVIN:**      Objection; outside

21  of the scope of the judge's order.  Do not

22  answer that question.

23         **MR. ARNEBECK:**      Would you flag that

24  for discussion with the judge, that question and

25  instruction.

72

1          **MR. EPSTEIN:**     If that is going

2   before the judge, I am going to join the

3   objection and also object to the lack of

4   foundation for the question.

5          **MR. ERVIN:**     We will join in

6   that objection for the record.

7   **BY MR. ARNEBECK:**

8   **Q.**   Are you familiar with a Trojan program that

9   an employee of one of your companies designed at

10  some time in the past?

11         **MR. EPSTEIN:**     Objection; lack of

12  foundation.

13         **MR. ERVIN:**     Objection; lack of

14  foundation, outside the scope of the judge's

15  order.  Do not answer that question.

16  **BY MR. ARNEBECK:**

17  **Q.**   Are you familiar with -- do you know of

18  your personal knowledge whether SmarTech was

19  hosting the Web site associated with the Swift

20  Boat campaign during the 2004 election?

21         **MR. ERVIN:**     Objection; outside

22  the scope of the judge's order.  Do not answer

23  that question.  Also lack of foundation.

24  **BY MR. ARNEBECK:**

25  **Q.**   Would you focus on the Exhibit marked

73

1    Deposition Exhibit 2.

2         (Witness complies with the request.)

3    Q.   And would you describe your understanding

4    of your personal knowledge to what extent there

5    was a different picture in terms of the actual

6    operation of the system during the 2006

7    election?

8              MR. ERVIN:        Objection; lack of

9    foundation.

10             MR. EPSTEIN:      I join that

11   objection.  I also object to the form of the

12   question.

13   BY MR. ARNEBECK:

14   Q.   You can answer the question.

15   A.   It was a simpler solution because it was an

16   off year election, it does not -- off years, you

17   don't -- it is not the same level of interest,

18   not the same amount of traffic.

19   Q.   Was there a difference in the level of

20   outsourcing of the hosting of the system in the

21   2006 election?

22             MR. ERVIN:        Objection; lack of

23   foundation.

24             MR. EPSTEIN:      I join in the

25   objection.

74

1          **MR. ERVIN:**          You may answer.

2          **THE WITNESS:**          Not that I recall.

3    **BY MR. ARNEBECK:**

4    **Q.**   Are you aware of any direct ties of this

5    system to Cedarville University in the 2006

6    election?

7          **MR. ERVIN:**          Objection; outside

8    the scope of the judge's order.

9          **MR. EPSTEIN:**          I join the

10   objection and object for lack of foundation.

11          (Pause.)

12          **MR. EPSTEIN:**          You didn't instruct

13   him not to answer.

14          **MR. ERVIN:**          I am sorry, do not

15   answer that question.

16   **BY MR. ARNEBECK:**

17   **Q.**   Same question with respect to the 2004

18   election year.  Are you aware of any direct ties

19   to Cedarville University to this system in the

20   2004 election in Ohio?

21          **MR. ERVIN:**          Objection.  Do not

22   answer that question, outside the scope of the

23   judge's order, lack of foundation.

24   **BY MR. ARNEBECK:**

25   **Q.**   Okay.  In the exhibit Mr. Dillman, who was

75

1    associated with Cedarville University, is listed

2    in a secondary role in the system.  And we are

3    talking about man in the middle, we are talking

4    about conflicts of interest.  My question is

5    within the scope of the judge's instruction, and

6    I would like to know if you know whether

7    Mr. Dillman, in his role within this system, has

8    any -- his involvement results in any connection

9    to Cedarville University, to the flow of this

10   system in the 2004 election.

11          **MR. EPSTEIN:**    Object to the form,

12   object for lack of foundation.

13          **MR. ERVIN:**    I join in that

14   objection.  For clarification, we were looking

15   at Exhibit 2.  Are we back to Exhibit 1 now?

16          **MR. ARNEBECK:**    Yes, back to

17   Exhibit 1.

18          **MR. ERVIN:**    I am going to

19   object to that question as outside the scope of

20   the judge's order as it pertains to the extent

21   of which one of these vendors or contractors may

22   be involved in an outside entity.  I would

23   instruct you not to answer that question.

24          **MR. ARNEBECK:**    Okay.  Mark that as

25   another question for the judge.

76

1   **BY MR. ARNEBECK:**

2   **Q.**   Are you aware of Cedarville University as

3   perhaps being by reputation a right-leaning

4   religious university?

5            **MR. ERVIN:**        Objection; lack of

6   foundation and outside the scope of the judge's

7   order.  Do not answer that question.

8            **MR. ARNEBECK:**    Why don't we call

9   the judge and see if we can get some help on

10  these, I think, is it two questions?

11           But short of that, did you want to

12  inquire of anything?

13           **MR. EPSTEIN:**     I do not intend to

14  inquire.

15           **MR. ARNEBECK:**    Do you want to do

16  any Redirect, or should we just make a call?  I

17  would like to get the judge's instructions.

18           **MR. ERVIN:**        I have no Redirect.

19  I have got, I think there is a total of -- I

20  have got a total of four issues for the judge.

21  Do you want to address all four or just the

22  Cedarville questions?

23           **MR. ARNEBECK:**    What do you have,

24  Jim?

25           **MR. ERVIN:**        It goes back to

77

1    putting under seal the discussions about whether

2    or not -- what I am about to say, I would ask to

3    put under seal.

4              **MR. ARNEBECK:**    That's right, we

5    had two discussions where I indicated all we

6    were talking about was routine business

7    dealings.  There was no discussion of any

8    particular marketing method or any, you know,

9    secrets.

10             **MR. ERVIN:**    I have four we need

11   to address with the judge.

12             **MR. ARNEBECK:**    The last two are

13   specific questions?

14             **MR. ERVIN:**    Right.

15             (Thereupon, a discussion was held off

16             the record.)

17             (Thereupon, the telephone conference

18             with Judge Oliver commenced at 2:10

19             o'clock p.m.)

20             **THE COURT:**    This is Judge

21   Oliver.

22             **MR. ERVIN:**    Hello, Your Honor.

23   This is James Ervin on behalf of Michael

24   Connell.  I also have here Cliff Arnebeck and

25   Robert Fitrakis on behalf of the Plaintiffs and

78

1    Aaron Epstein with the Attorney General, on

2    behalf of Jennifer Brunner, the Secretary of

3    State.

4         **THE COURT:**      My deputy told me

5    you had some questions about the scope of my

6    order.  You do have a court reporter there,

7    right?

8         **MR. ERVIN:**      Yes, sir, and she

9    is -- we have a court reporter, and she is

10   taking down this discussion with you, Your

11   Honor.

12        **THE COURT:**      Okay.  I wanted to

13   make sure, because I don't have one here, so,

14   all right.  Go ahead.

15        My deputy told me generally.  But go

16   ahead, and I will take them one at a time.

17        **MR. ERVIN:**      Thank you, Your

18   Honor.  This is James Ervin on behalf of Mr.

19   Connell.  There are four issues -- one second,

20   Your Honor.

21        **THE COURT:**      Sure.

22        **MR. ERVIN:**      Thank you.  We had

23   a small technical glitch.  Ironic enough.

24        This is James Ervin on behalf of

25   Mr. Connell.  There are four issues, Your Honor,

1  I will try and summarize, and I would definitely

2  want Mr. Arnebeck to assist and make sure I

3  clarify this properly.

4          The first issue is, during the course

5  of the deposition, Mr. Arnebeck asked a question

6  of Mr. Connell regarding his conversations with

7  his client, the Secretary of State, about a

8  vendor named SmarTech, and addressing the issue

9  as to how SmarTech became a vendor on behalf of

10  the Secretary of State.

11          I asked that that question and the

12  questions and answers from that be sealed.  The

13  Secretary of State is a client of my client's,

14  and I was concerned that any conversations he

15  had as to how they do business or

16  recommendations he may have had could address

17  proprietary information strategies or other

18  issues that may provide them a competitive edge

19  in the marketplace.  Mr. Arnebeck disagrees with

20  that, and I will let Mr. Arnebeck address his

21  position.

22          **THE COURT:**      All right.

23          **MR. ARNEBECK:**      Yes, Your Honor.

24  The discussion that followed this has nothing to

25  do with any kind of unique marketing scheme or

80

1    design or technical information of the kind that

2    is normally treated as a trade secret.

3              It merely dealt with the

4    communications concerning the setup in the

5    Secretary of State's office and the conduct of

6    public business.  And we don't think it has

7    anything to do with trade secrets.

8              **THE COURT:**      All right.  Let me

9    go back to Mr. Ervin.  The concern is that your

10   client, Mr. Connell, has the Secretary of State

11   as a client, your concern about confidences

12   between the two of them, is that what you are

13   concerned about?

14             **MR. ERVIN:**      Yes, Your Honor.

15             **THE COURT:**      May we have the

16   Assistant Attorney General Epstein who is

17   representing Secretary of State at this point in

18   time, do you have any comment on that?

19             **MR. EPSTEIN:**      Thank you, Your

20   Honor.  I believe it has been our office's

21   position, at least with respect to the issue of

22   what goes under seal, that we were not going to

23   take a position in that, that we were going to

24   let the other parties work that out as they saw

25   fit.

81

1          **THE COURT:**        Okay.  You are

2     representing the Secretary of State; is that

3     right?

4          **MR. EPSTEIN:**        That is correct,

5     Your Honor.  But the issue with respect to the

6     trade relationship would be the witness

7     Mr. Connell's concern.  I don't know that the

8     Secretary of State has any proprietary or trade

9     information that she is concerned about, about

10    safeguarding this context.  So I don't think we

11    have a position on the question.

12          **THE COURT:**        Okay.  If

13    Mr. Connell is not worried about the Secretary

14    of State, and the Secretary of State has no

15    concerns regarding confidences, then I would say

16    there is no reason to seal that.  That would be

17    my ruling.

18          **MR. ERVIN:**        Thank you, Your

19    Honor.

20          The next three issues, Your Honor,

21    are all related.  There is an exhibit before

22    Mr. Connell, it is the same Exhibit I that was

23    attached to the memorandum in opposition filed

24    by the Plaintiffs.

25          It is a schematic, or purports to be

82

1    a schematic of the Election Production System

2    Configuration for Web Results, related to the

3    2004 election.

4              There is an individual listed on that

5    document, a gentleman named Alan Dillman, who is

6    a vendor, related to that system.  Mr. Arnebeck

7    presented a series of questions as to whether

8    Mr. Connell could comment on Mr. Dillman's

9    involvement with -- if Mr. Connell could comment

10   on Mr. Dillman's involvement with the Secretary

11   of State's office, as well as his involvement

12   with Cedarville University, which Mr. Arnebeck

13   characterized as a possible right wing leaning

14   educational institution.

15             I objected to that series of

16   questions as it is, I believe, outside the scope

17   of the court's order.  Mr. Dillman's

18   relationship with an educational institution,

19   regardless of its affiliation, we would contend

20   is not pertinent to the scope of the inquiry

21   that we are here about today.

22             In addition, there was a previous

23   question regarding Mr. Connell's familiarity

24   with Mr. Dillman.  Mr. Connell indicated he was

25   aware that Mr. Dillman was a vendor, but

83

1   otherwise, did not have, I believe, specific

2   involvement with him.

3           So we objected to that series of

4   questions relating to Mr. Dillman and Cedarville

5   University and how that relates to the 2004

6   election.

7           **THE COURT:**        All right.

8           **MR. ARNEBECK:**     Your Honor, Cliff

9   Arnebeck on behalf of the Plaintiffs.

10  Mr. Dillman is listed as the person in secondary

11  control of the Secretary of State's Web site and

12  tabulation and so forth activities, at the

13  Secretary of State's office in November 2004.

14          We have information that he is a

15  gentleman that runs a company called GCR,

16  Limited, but he is also a professor at this

17  Cedarville University, and we understand that

18  there was a direct connection between the

19  Secretary of State's office and Cedarville

20  University on election night 2004, and we feel

21  that the probing of Mr. Connell's knowledge of

22  this, in his capacity in this system, is within

23  the scope of your advice to us that we were free

24  to explore the man in the middle in the Ohio

25  2004 election.

84

1          We submit that Mr. Dillman and his
2     connection to Cedarville is one aspect of a
3     possible man in the middle situation that we
4     should be able to probe Mr. Connell's personal
5     knowledge of that subject.
6          **MR. ERVIN:**       Your Honor, this is
7     James Ervin again, on behalf of Mr. Connell.  I
8     would comment that there was no foundation laid
9     as to Mr. Connell having some type of knowledge
10    about Mr. Dillman's relationship to Cedarville
11    University, there was no foundation laid to
12    support the position that Cedarville University
13    was linked to the 2004 election in some way.
14         We believe the court's order was
15    clear that the questions were to avoid
16    speculation, to have Mr. Connell speculate or
17    provide unfounded opinions, and we believe that
18    those questions fall within that prohibition by
19    the court.
20         **MR. ARNEBECK:**    Your Honor, if I
21    may, Cliff Arnebeck again.  I did not ask for
22    Mr. Connell's expert opinion about a
23    hypothetical, if there were a connection, or if
24    Mr. Dillman had these relationships.  I was
25    asking of his personal knowledge whether he had

85

1   knowledge of any such connections, any such

2   relationship, inasmuch as it is part of this map

3   of the structure in the Secretary of State's

4   office.

5            Mr. Dillman is part of the map and so

6   is Mr. Connell through GovTech.

7            **THE COURT:**       Okay.  Let me just

8   make a few comments and then maybe a few

9   clarifying questions, and I think we can get to

10  a quick resolution.

11           The man we are talking about is Alan,

12  is it Dillman?

13           **MR. ARNEBECK:**     Yes, Your Honor.

14           **THE COURT:**       Okay.  He has some

15  involvement with the system that was used in

16  2004.  Now, obviously the things that are

17  clearly in bounds is Mr. Dillman's role in that

18  process and any background information that

19  would bear on that.

20           I would be concerned about covering

21  other areas unless there was a foundation laid

22  and there is no question about it.  You,

23  Mr. Arnebeck, said something about Cedarville

24  University, not only something about right wing

25  leaning, but it was somehow involved or

86

1    connected with the 2004 election or the

2    Secretary of State's office in that election.

3          I don't know enough -- I don't know

4    how I measure that.  How does Cedarville

5    University become involved in this process?

6          **MR. ARNEBECK:**    Mr. Fitrakis can

7    address that.

8          **MR. FITRAKIS:**    Through Mr. Dillman

9    and on their Web site it was publicly displayed

10    that they were providing backup services for

11    SmarTech on that night, as well as people in the

12    Secretary of State's office who said there was a

13    direct connection on election night to

14    Cedarville University, which they also wrote

15    about on their Web site.

16          **THE COURT:**    All right.  You are

17    helping me some.  But when you say "a direct

18    connection," you know, you have to understand --

19          **MR. FITRAKIS:**    Transmission of

20    data.

21          **THE COURT:**    That there was data

22    being transmitted by or to Cedarville University

23    relative to the 2004 election?

24          **MR. FITRAKIS:**    Yes.  And that

25    their students were monitoring the SmarTech

1   site, according to the Cedarville Web site, in

2   fact, they were very proud of their activity on

3   that night.

4           THE COURT:        Now, that is

5   something they are being paid to do?

6           MR. FITRAKIS:        We are not sure

7   whether he was doing it through his company or

8   in his capacity as a professor there.  We know

9   there was a connection to the university.

10          THE COURT:        What would be their

11  role, what would they be seeking to do or ensure

12  in their role, just explain that.

13          MR. FITRAKIS:        Well, they on their

14  Web site indicated they were monitoring for

15  possible crashes of the site, and they were

16  looking at data transmissions.

17          THE COURT:        Okay.  Well, I

18  think your questions are going to have to -- I

19  am not saying they aren't, but they are going to

20  have to be focused as they relate to the

21  computer system 2004 and the election.

22          And so if you have got questions you

23  can ask based on information that you have

24  elsewhere, as long as you put those in a

25  pinpoint way to the witness, you can ask them.

88

1            But if he doesn't know the answer or

2    has no familiarity with it, then there is really

3    nowhere to go, so the question, one, would be

4    whether he knows Mr. Dillman, which I take it

5    the answer is "yes."  What role did Mr. Dillman

6    play, if any, in the 2004 election, in the

7    system, the computer system that was involved

8    during that election.

9            I am not telling you exactly what

10   questions, but those seem to make all the sense

11   in the world.

12           And then the question is, does he

13   know -- you can ask him the question, does he

14   know whether he was employed by Cedarville

15   University or what have you, and does he know

16   whether Cedarville University played any role in

17   assisting Mr. Dillman or a backup in his system

18   and what is his knowledge about what role they

19   played, all those things seem appropriate.

20           Now, if on the other hand, a question

21   just got off into, you know, was it a right wing

22   university and down that line, without laying

23   any foundation, if you have some concerns about

24   what Cedarville was doing and you really had

25   some background information that suggested that

89

1   because of the nature of the university, the
2   kind of university they are, if they would have
3   incentives to do certain things during the
4   course of the election, that might be
5   permissible too.  But it can't be an open-ended
6   process.

7           As long as you keep it tied to the
8   election and the questions that you ask are
9   somehow related to finding out information about
10  that, that this witness, Mr. Connell, may know
11  about.  That is really what you have got, is his
12  knowledge.

13          I am not sure that is helpful.  But
14  let me go back to Mr. Ervin, because I have kind
15  of laid out some guidance.  But I want to go
16  back to you so I make sure I have addressed your
17  concerns.  What do you think they are asking
18  about here that go beyond what I have just said?

19          **MR. ERVIN:**       I think, Your
20  Honor, there were some questions that were asked
21  previously that inquired of Mr. Connell's
22  knowledge or involvement with SmarTech, and I
23  think his answers to that indicated that he did
24  not have a substantive involvement.

25          Obviously his answers speak for

90

1     themselves, but in addition, there were

2     questions about his relationship or rather

3     working relationship with Mr. Dillman.  I think

4     these questions as to Mr. Dillman's involvement

5     with Cedarville, I think, go beyond his answers

6     and, because of a lack of foundation, I think do

7     not permit Mr. Arnebeck to continue to inquire

8     as to that involvement.

9             In addition, Mr. Arnebeck did make a

10    comment about Cedarville having right wing

11    leaning, I guess, philosophies, and I think that

12    all ties back into this political theory that I

13    think that we conveyed to the court on Friday is

14    being driven through Mr. Connell's desire by the

15    Plaintiffs to give testimony.

16            The relationship of Cedarville to

17    SmarTech, as to whether Cedarville is monitoring

18    election results, goes beyond what Mr. Connell

19    has indicated was his involvement with the 2004

20    election.  He has clearly stated that his job

21    was to design and facilitate a Web site that

22    posted public information and did not get into

23    voting tabulation, that he has no ownership

24    interest in SmarTech.  Neither he nor any of his

25    employees or anyone that he was aware of related

91

1    to his companies were on site at the SmarTech

2    facility in Tennessee.

3              So I think these questions about

4    Mr. Dillman's involvement with Cedarville

5    University and what Cedarville University did as

6    it relates to the election are outside the scope

7    of what the court has ordered.

8              I think this is an example of a

9    fishing expedition, and we would ask the

10   court -- we have instructed Mr. Connell not to

11   answer those questions and we would ask the

12   court to sustain the objection.

13             **MR. ARNEBECK:**     Your Honor, if I

14   may?  Cliff Arnebeck again for the Plaintiffs.

15   If I am not mistaken, while Mr. Ervin is

16   accurate in his description of Mr. Connell's

17   initial testimony in relation to SmarTech,

18   subsequently he indicated that SmarTech is the

19   company that he regularly has host, do the

20   server hosting on all of his business, his New

21   Media business, his political business, and that

22   the contract for the Secretary of State's office

23   with SmarTech may well have been a bundled

24   contract, where SmarTech was a subcontractor to

25   GovTech, which is Mr. Connell's company.

1             So this is relevant, it is within the

2    scope, and we would ask that we be permitted to

3    explore this within the scope of his honor's

4    ruling that we were free to explore with respect

5    to this man in the middle situation in this map

6    in the 2004 election.

7             If I may, Your Honor, I would like --

8    because of the fact that my co-counsel,

9    Mr. Fitrakis, has written several books on this

10   subject, I would ask that if his honor permits

11   this line of further questioning, that we be

12   able to, for this one area, that he be permitted

13   to ask the questions.

14        **MR. ERVIN:**        Your Honor, this is

15   James Ervin on behalf of Mr. Connell.  In all

16   due respect to Dr. Fitrakis, you know, we

17   addressed this on Friday, that there would be

18   one person asking questions, and the fact that

19   Mr. Fitrakis has written books about this or has

20   represented that the Plaintiffs have

21   information, there has been no such information

22   presented here to Mr. Connell that lays a proper

23   foundation for him to answer any questions about

24   Cedarville University or Mr. Dillman's relation

25   to that.

93

1          This is, again, the personal opinion

2     of the attorneys being pushed through this

3     procedure.  As we indicated on Friday, the

4     political machinations of the Plaintiff should

5     not be facilitated through this legal process.

6          **THE COURT:**       Okay.  Mr. Arnebeck

7     said something about SmarTech and its contract

8     may have been bundled through or with a contract

9     for GovTech.

10          And that is Mr. Connell's company.  I

11     guess the question is, what does he mean by

12     that, and did he have any knowledge of that?

13     Because if he didn't, and he had no relationship

14     that he was aware of between himself and

15     Mr. Dillman, then, of course, at some point that

16     questioning has to stop.

17          It may give you some information

18     which you can pursue further with the Secretary

19     of State or with somebody else, but the

20     interesting thing, I find very interesting that

21     some of these things can be gotten at in other

22     ways.

23          For example, Cedarville University,

24     whether it is a right wing leaning university,

25     that doesn't depend on any testimony by

94

1    Mr. Connell.  If you got some sense that it is,

2    I am sure you could fairly quickly find that out

3    or you already have some ideas about that,

4    without using this as the basis for doing that.

5            I don't want to preclude you from

6    any, Mr. Arnebeck, from any area which naturally

7    flows from what I have allowed you to do, but I

8    would say that the fact that he has some

9    relationship to SmarTech in another context

10   doesn't necessarily make this a situation where

11   you can kind of do a free for all on SmarTech.

12           It seems to me what we are doing is

13   focusing on the 2004 election, and the question

14   is, what happened during 2004, and what

15   knowledge does this witness have that bears on

16   that in a nonspeculative way.

17           And so, you know, I am just

18   struggling here to try to give you the right

19   parameters.  But if I were sitting there and I

20   were hearing the questions, I guess I would say

21   that when you get to the point where he says,

22   "What Mr. Dillman did really had no relationship

23   to what I was doing," that I had no -- if he

24   were to say, "I had no knowledge, particular

25   knowledge, specific knowledge of what

95

1   Mr. Dillman was doing during the election, I
2   don't know whether Cedarville was backing him
3   up, and I have no independent knowledge of any
4   of those matters," then it would seem to me that
5   you would have to stop.
6           I mean, I suppose for purposes of
7   discovery, if he says, "I do know X, Y and Z,"
8   so it turns out that it is not something that is
9   admissible, but would lead to admissible
10  information, that might be a possibility as
11  well.  But it is not open-ended.  You have got
12  to have some basis for further pursuing his
13  information.
14          So I think discovery -- I know
15  discovery would be broader than what is
16  admissible.  But at the same time, you can't
17  just put it to a witness and ask him to
18  speculate.  Let me see if I can just lay down a
19  rule here.
20          Where are you now?  I guess what else
21  do you want to ask him that might be more
22  beneficial than where we have been, or what
23  questions were asked that were not answered?
24  Either way.
25          MR. ARNEBECK:    What was the other

96

1    question?  You had a list, Jim.

2              **MR. ERVIN:**           I think, Your

3    Honor, there were four points.  The questions

4    regarding Cedarville comprise three of those

5    four points.  I think the court addressed the

6    first issue and said that that would not be

7    under seal.  We instructed our client not to

8    answer three questions related to the Cedarville

9    issue, and I don't believe that there are other

10   matters that have been contested about sealing

11   the record, Your Honor.

12             **THE COURT:**           Okay.  Other than

13   whether Cedarville is a right wing leaning

14   university and Mr. Dillman's relationship to it,

15   what else is outstanding that you instructed him

16   not to answer?

17             **MR. ARNEBECK:**      There was a

18   question, Your Honor, I asked if he was aware

19   that the Swift Boat campaign was being hosted on

20   the SmarTech servers in Chattanooga, Tennessee,

21   along with all the other Republican

22   organizations.  And he was instructed not to

23   answer that question.

24             **MR. ERVIN:**          This is James

25   Ervin, Your Honor, that is correct.  And I think

97

1    that question, Your Honor, was an issue that

2    Mr. Arnebeck raised during the hearing on

3    Friday, and the court stated then that that was

4    outside the scope of today's deposition.  We

5    believe that clearly falls outside your order,

6    Your Honor.

7           **THE COURT:**      Okay.  Anything

8    else?

9           **MR. ARNEBECK:**     I believe that is

10   all, Your Honor.

11          **THE COURT:**      Okay.  Just one

12   moment.

13          (Pause.)

14          **THE COURT:**      Mr. Arnebeck, how

15   would this SmarTech hosting -- what did you say?

16          **MR. ARNEBECK:**     Swift Boat Veterans

17   for Truth.

18          **THE COURT:**      What issue does

19   that go to in regard to the 2004 election, as it

20   relates to your case?

21          **MR. ARNEBECK:**     Well, the whole

22   point was to explore this man in the middle and

23   SmarTech as a possible man in the middle.  And

24   the point is that they are hosting the George W.

25   Bush for President campaign, the Republican

1    National Committee's campaign, a whole bevy of

2    other Republican partisan campaigns.

3              And Swift Boat Veterans for Truth, if

4    you recall, Your Honor, was one of these phony

5    front groups that was attacking John Kerry on

6    the theory that it was independent of the

7    campaign.  But it is on one side of the

8    campaign, there is no question about that.

9    Whether it is independent is another question.

10              But it shows that this SmarTech that

11    is performing this backup function, supposedly

12    for the Secretary of State's office, is itself a

13    fundamentally partisan organization, and very

14    well could be -- have the motive and opportunity

15    to be performing the corrupt man in the middle

16    function that Mr. Spoonamore, our expert

17    witness, is talking about.

18         MR. ERVIN:        Your Honor, this is

19    James Ervin.  Again, this is fishing and trying

20    to tie a bunch of different concepts together

21    and using this man in the middle concept as a

22    basis to ask a wide variety of questions.

23         MR. ARNEBECK:      Your Honor, let me

24    cut to the short -- I will withdraw the

25    question, because we have this as a matter of

99

1    record, and whether Mr. Connell knows it or not,

2    he knows enough that solidifies my point.

3              So let's limit it to the inquiry in

4    regard to Cedarville's connection to this and

5    Mr. Dillman's role and Mr. Connell's personal

6    knowledge of that situation.

7              **THE COURT:**      Okay.  I think that

8    would be entirely appropriate then.  That would

9    solve the issue, because that is, I think, where

10   I should be.

11             All right.  Anything further?

12             **MR. ARNEBECK:**    May Mr. Fitrakis

13   ask the questions on this one line of

14   questioning, Your Honor?

15             **MR. ERVIN:**      Your Honor, we

16   would object to that.  We addressed this with

17   the court on Friday that it is one person asking

18   the questions on behalf of the Plaintiffs.

19             **THE COURT:**       All right.  I would

20   like to continue with what we said,

21   Mr. Arnebeck, but you can -- I will give you an

22   extra ten minutes, if you want to confer with

23   him about areas to ask.  You can obviously

24   confer with him as you go.

25             **MR. ARNEBECK:**    Right.

100

1          **THE COURT:**          I will give you an
2    extra ten on top of what you have, if you want
3    to confer with him on that.
4          **MR. ARNEBECK:**          Thank you, Your
5    Honor.  I want it noted for the record, that we
6    were completed, our deposition, except for this
7    discussion with his honor at 2:00.  So we kept
8    within our bounds.
9          **THE COURT:**          All right.
10          **MR. ERVIN:**          Your Honor, I guess
11   I would ask the court that Mr. -- these last
12   questions regarding the Cedarville issues will
13   be the last questions asked for the purposes of
14   the deposition.  I think that we --
15          **THE COURT:**          I think that is
16   what Mr. Arnebeck was representing, that he was
17   essentially done except for these; is that
18   right?
19          **MR. ARNEBECK:**          That's correct,
20   Your Honor.
21          **THE COURT:**          All right.  Now,
22   let me just make one other comment.  I was
23   thinking about when you asked me about sealing
24   the record, which, of course, I ruled on the
25   other day.  Ultimately, depositions don't

101

1   necessarily get filed over here in court, simply

2   because they have been taken.  There is no

3   requirement that that happen.

4           So ultimately, when you go back to

5   Judge Marbley, I guess the question is, once

6   this is done, he may have some views on how this

7   can be used, if at all, in his case, and what

8   rules should attach to that.  So I just make

9   that comment, because that is something I

10  thought of.

11          MR. ERVIN:        Your Honor, this is

12  James Ervin on behalf of Mr. Connell.  I guess

13  for procedural purposes, would we have a

14  deposition filed with you under seal and then

15  transferred to Judge Marbley, to address how

16  those unsealed portions are set forth in a

17  separate document?

18          THE COURT:        You know, I am not

19  even sure -- candidly, I am not sure you want to

20  file it with me.  It is not a public record, and

21  at that time, I don't know what the best process

22  is.

23          MR. ERVIN:        Then I would offer

24  this suggestion, Your Honor, once the deposition

25  is completed, since there are portions that we

102

1    have asked to be placed under seal, that have

2    not been objected to by Plaintiff's counsel, we

3    would ask that the entire deposition be filed

4    under seal, that the parties to the deposition

5    be held to a gag order in effect until the

6    parties can address the deposition with Judge

7    Marbley and let him make a decision as to how

8    its contents can be released to the public, for

9    lack of a better phrase.

10           **MR. ARNEBECK:**    Your Honor, if I

11   may address this, this is Cliff Arnebeck for the

12   Plaintiffs.  Your Honor has ruled on the sealing

13   of the discussions with the Secretary of State.

14   So the only matter that by agreement is under

15   seal is my question and Mr. Connell's answer in

16   regard to whether or not there has been an

17   attempt to intimidate him as a witness in this

18   case.

19           That is the only thing that is at

20   issue as being under seal, and we are in

21   agreement.  So there is no reason to place

22   anything else under seal.

23           **MR. ERVIN:**    Your Honor, there

24   has been a series of questions and some

25   questions based upon Mr. Connell's answers, I

1   think those lines of questions that relate to

2   the scope that the court set forth were

3   indicated to be under seal, that Plaintiff's

4   counsel did not object to those, and those

5   haven't been presented to the court.

6           And I would ask that until we can

7   have the -- have the deposition transcribed and

8   address this with Judge Marbley, that no portion

9   of the deposition be released to the public by

10   any of the attorneys until we can address this

11   with Judge Marbley.

12           Obviously, Your Honor, there are

13   portions of the deposition that we have not

14   asked to be under seal that we believe fall

15   within the scope of the court's order.

16           But until we can find a mechanism by

17   which you can parcel out those sealed portions

18   and not sealed portions, I think until Judge

19   Marbley can address that, no portion of the

20   deposition should be released.

21           I think, as we have indicated to the

22   court, this close to the election, with some of

23   the things that Mr. Connell has gone through

24   prior to his deposition being taken and related

25   to his deposition, I don't think the Plaintiffs

1  are prejudiced by addressing this issue with

2  Judge Marbley and letting Judge Marbley come up

3  with a mechanism for releasing those unsealed

4  portions.

5          I mean, it is going to get out there,

6  but I think until Judge Marbley decides how to

7  do it, I think all the parties' interests are

8  protected and none would be burdened by that

9  process.

10          **THE COURT:**          Well, you know, I

11  have got, as I said before, kind of a delicate

12  role here.  But part of my responsibility is to

13  make sure that trade secrets are protected, also

14  to make sure that if information, for example,

15  such as possible threats and so forth are

16  revealed, that that would not create problems

17  for Mr. Connell.  When I say problems for him, I

18  mean possible problems with threats or other

19  kinds of things in the context of this election.

20          On the other hand, you know, there is

21  the common practice that depositions and trial

22  testimony not be sealed because of the public

23  interest.  I would have a concern that there may

24  actually be public entities that may very well

25  be interested.

105

1          I am not into drumming up any

2    publicity, anybody who knows me would

3    understand.  But at the same time, you know, I

4    have got to be sure that I protect, strike the

5    right balance.

6          When I was talking about Judge

7    Marbley, what I am saying is when we get back to

8    the case in a different context in which this

9    information may be raised, whether it is a

10   summary judgment motion or a motion for class

11   certification or whether it is in another

12   context, those rulings will be for Judge

13   Marbley.  He may very well determine in a

14   defined context that certain information is

15   relevant or not relevant, what have you.

16          But I am not inclined to go beyond

17   what I did the other day, and that is to say

18   that the information relative to any threat be

19   not disseminated, and that is an order of this

20   court, that the parties not do that.

21          So it is not a suggestion, that is an

22   order.  And that if there are any trade secret

23   information issues or problems, that, again,

24   that not be revealed.  That is an order.  It is

25   not a suggestion.

1           So I don't think I can go any further

2     than that.  So if the order is disobeyed, then

3     there are sanctions which can be meted out, and

4     I would not hesitate to do so under proper

5     circumstances.  That is the best I can do.

6           So I would like the parties to go

7     back and complete the deposition, and let me say

8     that I do commend you on both sides for your

9     professionalism and the way you have conducted

10    yourself in the light of issues that I know are

11    of not only emotional importance to both sides,

12    but which does cause people to become tense and

13    excited, especially in the context of an

14    election season.  So I do appreciate your

15    professionalism.

16           **MR. ERVIN:**      Thank you, Your

17    Honor.

18           **MR. ARNEBECK:**      Thank you, Your

19    Honor.

20           **MR. ERVIN:**      I guess as a final

21    question, Your Honor, in compliance with the

22    court's order about what is sealed and not

23    sealed, what recommendation does the court have

24    for logistically being able to pick apart the

25    deposition, where it is scattered throughout

107

1    different questions that pertain to different

2    issues?

3              **THE COURT:**       Well, the main

4    issue, I thought, would have been covered at one

5    time.  I don't know, because I don't have the

6    deposition.  Mr. Arnebeck, I would have thought,

7    would have pursued the issue of threats, and

8    would have concluded that issue all at one time.

9    Now, if he didn't do that --

10             **MR. ARNEBECK:**    I did, Your Honor.

11             **THE COURT:**       So whatever number

12   of pages those are, they should be redacted.

13             **MR. ERVIN:**       Would the parties

14   have the ability, with the court's

15   recommendation, to have the deposition

16   transcribed and then confer as to what should be

17   redacted, and if there is a problem, contact the

18   court?

19             **THE COURT:**       You certainly can

20   call me if there is an issue.

21             **MR. ERVIN:**       And would the

22   court --

23             **THE COURT:**       I would be happy to

24   intercede if there is a problem.

25             **MR. ERVIN:**       If the court is

1   willing, we would then ask to have a copy of the

2   deposition sent to the court, have the

3   deposition transcribed and then allow the

4   counsel to go through it and try and confer on

5   what portions --

6           THE COURT:        It is just a

7   question of time.  I don't know how long the

8   deposition is.  But it won't be that long.  I

9   don't know what the Plaintiffs is seeking to do

10  in terms of getting the deposition printed up,

11  how long that will take, whether that will be

12  this afternoon or some other time.  So I guess

13  without that information, I don't want to be in

14  a position to be the centerpiece of the process,

15  if there is an expedited process that is

16  underway.

17          MR. ARNEBECK:        It is a somewhat

18  expedited process, Your Honor, as I understand,

19  it was four or five hours.

20          THE COURT:        That's when you

21  intend to get it?

22          MR. ARNEBECK:        Yes.

23          MR. ERVIN:        Well, I think the

24  court reporter would have to weigh in on what

25  her ability is to transcribe it on an expedited

1    basis.  I would not want to speak for her, Your

2    Honor.

3              (Thereupon, a discussion was held off

4              the record.)

5              MR. ARNEBECK:    Your Honor, we were

6    poised to do it on an extraordinarily expedited

7    basis.  But it is probably going to be available

8    tomorrow at some time, as the last hearing was,

9    and we are at about the same length, so I expect

10   we will have it tomorrow.

11             THE COURT:      But I don't know

12   what use you intend to make of it.  I really

13   don't want to get directly involved in anybody's

14   strategy as to what use they may or may not make

15   of it.  All I am trying to do is make sure that

16   I don't get in the way, that somehow I don't

17   become the point of delay, because I don't know

18   why there would be a big reason for me to be

19   involved, although I am willing to, if there is

20   a real issue.  I mean, you could clearly agree

21   on the questions related to the threat.  They

22   seem discreet enough.

23             MR. ARNEBECK:    Your Honor, I will

24   professionally represent that we certainly are

25   able to comply strictly and completely with the

1    court's order with respect to the threat.

2          And there has been no other -- there

3    has been no discussion of trade secrets in my

4    view, even in the broadest understanding of what

5    is a trade secret.  I do have some familiarity

6    with that area of the law.  So I don't think we

7    really have an issue here.

8          **MR. ERVIN:**      Your Honor, this is

9    James Ervin.  I would indicate to the court, at

10   various times through the deposition, I asked

11   the court reporter to identify that a question

12   or a line of questioning and answers would be

13   sealed, and then when we got to a point that I

14   thought should be unsealed, I indicated that to

15   her.  And Mr. Arnebeck did not object.

16          So I would think when this deposition

17   is transcribed, there are going to be sections

18   that have been indicated as sealed that

19   Mr. Arnebeck may want to address or may not

20   address.  So I believe there are portions of the

21   deposition that have been sealed that do fall

22   within the court's order that have not been

23   addressed thus far, that Mr. Arnebeck may want

24   to address.  If we can't come to a meeting of

25   the minds --

1          **THE COURT:**        Let me just give

2     you some guidance.  And then, like I said

3     before, I just don't want to be in the place

4     where things are stopped unnecessarily in terms

5     of the process going forward.  I really don't.

6          Now, you can agree on things that go

7     beyond my order, if you want to, in terms of

8     sealing more, although generally I would not be

9     in favor of that.

10         But what I would be concerned about

11    is that -- let me just tell you two things.  One

12    is that the Secretary of State is a party to

13    this litigation.  They have counsel in the

14    litigation and the case is about what happened

15    in 2004.

16         So there are not too many aspects of

17    that that could qualify as trade secret or trade

18    secret not waived.  I don't see much to that

19    argument, because your client may be concerned

20    about the Secretary of State, Secretary of State

21    isn't concerned about itself.

22         **MR. ERVIN:**        Well, Your Honor,

23    to respectfully interrupt, my client is

24    concerned about the release of information as to

25    how he does business with the client that may

112

1  give a competitive edge to other individuals,

2  and in place at the time, when there was a

3  different Secretary of State, the agreement that

4  my client had included a confidentiality clause.

5           And I am not aware if counsel for the

6  Secretary of State has waived that formally.

7           **THE COURT:**        Well, when they say

8  that they have no objection, they basically are

9  taking the position, they are sitting right

10 there, that there is no Secretary of State --

11 the Secretary of State from 2004 is behind,

12 behind us.  He doesn't have any standing, he is

13 not around anymore.

14           So it seems to me that the new

15 Secretary of State succeeds to whatever

16 agreements and understandings.  And I am sure

17 there are many of them that they may repudiate

18 or reject or have chosen not to follow.  And so

19 with that said, I mean, it would be kind of an

20 odd situation to have someone asserting their

21 concern about confidentiality and then have the

22 Secretary of State say, "We have no such

23 concern."

24           I understand that that is a good

25 place to start with, because if you have an

113

1   agreement with somebody, and it is going to be

2   confidential, it is legitimate that Mr. Connell

3   would say, "Well, I don't want to talk about

4   that because I am precluded."  And then the

5   Secretary of State, says, "Well, we really don't

6   care."

7            You know, basically, it is like

8   attorney-client privilege which the client

9   waives, and the lawyer is still saying, "I don't

10  want to talk about it," and the client is

11  saying, "Talk about it if you want.  It is

12  okay."

13           I mean, that is the way I kind of see

14  that issue.

15           **MR. ERVIN:**        Thank you, Your

16  Honor.

17           **MR. ARNEBECK:**      Thank you, Your

18  Honor.

19           **THE COURT:**        All right.  But I

20  am going to be available.  So when you get the

21  transcript and you share with each other, it is

22  fine if you want to send one to me.  But it is

23  less important that you send one to me, that you

24  confer once the two of you receive it and if you

25  have any issues, then you should call me right

114

1  away before you disseminate it.

2           MR. ERVIN:        Yes, sir.

3           MR. ARNEBECK:      Thank you, Your

4  Honor.

5           THE COURT:        All right.  Thank

6  you.

7           MR. ERVIN:        Thank you.

8           THE COURT:        Good-bye.

9           (Thereupon, the telephone conference

10          with Judge Oliver was concluded at

11          2:57 o'clock p.m.)

12          MR. ERVIN:        All right.  Why

13  don't we -- do you need a minute before we get

14  to this?

15          MR. ARNEBECK:      Yes.  Take five

16  minutes.

17          (Thereupon, a recess was taken.)

18  BY MR. ARNEBECK:

19  Q.   I am going to do my best in recalling

20  exactly what the judge said.

21       Mr. Connell, are you familiar with Mr. Alan

22  Dillman?

23  A.   Yes.

24  Q.   And are you familiar with what role

25  Mr. Dillman played in the 2004 Presidential

115

1    election in Ohio?

2    **A.**   Relevant to his being a vendor for the

3    election night project.  I know nothing beyond

4    that.

5    **Q.**   In other words, you do not know of your

6    personal knowledge whether or not he is employed

7    by Cedarville University?

8              **MR. ERVIN:**      Objection; lack of

9    foundation.  You may answer that question.

10             **THE WITNESS:**     I think he was a

11   part-time instructor, yes.

12   **BY MR. ARNEBECK:**

13   **Q.**   Do you have any knowledge of your personal

14   knowledge whether or not, through Mr. Dillman or

15   otherwise, that there was any direct connection

16   between the Secretary of State's office and

17   Cedarville University on election night?

18             **MR. EPSTEIN:**     Objection.

19             **MR. ERVIN:**      Is that other than

20   him knowing Dillman was a part-time professor at

21   a university?

22             **MR. FITRAKIS:**    Yes, I think just

23   was there a direct connection?  You know, we

24   have reason to believe that there was a direct

25   connection between the Secretary of State's

1    office and Cedarville University for data and/or

2    imaging transmission.

3              MR. ARNEBECK:    All my question is,

4    he said that all he knows besides the fact that

5    Dillman had the contract, had a role in the

6    Secretary of State's office, he knows he had a

7    part-time position with Cedarville University,

8    and I am just asking, and perhaps by implication

9    he said he wouldn't know this, but I am asking

10   specifically does he have any knowledge of his

11   personal knowledge of any role, or any

12   connection between the Secretary of State's site

13   and Cedarville University on election night.

14             MR. EPSTEIN:    Object to the form.

15             MR. ERVIN:    I object to the

16   form.  Answer the question.

17             THE WITNESS:    I am not aware of

18   any connection between Cedarville University and

19   the Ohio Secretary of State on election night.

20   BY MR. ARNEBECK:

21   Q.   Okay.  One last question.  Are you aware of

22   any connections between SmarTech and Cedarville

23   University on the election night 2004?

24   A.   No.

25             MR. EPSTEIN:    Object to form and

117

1    foundation.

2              **MR. ARNEBECK:**    I think that

3    concludes our deposition.  If you have nothing?

4              **MR. EPSTEIN:**    I have no

5    questions.

6              **MR. ERVIN:**    I have no Redirect.

7    You have the right to read the transcript, to

8    make any corrections that you see fit.  You

9    can't change the substance, but you can change

10   spelling.  You have the right to waive that.  If

11   you want to instruct the court reporter that you

12   want to read, just tell her you want to read.

13             **THE WITNESS:**    I would like to

14   read.

15             (Thereupon, the M.L. Connell

16             deposition was concluded at 3:07

17             o'clock p.m.)

18                  - - -

19

20

21

22

23

24

25

118

1

2

3      I, MICHAEL L. CONNELL, do verify that I

4  have read this transcript consisting of 119

5  pages and have had the opportunity to make

6  corrections/changes.

7

8  Corrections/Changes Made _____

9

10  No Corrections/Changes Made _____

11

12

                    _____

13                    MICHAEL L. CONNELL

14

15

        Sworn to before me, _____,

16                            Notary Public

17  this _____ day of _____, _____.

18

19

20

21                    _____

                            Notary Public

22

23  My commission expires _____.

24                    - - -

25

119

1                    C E R T I F I C A T E
2
   STATE OF OHIO,       )
3                       )  SS:
   SUMMIT COUNTY,       )
4
          I, Binnie Purser Martino, a Registered
5  Diplomate Reporter, Certified Realtime Reporter
   and Notary Public within and for the State of
6  Ohio, duly commissioned and qualified, do hereby
   certify that the within named witness, MICHAEL
7  L. CONNELL, was by me first duly sworn to
   testify the truth, the whole truth and nothing
8  but the truth in the cause aforesaid; that the
   testimony then given by him was by me reduced to
9  Stenotype in the presence of said witness,
   afterwards prepared and produced by means of
10 Computer-Aided Transcription and that the
   foregoing is a true and correct transcript of
11 the testimony so given by him as aforesaid.
          I do further certify that this deposition
12 was taken at the time and place in the
   foregoing caption specified, and was completed
13 without adjournment.
          I do further certify that I am not a
14 relative, employee of or attorney for any party
   or counsel, or otherwise financially interested
15 in this action.
          I do further certify that I am not, nor is
16 the court reporting firm with which I am
   affiliated, under a contract as defined in Civil
17 Rule 28(D).
          IN WITNESS WHEREOF, I have hereunto set my
18 hand and affixed my seal of office at Akron,
   Ohio on this 10th day of November, 2008.
19
20
21
22
23    _____
          Binnie Purser Martino, RDR, CRR
24
          My commission expires June 26, 2009.
25                    - - -

**COURT REPORTERS OF AKRON CANTON AND CLEVELAND**
**330-666-9800                330-452-2400                216-621-6969**

**A**

**Aaron (2)**
2:19 78:1
**ability (3)**
26:18 107:14
108:25
**able (5)**
17:16 84:4
92:12 106:24
109:25
**aboveboard (1)**
9:6
**Absolutely (1)**
63:25
**accuracy (2)**
60:3 61:25
**accurate (2)**
59:20 91:16
**action (1)**
119:15
**activities (3)**
8:5 9:8 83:12
**activity (6)**
10:20 12:15,15
14:11,13 87:2
**actual (1)**
73:5
**addition (3)**
82:22 90:1,9
**additional (1)**
21:24
**address (16)**
5:13 41:4 76:21
77:11 79:16,20
86:7 101:15
102:6,11 103:8
103:10,19
110:19,20,24
**addressed (5)**
89:16 92:17
96:5 99:16
110:23
**addressing (4)**
11:22 34:19
79:8 104:1
**adjournment (...**
119:13

**admissible (3)**
95:9,9,16
**advantage (1)**
40:4
**advice (1)**
83:23
**affiliated (1)**
119:16
**affiliation (3)**
41:5,5 82:19
**affiliations (1)**
42:2
**affixed (1)**
119:18
**aforesaid (2)**
119:8,11
**afternoon (2)**
5:9 108:12
**age (1)**
5:2
**agencies (2)**
21:6,17
**agency (2)**
22:10 63:24
**aggregate (3)**
19:7 33:19 37:4
**aggregates (1)**
33:7
**aggregating (3)**
36:4,6 62:20
**aggregation (1)**
19:12
**agree (3)**
67:10 109:20
111:6
**agreed (1)**
12:4
**agreement (5)**
1:21 102:14,21
112:3 113:1
**agreements (1)**
112:16
**ahead (8)**
8:9,16,17 24:23
43:8,9 78:14
78:16
**Akron (1)**

119:18
**al (2)**
1:6,10
**Alan (6)**
60:7,19,21 82:5
85:11 114:21
**allow (2)**
18:12 108:3
**allowed (1)**
94:7
**allowing (1)**
33:9
**alluded (1)**
39:17
**altering (2)**
70:13,20
**Alvin (2)**
48:13,17
**amount (1)**
73:18
**analogy (1)**
42:9
**and/or (1)**
116:1
**anonymous (1)**
13:22
**answer (83)**
8:9,16,18 12:23
13:2 14:2
15:21 16:3,5
17:5 18:3
20:24 21:1
22:23 24:11
26:9,11,16,17
26:22 32:7,21
34:23 35:18
36:1 38:13
39:15 41:9
43:8,10,13
44:2,5,15,16
47:4 49:19
52:6 57:5,8,11
57:11,14,15,25
58:3,13 59:14
59:25 61:10,17
62:3,5 63:10
66:4 67:11

68:2,21 69:4,9
70:3,24 71:11
71:22 72:15,22
73:14 74:1,13
74:15,22 75:23
76:7 88:1,5
91:11 92:23
96:8,16,23
102:15 115:9
116:16
**answered (6)**
14:15 15:21
45:19 49:19
69:17 95:23
**answers (8)**
12:2 43:17
79:12 89:23,25
90:5 102:25
110:12
**anybody (3)**
20:12 55:23
105:2
**anybody's (1)**
109:13
**anymore (1)**
112:13
**anyway (2)**
50:11 67:14
**apart (1)**
106:24
**apparently (1)**
22:3
**APPEARANC...**
2:1 3:1
**appears (1)**
65:13
**applications (7)**
52:12,13 53:3,5
53:16 54:3
59:5
**appointed (1)**
56:16
**appreciate (1)**
106:14
**approach (1)**
53:15
**appropriate (2)**

88:19 99:8
**architecture (5)**
29:9 32:18
59:19,21 67:19
**area (3)**
92:12 94:6
110:6
**areas (2)**
85:21 99:23
**arguing (1)**
37:17
**argument (1)**
111:19
**Arnebeck (189)**
2:4,5 4:4 5:6
6:24 7:8,11
8:15 9:15,24
10:18 11:3,6
11:14,19 12:4
12:7,25 13:7
13:17,24 14:9
14:19 15:3,9
15:16 16:2,6
16:24 17:11
18:18 22:7
23:1,9 24:13
24:17,21 25:18
26:8,21 27:7
29:1,7,19 30:5
30:18,23 31:7
31:12,19 32:15
32:24 34:9
35:1,3 36:19
36:24 37:21,24
38:16 39:4,19
39:23 41:17
42:20 43:19,22
44:8,22 45:13
45:16,20 47:15
49:1,7,11,14
49:24 50:24
51:14 52:5
53:24 55:19
56:8,15,24
57:24 58:7,17
59:7,18 60:5
60:12,16 61:6

61:11,22 63:2
63:16,22 64:2
64:19 66:6,15
66:24 67:5,16
68:5,22,24
69:8,11,20,24
70:6,17 71:1
71:13,23 72:7
72:16,24 73:13
74:3,16,24
75:16,24 76:1
76:8,15,23
77:4,12,24
79:2,5,19,20
79:23 82:6,12
83:8,9 84:20
84:21 85:13,23
86:6 90:7,9
91:13,14 93:6
94:6 95:25
96:17 97:2,9
97:14,16,21
98:23 99:12,21
99:25 100:4,16
100:19 102:10
102:11 106:18
107:6,10
108:17,22
109:5,23
110:15,19,23
113:17 114:3
114:15,18
115:12 116:3
116:20 117:2
**Aronoff (2)**
1:23 3:5
**arrive (1)**
55:4
**asked (24)**
15:21,22 16:16
34:17,20 37:6
37:7 40:16,19
40:21 42:11
49:19 58:8
68:7 79:5,11
89:20 95:23
96:18 100:13

100:23 102:1
103:14 110:10
**asking (24)**
6:22 10:17
13:25 14:6,20
14:25 15:22,23
16:9 37:9 39:1
53:9 66:22
67:6 69:24
70:1,17,18
84:25 89:17
92:18 99:17
116:8,9
**aspect (1)**
84:2
**aspects (2)**
12:13 111:16
**asserting (2)**
24:18 112:20
**assertion (1)**
65:12
**assist (2)**
54:21 79:2
**Assistant (1)**
80:16
**assisting (1)**
88:17
**ASSN (1)**
1:6
**associated (3)**
60:22 72:19
75:1
**associations (1)**
60:25
**assumes (1)**
67:14
**attach (1)**
101:8
**attached (2)**
13:19 81:23
**attack (2)**
41:14,18
**attacking (1)**
98:5
**attempt (1)**
102:17
**attempting (1)**

14:22
**attended (1)**
5:19
**attorney (8)**
2:5,10,17,19 3:6
78:1 80:16
119:14
**attorneys (2)**
93:2 103:10
**attorney-clien...**
113:8
**attractive (1)**
17:18
**augmentation ...**
51:6
**available (5)**
20:7 33:15,18
109:7 113:20
**Averbeck (6)**
12:19,24,25
48:12,14 49:2
**avoid (1)**
84:15
**aware (33)**
13:8 34:8 35:12
39:6,13 40:8
40:10 42:21,21
43:1,23 44:10
60:25 61:7
63:17 65:11
68:12 69:23,25
70:1,7,11,19
74:4,18 76:2
82:25 90:25
93:14 96:18
112:5 116:17
116:21
**A.m (1)**
28:19

_____
**B**
_____
**back (15)**
21:4 38:17
46:18 58:3
65:22 75:15,16
76:25 80:9
89:14,16 90:12

101:4 105:7
106:7
**background (4)**
10:14 50:13
85:18 88:25
**backing (1)**
95:2
**backup (12)**
20:21 21:10,15
22:15 25:7
35:15 36:21
38:8 40:11
86:10 88:17
98:11
**bad (1)**
55:11
**balance (1)**
105:5
**base (2)**
38:21 42:2
**based (5)**
22:5,8 25:16
87:23 102:25
**basic (1)**
9:18
**basically (8)**
17:13 21:9 51:5
53:17,17 54:7
112:8 113:7
**basis (6)**
42:3 94:4 95:12
98:22 109:1,7
**bear (1)**
85:19
**bears (1)**
94:15
**begins (1)**
42:6
**behalf (14)**
2:3,15 3:3 77:23
77:25 78:2,18
78:24 79:9
83:9 84:7
92:15 99:18
101:12
**believe (21)**
7:22 12:11 19:9

21:25 25:20
33:22 45:18
48:12,13 67:3
80:20 82:16
83:1 84:14,17
96:9 97:5,9
103:14 110:20
115:24
**beneficial (1)**
95:22
**Benesch (2)**
1:22 3:4
**best (11)**
13:4 26:17
28:13 34:10
36:16 42:9
57:12 59:22
101:21 106:5
114:19
**better (1)**
102:9
**bevy (1)**
98:1
**beyond (11)**
49:13 54:18
59:17 66:9
67:8 89:18
90:5,18 105:16
111:7 115:3
**bids (1)**
52:18
**big (3)**
55:4,17 109:18
**bill (2)**
6:12 47:12
**Binnie (3)**
1:18 119:4,23
**bit (1)**
21:4
**bluebloods (1)**
39:10
**Board (1)**
37:5
**boards (4)**
19:10 52:13,14
53:23
**Boat (4)**

72:20 96:19
97:16 98:3
**Bob (4)**
25:23 28:14,18
30:22
**books (2)**
92:9,19
**bounds (2)**
85:17 100:8
**box (1)**
29:10
**Boy (1)**
55:22
**break (3)**
42:13 50:10
64:14
**Brecksville (1)**
5:14
**Brett (1)**
13:20
**brief (1)**
62:11
**briefly (3)**
5:22 9:16 10:22
**bring (1)**
47:21
**bringing (3)**
36:21 38:4
46:23
**broad (3)**
2:21 22:5,8
**broader (1)**
95:15
**broadest (2)**
55:3 110:4
**BRONZEVIL...**
1:5
**Brunner (3)**
1:10 2:16 78:2
**Bryden (1)**
2:11
**budgetary (1)**
22:4
**built (3)**
47:11 59:21
61:24
**bunch (1)**

98:20
**bundle (1)**
47:8
**bundled (3)**
47:22 91:23
93:8
**bundles (1)**
48:8
**burdened (1)**
104:8
**Bush (5)**
5:25 11:8 16:12
42:22 97:25
**business (15)**
23:3,5,7,14,15
25:4 50:25
53:22 77:6
79:15 80:6
91:20,21,21
111:25

---
**C**

**C (2)**
119:1,1
**call (5)**
40:17 76:8,16
107:20 113:25
**called (4)**
1:15 6:10 29:9
83:15
**campaign (16)**
6:1,13 9:11 11:8
13:11 14:7,17
14:24 16:12
42:23 72:20
96:19 97:25
98:1,7,8
**campaigns (3)**
10:1,3 98:2
**candidly (1)**
101:19
**capability (1)**
35:15
**capable (4)**
64:5,23 70:13,20
**capacity (7)**
25:4,16 40:9

45:2 69:12
83:22 87:8
**Capitol (1)**
6:16
**capsulize (2)**
9:16 10:22
**caption (1)**
119:12
**care (1)**
113:6
**careful (1)**
55:10
**carefully (1)**
21:7
**carry (1)**
10:24
**case (8)**
1:8 28:12 36:17
97:20 101:7
102:18 105:8
111:14
**cause (4)**
12:11 34:5
106:12 119:8
**Cedarville (42)**
61:7 74:5,19
75:1,9 76:2,22
82:12 83:4,17
83:19 84:2,10
84:12 85:23
86:4,14,22
87:1 88:14,16
88:24 90:5,10
90:16,17 91:4
91:5 92:24
93:23 95:2
96:4,8,13
100:12 115:7
115:17 116:1,7
116:13,18,22
**Cedarville's (1)**
99:4
**cell (1)**
23:19
**centerpiece (1)**
108:14
**central (2)**

53:12,18
**centralize (1)**
54:21
**centralized (3)**
52:8 54:8,22
**CEO (1)**
40:7
**certain (3)**
12:13 89:3
105:14
**certainly (3)**
63:13 107:19
109:24
**certification (1)**
105:11
**certified (3)**
1:19 5:3 119:5
**certify (4)**
119:6,11,13,15
**change (3)**
50:5 117:9,9
**changed (2)**
50:6,6
**changes (1)**
68:8
**characterized ...**
82:13
**Chattanooga (6)**
34:6 42:24 43:5
43:25 44:12
96:20
**check (1)**
9:2
**choose (1)**
52:19
**chosen (1)**
112:18
**circumstances...**
106:5
**citizens (1)**
62:16
**Civil (3)**
1:16 25:8
119:16
**clarification (1)**
75:14
**clarify (1)**

79:3
**clarifying (1)**
85:9
**class (1)**
105:10
**clause (1)**
112:4
**clear (8)**
17:20 23:16,17
33:16 54:4
65:4,16 84:15
**clearly (7)**
40:18,25 66:21
85:17 90:20
97:5 109:20
**Cleveland (2)**
1:24 51:22
**client (17)**
38:21 40:23
41:15,18 42:2
43:12 79:7,13
80:10,11 96:7
111:19,23,25
112:4 113:8,10
**clients (2)**
40:10,14
**client's (2)**
41:4 79:13
**Cliff (6)**
25:24 77:24
83:8 84:21
91:14 102:11
**Clifford (1)**
2:5
**Cliff's (1)**
25:24
**close (2)**
19:6 103:22
**coal (1)**
21:9
**Coats (1)**
6:8
**collecting (1)**
59:1
**college (2)**
5:22 10:20
**Columbus (7)**

2:7,12,22 3:8
51:7 53:18
54:8
**come (11)**
13:22,22 19:5
37:4 38:8
47:10 50:4,8
54:12 104:2
110:24
**comes (1)**
25:2
**commenced (1)**
77:18
**commencing (1)**
1:25
**commend (1)**
106:8
**comment (7)**
80:18 82:8,9
84:8 90:10
100:22 101:9
**comments (1)**
85:8
**commercial (1)**
65:15
**commission (2)**
118:23 119:24
**commissioned...**
119:6
**Committee (2)**
16:14 43:2
**Committee's (1)**
98:1
**common (5)**
21:8 32:10 47:6
47:7 104:21
**Communicate...**
50:25
**communicate...**
12:16 13:12
**communicatin...**
12:12
**communicatio...**
6:18 7:17 12:20
16:11 40:8
46:5 59:11
80:4

**companies (5)**
45:23 51:25
66:8 72:9 91:1
**company (17)**
7:4,16,17 40:13
47:2 50:3
51:11 60:21,23
67:2,8,17
83:15 87:7
91:19,25 93:10
**compatible (1)**
59:6
**compel (1)**
13:18
**competitive (3)**
9:3 79:18 112:1
**complete (3)**
22:12,17 106:7
**completed (3)**
100:6 101:25
119:12
**completely (2)**
55:7 109:25
**compliance (2)**
52:9 106:21
**compliant (2)**
55:13,16
**complies (1)**
73:2
**comply (1)**
109:25
**comprise (1)**
96:4
**computer (7)**
18:22 23:18
64:5,22 70:7
87:21 88:7
**computers (4)**
34:14 35:13
64:8 65:1
**Computer-Ai...**
119:10
**concept (2)**
40:17 98:21
**concepts (1)**
98:20
**concern (7)**

64:21 80:9,11
81:7 104:23
112:21,23
**concerned (8)**
79:14 80:13
81:9 85:20
111:10,19,21
111:24
**concerning (3)**
12:21 14:10
80:4
**concerns (5)**
71:7,16 81:15
88:23 89:17
**concluded (3)**
107:8 114:10
117:16
**concludes (1)**
117:3
**conducive (1)**
65:13
**conduct (2)**
50:25 80:5
**conducted (1)**
106:9
**confer (6)**
99:22,24 100:3
107:16 108:4
113:24
**conference (3)**
42:16 77:17
114:9
**confidences (2)**
80:11 81:15
**confidential (1)**
113:2
**confidentiality...**
112:4,21
**configuration ...**
30:9 62:25 64:5
64:23 82:2
**conflicts (1)**
75:4
**confused (1)**
26:13
**Congressman ...**
5:24 6:16

**connected (2)**
65:5 86:1
**connection (14)**
69:14 75:8
83:18 84:2,23
86:13,18 87:9
99:4 115:15,23
115:25 116:12
116:18
**connections (2)**
85:1 116:22
**Connell (43)**
1:14 5:1,7,12
11:20 14:14,23
30:2,11 31:4
40:7 42:21
45:21 77:24
78:19,25 79:6
80:10 81:13,22
82:8,9,24 84:7
84:9,16 85:6
89:10 90:18
91:10 92:15,22
94:1 99:1
101:12 103:23
104:17 113:2
114:21 117:15
118:3,13 119:7
**Connell's (13)**
81:7 82:23
83:21 84:4,22
89:21 90:14
91:16,25 93:10
99:5 102:15,25
**consisting (1)**
118:4
**consolidated (1)**
54:7
**Constitutional...**
2:20
**consulted (1)**
26:2
**consulting (3)**
25:10 66:8 67:7
**contact (8)**
48:9,10 49:22
56:16,17 58:2

70:12 107:17
**contained (1)**
15:1
**contend (1)**
82:19
**contents (1)**
102:8
**contested (1)**
96:10
**context (9)**
65:15 66:13
81:10 94:9
104:19 105:8
105:12,14
106:13
**continue (3)**
6:25 90:7 99:20
**CONTINUED...**
3:1
**contract (13)**
46:19 47:8 48:4
54:19,20 55:21
55:21 91:22,24
93:7,8 116:5
119:16
**contracted (1)**
19:24
**contracting (2)**
9:6 46:19
**contractor (6)**
49:23,25 50:1,2
60:20 67:2
**contractors (7)**
19:14,17 24:4
26:1 27:2 28:9
75:21
**control (4)**
22:20 29:3,15
83:11
**conversations ...**
71:3,5 79:6,14
**convey (1)**
63:1
**conveyed (2)**
65:18 90:13
**coordinate (1)**
50:25

copies (2)
29:20,23
Coplan (2)
1:22 3:4
copy (1)
108:1
Corporation (1)
51:23
correct (10)
11:7 12:18 25:3
35:6 37:11
67:3 81:4
96:25 100:19
119:10
corrections (1)
117:8
corrections/ch...
118:6,8,10
corrupt (1)
98:15
cost (4)
21:23 25:16
53:13 54:13
counsel (8)
1:21 65:10
102:2 103:4
108:4 111:13
112:5 119:14
counties (3)
33:13,19 53:3
counting (2)
27:9,12
county (8)
36:5,6 52:14
62:10 64:7,25
68:13 119:3
couple (2)
19:20,21
course (5)
10:20 79:4 89:4
93:15 100:24
court (70)
1:1 77:20 78:4,6
78:9,12,21
79:22 80:8,15
81:1,12 83:7
84:19 85:7,14

86:16,21 87:4
87:10,17 90:13
91:7,10,12
93:6 96:5,12
97:3,7,11,14
97:18 99:7,17
99:19 100:1,9
100:11,15,21
101:1,18 103:2
103:5,22
104:10 105:20
106:23 107:3
107:11,18,19
107:22,23,25
108:2,6,20,24
109:11 110:9
110:11 111:1
112:7 113:19
114:5,8 117:11
119:16
court's (7)
82:17 84:14
103:15 106:22
107:14 110:1
110:22
covered (2)
38:10 107:4
covering (1)
85:20
co-counsel (1)
92:8
crashed (1)
37:3
crashes (1)
87:15
create (3)
60:3,4 104:16
creation (1)
10:21
credit (1)
21:21
criminal (1)
12:15
cronyism (1)
9:7
cross-examina...
42:5

CRR (1)
119:23
crushing (1)
20:5
currently (2)
56:12 62:19
cut (1)
98:24
CV (1)
1:9
cycle (3)
6:14,15,17

———————
D
———————
D (2)
2:19 4:1
Dan (1)
6:8
data (16)
17:22 19:12
21:14,19 33:14
35:10 36:5,6
53:18 54:7
63:5,25 86:20
86:21 87:16
116:1
database (4)
54:23,23 55:21
56:11
day (6)
1:24 46:25
100:25 105:17
118:17 119:18
day-to-day (2)
10:11,12
dealings (1)
77:7
deals (2)
14:18 37:3
dealt (1)
80:3
decided (1)
7:25
decides (1)
104:6
decision (11)
22:4 23:25 24:3

24:6 25:17,19
26:3,24 27:2
55:11 102:7
decisions (1)
60:9
declaration (4)
13:20 65:6 71:6
71:17
declarations (1)
65:7
Defendant (1)
2:15
Defendants (1)
1:11
defined (3)
55:8 105:14
119:16
definitely (1)
79:1
delay (1)
109:17
delicate (1)
104:11
Democratic (2)
39:12,12
Democrats (1)
41:2
Department (1)
6:7
depend (1)
93:25
deposed (1)
5:4
deposition (36)
1:14 29:21 30:2
30:7 31:4
59:20 73:1
79:5 97:4
100:6,14
101:14,24
102:3,4,6
103:7,9,13,20
103:24,25
106:7,25 107:6
107:15 108:2,3
108:8,10
110:10,16,21

117:3,16
119:11
depositions (2)
100:25 104:21
deputy (2)
78:4,15
describe (5)
5:17 16:7 50:22
61:14 73:3
described (4)
35:15 36:20
38:1 54:18
describing (2)
41:20 61:13
description (1)
91:16
design (5)
34:11 35:5
55:20 80:1
90:21
designed (4)
18:15,20 62:9
72:9
designing (1)
17:23
desire (1)
90:14
detail (1)
6:3
determine (1)
105:13
developed (1)
70:8
developer (1)
16:12
development (1)
31:24
diagram (2)
62:24 63:15
difference (1)
73:19
different (20)
8:6,24 9:8,10,12
19:20,21 21:17
23:20 33:13
37:2 57:14
62:17 69:18

73:5 98:20
105:8 107:1,1
112:3
**differently (2)**
21:4 52:17
**Dillman (31)**
60:7,19,21,24
66:20 67:2,4
74:25 75:7
82:5,24,25
83:4,10 84:1
84:24 85:5,12
86:8 88:4,5,17
90:3 93:15
94:22 95:1
114:22,25
115:14,20
116:5
**Dillman's (11)**
67:17 82:8,10,17
84:10 85:17
90:4 91:4
92:24 96:14
99:5
**Diplomate (2)**
1:18 119:5
**direct (11)**
44:20 48:4 71:2
74:4,18 83:18
86:13,17
115:15,23,24
**direction (3)**
29:14 42:1
46:16
**directly (3)**
21:23 71:17
109:13
**disagreement ...**
43:20
**disagrees (1)**
79:19
**disaster (2)**
21:7,8
**disconnect (1)**
47:14
**discovered (1)**
21:19

**discovery (3)**
95:7,14,15
**discreet (1)**
109:22
**discussed (3)**
13:5 59:6 67:20
**discussion (20)**
7:9 24:15,18
28:2,9 29:24
37:22 42:18
46:22 47:17
57:22 66:20
71:24 77:7,15
78:10 79:24
100:7 109:3
110:3
**discussions (3)**
77:1,5 102:13
**disobeyed (1)**
106:2
**display (3)**
27:19 34:12
35:5
**displayed (2)**
63:6 86:9
**disseminate (1)**
114:1
**disseminated (1)**
105:19
**distinction (1)**
27:14
**DISTRICT (2)**
1:1,2
**DIVISION (1)**
1:3
**document (5)**
29:18 30:16
68:1 82:5
101:17
**documents (2)**
31:24 32:17
**doing (16)**
7:22 9:17,19
10:19 27:23
30:24 33:9
36:5 51:5 59:4
87:7 88:24

94:4,12,23
95:1
**Dr (1)**
92:16
**drilling (1)**
10:12
**driven (1)**
90:14
**drives (6)**
68:13 69:1,14,23
69:25 70:2
**drumming (1)**
105:1
**due (1)**
92:16
**duly (3)**
5:3 119:6,7
**duplication (1)**
22:12

___

**E**

**E (3)**
4:1 119:1,1
**earlier (2)**
46:22 47:16
**early (1)**
53:4
**earned (1)**
53:22
**East (1)**
2:21
**edge (2)**
79:18 112:1
**education (1)**
5:17
**educational (2)**
82:14,18
**effect (2)**
53:25 102:5
**effective (1)**
54:13
**effectively (1)**
53:13
**effort (1)**
68:12
**either (4)**
47:1 65:7 71:2

95:24
**elaborate (1)**
17:25
**election (95)**
6:15,17 11:12,25
12:14,22 14:4
14:7,11,18
16:8,21 17:8,9
17:15 20:14
22:13 27:11
28:4,5,8,10,16
29:5,16 30:8
31:1,2 33:2,7
33:21 34:12
35:5,11,23,23
38:6 43:3
50:15,20 51:12
51:21 55:25
59:22 62:12
66:18,25 68:6
68:14,15 69:2
69:15 70:14,22
71:9,15 72:20
73:7,16,21
74:6,18,20
75:10 82:1,3
83:6,20,25
84:13 86:1,2
86:13,23 87:21
88:6,8 89:4,8
90:18,20 91:6
92:6 94:13
95:1 97:19
103:22 104:19
106:14 115:1,3
115:17 116:13
116:19,23
**elections (10)**
18:8 19:10,21
20:4 32:1,18
37:5 52:14,14
53:23
**electronic (1)**
71:8
**embarrassing ...**
20:11
**emerge (1)**

7:21
**emerged (1)**
7:19
**emotional (1)**
106:11
**employed (2)**
88:14 115:6
**employee (2)**
72:9 119:14
**employees (3)**
58:20,25 90:25
**EN (1)**
30:9
**Energy (1)**
6:7
**engagement (2)**
33:1,1
**ensure (1)**
87:11
**entered (1)**
23:24
**entire (2)**
22:10 102:3
**entirely (1)**
99:8
**entities (7)**
6:19 8:7 10:2
29:12 39:9
46:8 104:24
**entity (3)**
7:19 9:12 75:22
**Entry (2)**
30:9,10
**environment (1)**
21:5
**Epstein (56)**
2:19 8:8 13:13
18:5 22:22
24:9 25:12
26:6 27:4 29:6
32:3,6 35:19
36:23 44:3,14
45:6 48:22
52:1,22 56:14
57:4 58:12,22
60:1 61:2,18
62:4 63:9,18

64:12 65:19
66:3,22 67:9
67:23 68:17,20
69:5,19 72:1
72:11 73:10,24
74:9,12 75:11
76:13 78:1
80:16,19 81:4
115:18 116:14
116:25 117:4
**equation (1)**
48:2
**Ervin (187)**
3:6 6:22 7:6
8:11,17,20
9:22 10:15,25
11:11,18 12:2
12:23 13:2,14
14:2,14,25
15:4,13,20
16:4,22,25
17:5 18:3
20:23 21:1
22:23 23:6
24:7,11,17
26:4,10,15
28:22 29:17,22
30:17 31:10,14
32:2,4,7,12,20
34:1,16 35:17
35:25 36:22
37:1,19 38:12
39:14 40:15
42:8,15 43:6,8
43:13,16,20
44:1,5,15,19
45:8,11,15,18
47:3 48:23
49:6,9,18
50:21 51:13
52:3,24 53:7
54:25 56:3,19
57:2,5,9,16,20
58:10,13 59:13
59:24 60:10,14
61:4,9,16 62:2
62:5 63:7,10

63:20 64:10,16
65:16,21 66:1
66:4,10 67:1
67:10,24 68:18
68:21 69:3,6
69:10,16,22
70:3,15,23
71:10,20 72:5
72:13,21 73:8
73:22 74:1,7
74:14,21 75:13
75:18 76:5,18
76:25 77:10,14
77:22,23 78:8
78:17,18,22,24
80:9,14 81:18
84:6,7 89:14
89:19 91:15
92:14,15 96:2
96:24,25 98:18
98:19 99:15
100:10 101:11
101:12,23
102:23 106:16
106:20 107:13
107:21,25
108:23 110:8,9
111:22 113:15
114:2,7,12
115:8,19
116:15 117:6
**escalation (1)**
60:8
**especially (1)**
106:13
**essentially (2)**
33:4 100:17
**ES&S (1)**
52:11
**ES&Ses (1)**
53:19
**et (2)**
1:6,10
**evening (1)**
36:14
**evolution (1)**
20:19

**exactly (2)**
88:9 114:20
**Examination (3)**
1:15 4:4 5:5
**example (5)**
6:21 9:25 91:8
93:23 104:14
**excited (1)**
106:13
**exclude (1)**
40:6
**exercising (1)**
29:15
**exhibit (25)**
4:7,8 29:8,9,21
30:1,7,11,12
30:25,25 31:3
31:9 59:20
60:13 65:18
67:19 72:25
73:1 74:25
75:15,15,17
81:21,22
**exhibits (1)**
31:21
**existing (5)**
50:11 53:3,16
54:1,3
**expect (1)**
109:9
**expected (1)**
28:15
**expedited (4)**
108:15,18,25
109:6
**expedition (1)**
91:9
**expensive (2)**
21:20 55:6
**experience (1)**
5:23
**expert (4)**
64:21 70:18
84:22 98:16
**expires (2)**
118:23 119:24
**explain (2)**

7:12 87:12
**explaining (1)**
10:19
**explore (5)**
41:13 83:24
92:3,4 97:22
**expose (1)**
12:13
**exposure (7)**
49:21 52:7,10,11
56:22 59:1,16
**expressed (2)**
71:7,16
**expression (1)**
12:9
**extensively (1)**
39:25
**extent (7)**
23:10 27:8 29:2
29:13 71:2
73:4 75:20
**extra (2)**
99:22 100:2
**extraordinaril...**
109:6
**e-mails (2)**
43:23 45:4

_____

**F**
**F (1)**
119:1
**face (1)**
34:11
**facilitate (1)**
90:21
**facilitated (1)**
93:5
**facility (4)**
20:15 21:10,19
91:2
**fact (10)**
14:20 40:7 41:1
46:24 53:21
87:2 92:8,18
94:8 116:4
**failed (2)**
20:6,16

**failover (9)**
19:25 20:2,15
22:5 36:17,18
37:11,12 38:3
**failure (5)**
33:2,20,24 34:15
35:12
**fairly (3)**
9:1 33:13 94:2
**fall (3)**
84:18 103:14
110:21
**falls (1)**
97:5
**familiar (13)**
14:1,20 15:10
29:13 30:16
31:9 38:22
61:20 65:12
72:8,17 114:21
114:24
**familiarity (3)**
82:23 88:2
110:5
**family (2)**
57:1 58:9
**far (2)**
41:17 110:23
**fashion (1)**
23:2
**favor (1)**
111:9
**features (1)**
61:24
**Federal (2)**
1:16 9:5
**feel (1)**
83:20
**felt (1)**
7:15
**figure (1)**
62:13
**file (5)**
52:8 53:12,18
54:8 101:20
**filed (6)**
13:17 65:8

81:23 101:1,14
102:3
**files (1)**
53:11
**final (1)**
106:20
**financially (1)**
119:14
**find (5)**
21:18 39:11
93:20 94:2
103:16
**finding (1)**
89:9
**fine (4)**
35:4 36:12
41:19 113:22
**firm (9)**
23:22 48:21
50:14,18 61:24
66:7 68:7 70:8
119:16
**firms (6)**
21:21,25 50:5,8
50:18 52:12
**first (8)**
5:3 21:21 22:1
28:21 34:23
79:4 96:6
119:7
**firsthand (1)**
25:15
**fishing (2)**
91:9 98:19
**fit (3)**
6:20 80:25
117:8
**Fitrakis (23)**
2:10 34:4 36:2
37:10,18 38:24
39:21 42:14
44:13 53:5
66:19 77:25
86:6,8,19,24
87:6,13 92:9
92:16,19 99:12
115:22

**fits (2)**
7:13 24:20
**five (2)**
108:19 114:15
**flag (1)**
71:23
**Floor (2)**
2:21 3:7
**Florida (2)**
11:9,10
**flow (1)**
75:9
**flows (1)**
94:7
**focus (4)**
27:8 36:11
41:22 72:25
**focused (2)**
27:18 87:20
**focusing (1)**
94:13
**folks (3)**
25:9 26:24 60:9
**follow (2)**
9:17 112:18
**followed (1)**
79:24
**following (1)**
62:13
**follows (1)**
5:4
**follow-up (1)**
14:15
**foregoing (2)**
119:10,12
**form (43)**
7:25 8:8 12:9
13:15 18:6
20:23 22:22
23:7 24:8,9
25:12 26:4
29:6,18 31:16
32:4,21 34:16
34:24 35:18
38:13 45:6
47:3 48:24
49:18 50:22

52:2 56:19
58:22 59:13
61:2,19 62:2
63:7 64:11
66:2 67:9
69:18 73:11
75:11 116:14
116:16,25
**formally (3)**
8:1,1 112:6
**forth (5)**
39:16 83:12
101:16 103:2
104:15
**forum (1)**
8:5
**forward (4)**
10:24 12:5 48:3
111:5
**foundation (48)**
24:10 25:13
26:5 32:5,21
34:25 35:18
38:13 40:23
44:2 52:4,23
56:20 57:3
58:11 59:14,25
61:3,17 62:3
63:8,19 64:11
65:20 66:2,11
67:25 68:19,20
69:17 72:4,12
72:14,23 73:9
73:23 74:10,23
75:12 76:6
84:8,11 85:21
88:23 90:6
92:23 115:9
117:1
**four (9)**
37:17 76:20,21
77:10 78:19,25
96:3,5 108:19
**framed (1)**
41:10
**frankly (5)**
9:7 10:5 18:14

18:16 28:11
**free (4)**
42:5 83:23 92:4
94:11
**Friday (9)**
30:14,18 31:11
68:2 90:13
92:17 93:3
97:3 99:17
**Friedlander (2)**
1:22 3:4
**front (1)**
98:5
**full (1)**
5:11
**function (7)**
22:13 25:8
38:21 40:12
54:16 98:11,16
**functioned (2)**
34:12,15
**functioning (2)**
9:20,23
**fundamentally...**
98:13
**further (9)**
16:17 92:11
93:18 95:12
99:11 106:1
119:11,13,15

---

**G**

**gag (1)**
102:5
**Garrison (2)**
48:13 49:2
**Garrison's (1)**
48:17
**gathering (1)**
59:17
**GCR (5)**
19:22 60:23
66:20 67:2
83:15
**general (5)**
2:17 19:4 61:21
78:1 80:16

**generally (2)**
78:15 111:8
**generated (2)**
27:19 31:22
**gentleman (2)**
82:5 83:15
**George (2)**
42:22 97:24
**Gerrymanderi...**
6:11
**getting (1)**
108:10
**give (9)**
5:13 12:21
90:15 93:17
94:18 99:21
100:1 111:1
112:1
**given (3)**
36:13 119:8,11
**giving (2)**
11:24 29:14
**glide (1)**
55:15
**glitch (1)**
78:23
**go (39)**
8:9,16,17 11:17
18:21 21:4
24:1,22 34:5
36:6,7 37:19
39:21 42:15
43:8,9 45:11
46:18 52:19
55:8 57:20
62:16,18 78:14
78:15 80:9
88:3 89:14,15
89:18 90:5
97:19 99:24
101:4 105:10
106:1,6 108:4
111:6
**goal (1)**
53:13
**goes (4)**
64:20 76:25

80:22 90:18
**going (22)**
6:25 18:5 21:3
38:17 43:16
57:25 65:19
66:11 72:1,2
75:18 80:22,23
87:18,19 104:5
109:7 110:17
111:5 113:1,20
114:19
**good (4)**
5:7,9 10:19
112:24
**Good-bye (1)**
114:8
**gotten (1)**
93:21
**government (5)**
7:23 9:6,9,10
21:17
**governmental ...**
7:14 8:6 10:1,4
10:6 21:6 46:8
**governor (1)**
11:9
**GovTech (41)**
6:21,23 7:4,5,13
7:20,22,25 8:7
8:24 10:3,4,21
11:10 17:4,9
23:11 25:11
27:1,16,18
29:10,11 45:1
46:6,10 47:23
49:4,16,25
50:2,14 51:16
51:17 54:2,9
54:16 61:14
85:6 91:25
93:9
**GovTech's (3)**
9:21 46:23 49:9
**graduated (1)**
5:20
**graduation (2)**
5:21 10:23

**great (1)**
41:19
**group (1)**
6:10
**groups (2)**
25:11 98:5
**GSA (1)**
9:1
**guess (14)**
5:8 8:2 9:9 38:5
66:13 90:11
93:11 94:20
95:20 100:10
101:5,12
106:20 108:12
**guidance (2)**
89:15 111:2
**guys (3)**
26:13 30:14
65:4
**GWB (1)**
44:13
**GWBush43.co...**
44:10
**GWB43.com (1)**
44:24

---
## H
**Hampshire (1)**
6:12
**hand (3)**
88:20 104:20
119:18
**handed (1)**
30:6
**hands (1)**
10:10
**happen (1)**
101:3
**happened (5)**
38:11 47:1 70:1
94:14 111:14
**happens (1)**
8:14
**happy (1)**
107:23
**hard (6)**

68:13 69:1,14,23
69:25 70:2
**hardware (2)**
54:15 62:25
**Hatch (1)**
6:12
**HAVA (10)**
52:8 53:11
54:24 55:7,8,9
55:13,22,23
56:3
**heard (2)**
28:21 44:17
**hearing (4)**
13:19 94:20
97:2 109:8
**heavier (1)**
56:10
**heavily (1)**
50:11
**held (9)**
7:9 24:15 29:24
37:22 42:18
57:22 77:15
102:5 109:3
**Hello (1)**
77:22
**help (5)**
11:21 17:14,24
55:24 76:9
**helpful (1)**
89:13
**helping (3)**
17:23 23:14
86:17
**Henry (3)**
49:22 50:12
51:4
**hereinafter (1)**
5:3
**hereunto (1)**
119:17
**hesitate (1)**
106:4
**hierarchy (1)**
29:3
**high (3)**

3:7 5:17 17:17
**Hill (1)**
6:16
**hire (4)**
66:7,12,16 67:6
**hired (4)**
66:14,16 67:4,22
**hires (1)**
66:23
**history (1)**
6:20
**Hmm (1)**
20:25
**hog (5)**
18:17,19,20,25
19:1
**Hoke (1)**
6:17
**honor (55)**
77:22 78:11,18
78:20,25 79:23
80:14,20 81:5
81:19,20 83:8
84:6,20 85:13
89:20 91:13
92:7,10,14
96:3,11,18,25
97:1,6,10 98:4
98:18,23 99:14
99:15 100:5,7
100:10,20
101:11,24
102:10,12,23
103:12 106:17
106:19,21
107:10 108:18
109:2,5,23
110:8 111:22
113:16,18
114:4
**honor's (1)**
92:3
**hopeful (1)**
10:22
**horse (1)**
62:13
**host (2)**

46:8 91:19
**hosted (6)**
42:23 43:3,4
44:11 47:11
96:19
**hosting (14)**
21:13,14 38:20
38:23 39:7
46:2,2 47:7
54:18 72:19
73:20 91:20
97:15,24
**hours (1)**
108:19
**hypothetical (2)**
12:10 84:23
**h-o-g (1)**
18:25

---
## I
**ideas (1)**
94:3
**identification ...**
30:4,7 31:6
**identified (1)**
67:1
**identify (3)**
21:11 61:23
110:11
**imaging (1)**
116:2
**immediate (1)**
13:19
**implement (1)**
55:9
**implementatio...**
56:1
**implementer (1)**
59:16
**implicate (2)**
12:14 14:12
**implication (1)**
116:8
**importance (1)**
106:11
**important (2)**
35:22 113:23

**improper (3)**
12:15 14:11,13
**inasmuch (1)**
85:2
**inaugural (2)**
6:3,6
**incentives (1)**
89:3
**inclined (1)**
105:16
**included (1)**
112:4
**including (1)**
25:11
**incorporated (2)**
8:1,3
**incorporating ...**
53:25
**independent (4)**
23:25 95:3 98:6
98:9
**independently...**
53:22
**Indiana (1)**
6:8
**indicate (1)**
110:9
**indicated (18)**
14:5 15:24
26:22 47:18
60:6 66:15
67:25 77:5
82:24 87:14
89:23 90:19
91:18 93:3
103:3,21
110:14,18
**indicating (3)**
13:11 15:18
27:15
**individual (5)**
19:10 49:21
53:22 62:10
82:4
**individuals (3)**
29:11 66:9
112:1

**industry (1)**
70:12
**information (2...**
15:1 59:2 64:7
64:25 79:17
80:1 81:9
83:14 85:18
87:23 88:25
89:9 90:22
92:21,21 93:17
95:10,13
104:14 105:9
105:14,18,23
108:13 111:24
**informed (1)**
28:15
**initial (1)**
91:17
**inquire (6)**
39:24 41:8 42:5
76:12,14 90:7
**inquired (1)**
89:21
**inquiry (2)**
82:20 99:3
**insofar (1)**
58:19
**instance (1)**
8:25
**institution (2)**
82:14,18
**instruct (5)**
41:9 69:9 74:12
75:23 117:11
**instructed (5)**
39:24 91:10
96:7,15,22
**instructing (2)**
16:3,4
**instruction (2)**
71:25 75:5
**instructions (5)**
64:6,6,24,24
76:17
**instructor (1)**
115:11
**intend (3)**

76:13 108:21
109:12
**intensive (1)**
33:10
**interact (2)**
50:19,23
**interacted (2)**
48:21 49:5
**interacting (4)**
19:14,18 51:11
59:8
**interaction (1)**
22:1
**intercede (1)**
107:24
**interest (8)**
36:13 40:2,2,4
73:17 75:4
90:24 104:23
**interested (3)**
20:9 104:25
119:14
**interesting (2)**
93:20,20
**interests (1)**
104:7
**internal (2)**
25:8 33:6
**internally (2)**
18:9 30:20
**interrupt (1)**
111:23
**intimidate (2)**
14:22 102:17
**introduced (1)**
48:2
**introduction (2)**
11:16 48:1
**invest (1)**
55:11
**involved (26)**
8:4 10:3 16:8,20
17:1,9,12 18:1
21:23 22:19
23:2,23 24:5
25:24 26:2
27:2,21 49:13

49:16 68:9
75:22 85:25
86:5 88:7
109:13,19
**involvement (...**
10:11,12 16:9,17
20:4,20 33:6
44:23 45:3
75:8 82:9,10
82:11 83:2
85:15 89:22,24
90:4,8,19 91:4
**involves (1)**
14:7
**in-depth (1)**
9:1
**Iowa (4)**
5:19,25 6:1,9
**Iowans (1)**
6:10
**Ironic (1)**
78:23
**issue (21)**
39:18 40:24
60:8 79:4,8
80:21 81:5
96:6,9 97:1,18
99:9 102:20
104:1 107:4,7
107:8,20
109:20 110:7
113:14
**issues (10)**
76:20 78:19,25
79:18 81:20
100:12 105:23
106:10 107:2
113:25
**iterations (1)**
31:21

---

**J**

**J (1)**
2:10
**James (10)**
3:6 77:23 78:18
78:24 84:7

92:15 96:24
98:19 101:12
110:9
**Jeb (1)**
11:8
**Jeff (6)**
12:19,24,25 13:5
48:12,14
**Jennifer (3)**
1:10 2:16 78:2
**Jim (5)**
5:24 11:14
41:17 76:24
96:1
**job (2)**
10:19 90:20
**Joe (1)**
25:23
**John (1)**
98:5
**join (15)**
26:6 35:19 44:3
52:24 60:1
61:4 64:12
65:21 69:19
72:2,5 73:10
73:24 74:9
75:13
**Jr (1)**
3:6
**judge (28)**
11:13 14:3,5
24:20 39:16
40:18,25 71:24
72:2 75:25
76:9,20 77:11
77:18,20 101:5
101:15 102:6
103:8,11,18
104:2,2,6
105:6,12
114:10,20
**judge's (13)**
14:8 69:7 70:16
71:11,21 72:14
72:22 74:8,23
75:5,20 76:6

76:17
**judgment (1)**
105:10
**June (1)**
119:24

___

**K**

**keep (2)**
9:5 89:7
**kept (1)**
100:7
**Kerry (1)**
98:5
**key (1)**
6:20
**Kimberlin (1)**
13:20
**kind (17)**
9:2,18 19:7
22:18 34:17
55:3,8 61:12
62:12 79:25
80:1 89:2,14
94:11 104:11
112:19 113:13
**kinds (2)**
8:4 104:19
**KING (1)**
1:5
**know (89)**
8:25 9:6,13
11:20 12:9
13:3 15:25
17:3,4,8 18:21
18:24 19:9
20:24 22:10
23:19 24:12
31:17 32:10,13
32:13,22 33:16
33:22 36:8,10
36:11,15 38:14
38:15 39:1,2
43:7 44:19
46:17,24 48:18
48:19 49:12,23
51:3,4 52:10
53:17 55:3,22

57:6 60:9,24
62:15,21,23
70:4 72:17
75:6,6 77:8
81:7 86:3,3,18
87:8 88:1,13
88:14,15,21
89:10 92:16
94:17 95:2,7
95:14 101:18
101:21 104:10
104:20 105:3
106:10 107:5
108:7,9 109:11
109:17 113:7
115:3,5,23
116:9
**knowing (1)**
115:20
**knowledge (39)**
14:16 26:25
29:2 31:20
32:16 34:10
35:8 36:16
38:11,19 42:10
44:21 57:12
58:19 59:23
69:12 70:19
72:18 73:4
83:21 84:5,9
84:25 85:1
88:18 89:12,22
93:12 94:15,24
94:25,25 95:3
99:6 115:6,13
115:14 116:10
116:11
**knows (7)**
15:24 88:4 99:1
99:2 105:2
116:4,6

___

**L**

**L (7)**
1:14 3:6 5:1,12
118:3,13 119:7
**lack (34)**

32:4,21 34:24
38:13 44:1
52:3 56:20
57:2 58:10
59:14,24 61:16
62:3 63:8
64:11 65:20
66:11 67:24
68:18,20 69:16
72:3,11,13,23
73:8,22 74:10
74:23 75:12
76:5 90:6
102:9 115:8
**laid (5)**
40:23 84:8,11
85:21 89:15
**larger (1)**
38:9
**law (7)**
1:21 2:4,5,10,19
3:6 110:6
**lawful (1)**
5:2
**lawyer (1)**
113:9
**lay (1)**
95:18
**laying (1)**
88:22
**lays (1)**
92:22
**Leach (1)**
5:24
**lead (2)**
41:14 95:9
**lead-up (1)**
32:25
**leaning (5)**
82:13 85:25
90:11 93:24
96:13
**leeway (1)**
14:5
**legal (2)**
7:18 93:5
**legitimate (1)**

113:2
**length (1)**
109:9
**Leonti (1)**
25:23
**letting (1)**
104:2
**let's (6)**
6:13 21:4 35:1
42:15 55:4
99:3
**level (6)**
6:3 24:4 64:8,25
73:17,19
**leverage (1)**
53:16
**light (1)**
106:10
**limit (2)**
71:14 99:3
**limited (5)**
41:7 56:21
60:23 67:3
83:16
**LINCOLN (1)**
1:5
**line (4)**
88:22 92:11
99:13 110:12
**lines (1)**
103:1
**linked (1)**
84:13
**list (3)**
39:9,13 96:1
**listed (3)**
75:1 82:4 83:10
**litigation (3)**
65:8 111:13,14
**little (3)**
29:10 46:21
**live (1)**
21:15
**LLC (1)**
8:2
**LLP (2)**
1:23 3:5

**location (3)**
20:17,20,22
**logistically (1)**
106:24
**long (5)**
87:24 89:7
108:7,8,11
**look (5)**
21:6,21,24 33:12
46:18
**looked (2)**
21:18 39:9
**looking (7)**
6:4 22:17 46:15
46:15,15 75:14
87:16
**lot (15)**
18:22 20:13
21:5,7,16
23:20 33:11
36:12 53:14
54:14,14,15
55:5,11,16

___

**M**

**machinations ...**
93:4
**main (1)**
107:3
**major (1)**
63:23
**majority (2)**
46:1,4
**making (3)**
24:6 27:14 59:4
**man (17)**
39:5,23 40:16,22
41:11 42:7
64:20 65:14
75:3 83:24
84:3 85:11
92:5 97:22,23
98:15,21
**management (3)**
22:19 29:4,15
**managing (4)**
31:25 35:9,10

54:9
**Mangan (4)**
25:23 28:14,18
30:22
**manipulate (1)**
40:3
**manipulation ...**
65:14
**map (7)**
29:9 59:19
61:12 63:6
85:2,5 92:5
**maps (1)**
32:18
**Marbley (11)**
101:5,15 102:7
103:8,11,19
104:2,2,6
105:7,13
**mark (3)**
29:20 30:25
75:24
**marked (5)**
30:3,7 31:5
59:20 72:25
**market (1)**
53:20
**marketing (2)**
77:8 79:25
**marketplace (1)**
79:19
**Martin (1)**
6:16
**Martino (3)**
1:18 119:4,23
**Masson (1)**
60:6
**materials (3)**
13:9,15,16
**matter (3)**
20:12 98:25
102:14
**matters (2)**
95:4 96:10
**McCain (4)**
13:11 14:7,17,17
**mean (32)**

7:2 9:9 10:13
16:18 17:3,3
23:15,17,23
26:12 36:3
38:23 39:1,2,5
46:16 47:9
50:22 53:6,8
56:6 60:3
63:12,13 67:12
93:11 95:6
104:5,18
109:20 112:19
113:13
**means (4)**
15:12,12 20:6
119:9
**measure (1)**
86:4
**mechanism (2)**
103:16 104:3
**media (23)**
6:18 7:2,5,17
8:6 9:20,21
10:9 16:11
19:4 20:9 36:7
38:25 39:7,7
40:8 44:23
45:1 46:4,4
51:19 62:16
91:21
**meeting (3)**
28:8,14 110:24
**member (4)**
41:6 56:25 58:9
60:18
**members (4)**
20:8,8 50:18
62:15
**memorandum...**
15:2,5 81:23
**memory (2)**
18:10 33:8
**mentioned (3)**
32:25 33:2
67:15
**merely (1)**
80:3

**merit (1)**
23:16
**meted (1)**
106:3
**method (1)**
77:8
**Michael (7)**
1:14 5:1,12
77:23 118:3,13
119:6
**middle (15)**
39:24 40:17,22
41:12 42:7
64:20 65:14
75:3 83:24
84:3 92:5
97:22,23 98:15
98:21
**Mike (3)**
49:22 50:12
51:4
**mind (2)**
7:12 24:24
**minds (1)**
110:25
**minimize (1)**
55:16
**minor (2)**
52:9 54:11
**minute (5)**
24:14 37:20
45:12 50:4
114:13
**minutes (2)**
99:22 114:16
**mirror (5)**
21:19 37:11,12
38:8 53:17
**mirrored (2)**
20:18 21:15
**mirroring (2)**
19:25 22:5
**mirror-over (1)**
34:6
**mistaken (1)**
91:15
**misunderstan...**

53:2
**moment (2)**
57:21 97:12
**Monday (1)**
1:24
**money (2)**
55:11,17
**monitoring (3)**
86:25 87:14
90:17
**month (1)**
47:12
**morning (1)**
5:7
**motion (4)**
13:18 65:9
105:10,10
**motive (1)**
98:14
**move (1)**
39:14
**moving (1)**
48:2
**multiple (1)**
31:21
**M.L (3)**
30:2 31:4
117:15

—————
**N**
**N (1)**
4:1
**name (3)**
5:11 25:25
58:16
**named (3)**
79:8 82:5 119:6
**names (4)**
29:11,12 50:6,9
**NANCY (1)**
2:17
**national (5)**
9:11 10:8 16:13
43:2 98:1
**naturally (1)**
94:6
**nature (2)**

32:19 89:1
**necessarily (2)**
94:10 101:1
**need (8)**
20:14 45:8
57:16,17 64:14
66:13 77:10
114:13
**needed (2)**
17:13 20:15
**NEIGHBOR...**
1:6
**Neither (1)**
90:24
**never (2)**
22:3,4
**new (22)**
6:12,18 7:2,5,17
8:5 9:20,20
10:9 16:11
38:25 39:7,7
40:8 44:23
45:1 46:4,4
54:14,15 91:20
112:14
**night (31)**
17:8,10,15 20:13
20:14 28:5,10
28:16 29:5,16
31:1 33:7
34:13 35:11,23
36:11 38:6
50:15,20 51:12
51:21 62:12
83:20 86:11,13
87:3 115:3,17
116:13,19,23
**nine (1)**
9:4
**nonpolitical (1)**
25:17
**nonspeculativ...**
94:16
**normal (1)**
11:16
**normally (2)**
21:11 80:2

**NORTHERN ...**
1:2
**Notary (4)**
1:19 118:16,21
119:5
**noted (1)**
100:5
**Notice (1)**
1:21
**November (3)**
1:25 83:13
119:18
**nuclear (1)**
62:22
**number (4)**
18:7 36:3 60:13
107:11
**numbers (3)**
19:7 36:8 37:4

**O**

**O (1)**
2:5
**object (27)**
8:8,11,12 18:6
22:22 26:13
29:6 34:24
45:6 53:11
58:22 61:19
65:20 66:11
67:9 72:3
73:11 74:10
75:11,12,19
99:16 103:4
110:15 116:14
116:15,25
**objected (3)**
82:15 83:3
102:2
**objection (91)**
11:11,17 13:13
13:14,15 15:20
20:23 23:6
24:7,9 25:12
26:4,7,16 27:4
29:17 32:2,3
32:20 34:16

35:17 36:22,23
38:12 39:14
44:1,4,14 47:3
48:22,23 49:18
50:21 52:1,3
52:22,25 56:14
56:19 57:2,4
57:10 58:10,12
59:13,24 60:1
61:2,5,9,16,18
62:2,4 63:7,9
63:18 64:10
65:22 66:1
67:11,23,24
68:17,18 69:3
69:5,16,19
70:15,24 71:10
71:20 72:3,6
72:11,13,21
73:8,11,22,25
74:7,10,21
75:14 76:5
91:12 112:8
115:8,18
**objections (4)**
32:6 35:20
64:13 66:3
**objective (3)**
33:17 54:12
55:14
**obtained (1)**
8:25
**obviously (4)**
85:16 89:25
99:23 103:12
**occur (1)**
33:20
**occurring (2)**
19:8 59:12
**odd (2)**
46:21 112:20
**offer (1)**
101:23
**office (36)**
6:2 17:19 19:15
21:18 22:13
25:6,10 28:3,7

29:4,16 34:14
35:14 46:11
47:20,24 51:8
54:17,22 64:9
65:2 67:21
70:9 80:5
82:11 83:13,19
85:4 86:2,12
91:22 98:12
115:16 116:1,6
119:18
**offices (3)**
1:22 2:4,20
**office's (1)**
80:20
**official (1)**
20:12
**Oh (2)**
8:13 60:14
**Ohio (42)**
1:2,9,20,24 2:7
2:12,15,18,22
3:8 5:14 11:12
12:1,22 14:11
14:24 16:8,20
18:10 19:8,23
21:21,25 30:20
36:9,13 56:18
60:18 62:14,16
63:23 68:6
70:9 71:15,19
74:20 83:24
115:1 116:19
119:2,6,18
**okay (45)**
6:6 7:21 8:19
11:5,20 13:8
15:15 16:2
17:7 19:2
24:22 26:19
28:13 30:24
32:14 35:1,24
37:18 38:17
46:21 47:25
48:6,9 54:5,20
55:4 56:9
59:19 64:3

65:12 74:25
75:24 78:12
81:1,12 85:7
85:14 87:17
93:6 96:12
97:7,11 99:7
113:12 116:21
**Oliver (3)**
77:18,21 114:10
**once (4)**
33:12 101:5,24
113:24
**open-ended (2)**
89:5 95:11
**operation (1)**
73:6
**opinion (4)**
68:25 70:18
84:22 93:1
**opinions (1)**
84:17
**opportunities ...**
7:14
**opportunity (2)**
98:14 118:5
**opposed (1)**
7:16
**opposition (4)**
13:18 15:2,5
81:23
**Oracle (4)**
18:12,12 50:12
50:12
**order (26)**
14:8 39:17 69:7
70:16 71:11,21
72:15,22 74:8
74:23 75:20
76:7 78:6
82:17 84:14
97:5 102:5
103:15 105:19
105:22,24
106:2,22 110:1
110:22 111:7
**ordered (1)**
91:7

**organization (3)**
9:11 10:8 98:13
**organizations ...**
39:8,12 96:22
**originated (3)**
25:8,10 52:16
**outcome (2)**
70:13,21
**outside (22)**
14:8 21:25 27:1
39:16 41:15
61:9 67:21
69:6 70:16
71:10,20 72:14
72:21 74:7,22
75:19,22 76:6
82:16 91:6
97:4,5
**outsourcing (1)**
73:20
**outstanding (2)**
45:17 96:15
**overload (1)**
35:12
**overwhelmed ...**
33:14
**ownership (3)**
22:20 50:6
90:23
**o'clock (4)**
1:25 77:19
114:11 117:17

**P**

**page (1)**
60:13
**pages (5)**
20:6 33:4,15
107:12 118:5
**paid (1)**
87:5
**parameters (1)**
94:19
**parcel (1)**
103:17
**part (10)**
13:20 35:9

47:22 48:1
52:8 61:15
63:4 85:2,5
104:12
**particular (3)**
36:14 77:8
94:24
**parties (10)**
20:9 41:22
67:20 80:24
102:4,6 104:7
105:20 106:6
107:13
**partisan (8)**
39:12 40:2,4,13
41:22,25 98:2
98:13
**party (4)**
41:7,19 111:12
119:14
**part-time (3)**
115:11,20 116:7
**passed (4)**
55:23,23 56:2,3
**passionate (1)**
10:5
**pattern (1)**
9:18
**Pause (2)**
74:11 97:13
**pay (1)**
47:11
**people (10)**
15:17 20:13
23:20 33:11
36:6 42:11
52:11 55:5
86:11 106:12
**perform (1)**
17:16
**performed (1)**
36:12
**performing (2)**
98:11,15
**performs (1)**
46:1
**permissible (1)**

89:5
**permit (1)**
90:7
**permits (1)**
92:10
**permitted (2)**
92:2,12
**person (8)**
11:1 18:21
49:25 51:3
53:9 83:10
92:18 99:17
**personal (15)**
16:9 32:16 35:8
38:18 58:19
70:19 72:18
73:4 84:4,25
93:1 99:5
115:6,13
116:11
**personally (7)**
16:22 17:1 18:1
23:12 51:2
60:25 69:13
**personnel (3)**
28:4 49:4 59:9
**pertain (1)**
107:1
**pertained (1)**
14:6
**pertains (1)**
75:20
**pertinent (2)**
41:2 82:20
**philosophies (1)**
90:11
**phony (1)**
98:4
**phrase (1)**
102:9
**pick (1)**
106:24
**picked (1)**
53:20
**picture (8)**
7:13 23:25 25:2
38:5 46:24

47:18 55:17
73:5
**pieces (1)**
18:7
**pinpoint (1)**
87:25
**place (15)**
18:8 29:10 53:4
62:18 63:24
70:8,11,20
71:8,19 102:21
111:3 112:2,25
119:12
**placed (1)**
102:1
**plain (1)**
22:11
**Plaintiff (1)**
93:4
**Plaintiffs (13)**
1:7,15 2:3 77:25
81:24 83:9
90:15 91:14
92:20 99:18
102:12 103:25
108:9
**Plaintiff's (6)**
4:7,8 30:1 31:3
102:2 103:3
**plan (1)**
21:8
**planning (1)**
21:7
**plans (1)**
31:25
**play (2)**
38:8 88:6
**played (3)**
88:16,19 114:25
**player (1)**
6:20
**please (8)**
5:10 11:18
29:23 37:20
43:18 53:9
57:21 65:23
**point (15)**

12:5 20:3 24:25
25:1 41:20
48:9 58:2
80:17 93:15
94:21 97:22,24
99:2 109:17
110:13
**points (5)**
48:10 56:16
67:13 96:3,5
**poised (1)**
109:6
**political (9)**
10:1,7 24:3 41:5
41:6,22 90:12
91:21 93:4
**politically (1)**
8:5
**politics (1)**
39:11
**portion (3)**
12:3 103:8,19
**portions (8)**
101:16,25
103:13,17,18
104:4 108:5
110:20
**posed (1)**
40:19
**position (12)**
40:3,7,12 48:17
79:21 80:21,23
81:11 84:12
108:14 112:9
116:7
**possibility (1)**
95:10
**possible (9)**
40:2 53:14
63:13 82:13
84:3 87:15
97:23 104:15
104:18
**post (1)**
21:5
**posted (1)**
90:22

**postgraduate (...**
5:20
**posting (3)**
27:23,25,25
**practice (3)**
32:11 48:7
104:21
**preceding (2)**
28:3,7
**precisely (1)**
54:20
**preclude (1)**
94:5
**precluded (1)**
113:4
**prejudiced (1)**
104:1
**prepare (1)**
68:1
**prepared (2)**
30:21 119:9
**presence (2)**
40:1 119:9
**present (1)**
10:2
**presented (3)**
82:7 92:22
103:5
**presenting (1)**
33:7
**President (4)**
6:1 13:1 48:15
97:25
**Presidential (4)**
16:8,21 35:23
114:25
**pretty (3)**
21:8 47:6,7
**prevent (1)**
9:7
**previous (5)**
18:8 20:4 26:22
47:25 82:22
**previously (10)**
17:16 18:9
22:16 30:15
36:20 37:25

47:5 50:7
67:15 89:21
**primarily (1)**
26:2
**primary (12)**
20:16 21:10,12
33:17,24 34:2
34:13,14 35:13
48:12 49:20
60:7
**printed (1)**
108:10
**prior (7)**
20:4 31:25 33:2
33:5,20 68:2
103:24
**privilege (1)**
113:8
**probably (2)**
49:21 109:7
**probe (1)**
84:4
**probing (1)**
83:21
**problem (11)**
18:11 20:3 33:2
35:12,12 38:6
38:9 40:15
50:7 107:17,24
**problems (7)**
17:15 34:12,15
104:16,17,18
105:23
**procedural (1)**
101:13
**procedure (2)**
1:17 93:3
**process (14)**
9:2 40:3 54:9,12
85:18 86:5
89:6 93:5
101:21 104:9
108:14,15,18
111:5
**processed (2)**
43:24 45:5
**processing (2)**

62:1 63:5
**produced (2)**
30:20 119:9
**Production (2)**
30:8 82:1
**professional (8)**
10:19 23:10,21
24:4 25:16
35:9 45:2
68:25
**professionalis...**
106:9,15
**professionally ...**
16:23 18:2
23:12 69:13
109:24
**professor (3)**
83:16 87:8
115:20
**program (1)**
72:8
**programming ...**
9:13
**prohibition (1)**
84:18
**prohibitive (1)**
21:24
**project (7)**
48:20 52:8,19
54:2 58:18,24
115:3
**prompted (1)**
36:21
**proper (3)**
40:23 92:22
106:4
**properly (1)**
79:3
**proprietary (2)**
79:17 81:8
**propriety (1)**
69:1
**protect (3)**
61:25 63:24
105:4
**protected (2)**
104:8,13

**protecting (1)**
62:22
**protocol (1)**
29:3
**proud (1)**
87:2
**prove (1)**
55:12
**provide (6)**
23:18 25:7 46:3
50:14 79:18
84:17
**provided (5)**
15:7 16:1 47:23
54:24 65:10
**provider (2)**
45:22 51:24
**provides (1)**
23:19
**providing (6)**
17:23 35:16
40:11 41:24
54:22 86:10
**public (27)**
1:20,23 17:20,21
17:21 19:4,4
20:8,11 33:8,9
33:18 34:3,19
37:2 62:17,19
80:6 90:22
101:20 102:8
103:9 104:22
104:24 118:16
118:21 119:5
**publicity (1)**
105:2
**publicly (1)**
86:9
**publish (1)**
19:11
**purporting (1)**
13:10
**purports (2)**
61:14 81:25
**purpose (5)**
9:10,11 62:11
63:1,14

**purposes (6)**
30:3 31:5 46:19
95:6 100:13
101:13
**Purser (3)**
1:18 119:4,23
**pursuant (2)**
1:16,20
**pursue (1)**
93:18
**pursued (2)**
8:25 107:7
**pursuing (1)**
95:12
**pushed (1)**
93:2
**put (5)**
28:6 55:14 77:3
87:24 95:17
**putting (1)**
77:1
**p.m (6)**
1:25 28:19,20
77:19 114:11
117:17

---

**Q**

**qualified (1)**
119:6
**qualify (1)**
111:17
**quash (1)**
65:9
**queries (4)**
18:13,22 30:10
33:10
**question (98)**
8:9,12,12,21
10:16 11:23
12:3 13:3 14:3
14:10,15 15:14
16:18 17:6
18:6 21:2
24:22 26:17,20
26:25 32:8
34:20,23,24
36:1 37:6 38:5

38:17 39:15
40:19,20,21
42:6,12 43:9
43:14 44:6,16
44:16 45:17
47:25 58:1,4
61:10 64:4,15
64:17 65:22
67:13 68:3
69:4,18,21
70:24 71:12,14
71:22,24 72:4
72:15,23 73:12
73:14 74:15,17
74:22 75:4,19
75:23,25 76:7
79:5,11 81:11
82:23 85:22
88:3,12,13,20
93:11 94:13
96:1,18,23
97:1 98:8,9,25
101:5 102:15
106:21 108:7
110:11 115:9
116:3,16,21
**questioning (4)**
92:11 93:16
99:14 110:12
**questions (47)**
11:21 27:9
34:17 40:16
41:3,9 43:17
53:9 57:11
76:10,22 77:13
78:5 79:12
82:7,16 83:4
84:15,18 85:9
87:18,22 88:10
89:8,20 90:2,4
91:3,11 92:13
92:18,23 94:20
95:23 96:3,8
98:22 99:13,18
100:12,13
102:24,25
103:1 107:1

109:21 117:5
**quick (2)**
7:7 85:10
**quickly (1)**
94:2
**quite (6)**
9:7 10:5 18:14
18:16 22:8
28:11

---

**R**

**R (1)**
119:1
**race (1)**
62:13
**raised (2)**
97:2 105:9
**Rapp (3)**
57:1 58:9,15
**rates (1)**
9:3
**RDR (1)**
119:23
**reached (1)**
20:3
**read (18)**
13:9,25 15:1,4,6
15:25 16:1
58:3,5 65:6,10
65:22,24 117:7
117:12,12,14
118:4
**real (3)**
7:7 21:15
109:20
**really (21)**
7:18,19 9:5
19:11 20:13
36:10 39:1
47:25 55:2
56:22 58:25
59:4,16 88:2
88:24 89:11
94:22 109:12
110:7 111:5
113:5
**Realtime (2)**

1:19 119:5
**real-time (8)**
18:13 19:5,6
36:3 37:14,16
37:17 53:12
**reason (4)**
81:16 102:21
109:18 115:24
**reasons (1)**
22:4
**recall (10)**
23:24 24:22
27:5 32:17,18
48:4 51:20
56:23 74:2
98:4
**recalling (1)**
114:19
**receive (1)**
113:24
**received (3)**
13:9 14:21
15:18
**receiving (4)**
64:6,7,24,25
**recess (2)**
45:14 114:17
**recited (1)**
13:21
**recollection (5)**
13:5 21:16
28:11,13 71:3
**recommendati...**
106:23 107:15
**recommendati...**
79:16
**recommendin...**
23:4,4,13
**record (29)**
5:11 7:7,10 8:10
24:13,16 29:23
29:25 37:20,23
37:25 39:22
40:5,6 42:16
42:19 45:12
57:21,23 58:6
65:25 72:6

77:16 96:11
99:1 100:5,24
101:20 109:4
**recount (4)**
68:6,10,15 69:15
**redacted (2)**
107:12,17
**Redirect (3)**
76:16,18 117:6
**redistricting (1)**
6:11
**reduced (1)**
119:8
**reference (2)**
14:22 37:7
**referencing (1)**
13:16
**referring (1)**
65:17
**reflected (1)**
67:19
**reflecting (1)**
31:24
**regard (10)**
11:24 12:20
14:10,23 19:13
65:8 69:1
97:19 99:4
102:16
**regarding (6)**
14:16 79:6
81:15 82:23
96:4 100:12
**regardless (2)**
46:25 82:19
**Registered (2)**
1:18 119:4
**registrant (1)**
52:12
**registration (7)**
53:10 54:5,6,6
54:23 55:21
56:11
**regularly (2)**
49:4 91:19
**reiterate (1)**
62:8

**reject (1)**
112:18
**relate (2)**
87:20 103:1
**related (9)**
68:9 81:21 82:2
82:6 89:9
90:25 96:8
103:24 109:21
**relates (3)**
83:5 91:6 97:20
**relating (1)**
83:4
**relation (4)**
46:22 49:6
91:17 92:24
**relationship (1...**
7:5 23:11 25:5
46:10,12 66:21
81:6 82:18
84:10 85:2
90:2,3,16
93:13 94:9,22
96:14
**relationships (3)**
29:14 54:1
84:24
**relative (3)**
86:23 105:18
119:14
**release (1)**
111:24
**released (3)**
102:8 103:9,20
**releasing (1)**
104:3
**relevant (4)**
92:1 105:15,15
115:2
**relied (1)**
50:11
**religious (2)**
41:5 76:4
**remember (6)**
8:23 19:19,22
25:24 56:5
58:15

**remove (1)**
68:13
**removed (2)**
21:12 69:14
**removing (3)**
69:1,23,25
**renew (2)**
66:1 70:23
**rephrase (3)**
35:2 36:25
71:14
**reported (1)**
62:20
**reporter (11)**
1:19,19 58:5
65:24 78:6,9
108:24 110:11
117:11 119:5,5
**reporting (10)**
17:8,10,21 27:10
27:13 29:14
35:24 36:3
37:4 119:16
**represent (1)**
109:24
**representative...**
58:15
**represented (2)**
17:18 92:20
**representing (3)**
80:17 81:2
100:16
**Republican (11)**
16:13 39:8,11
40:10,13 41:15
41:18 43:2
96:21 97:25
98:2
**Republicans (1)**
41:1
**repudiate (1)**
112:17
**reputation (1)**
76:3
**request (2)**
13:19 73:2
**requested (2)**

58:6 65:25
**require (1)**
54:14
**required (1)**
53:12
**requirement (1)**
101:3
**requirements ...**
59:3,17
**requiring (1)**
53:14
**reserve (1)**
24:19
**reserving (1)**
43:20
**resolution (2)**
60:8 85:10
**resource (7)**
18:16,16,19,20
18:20,25 33:10
**resources (1)**
18:23
**respect (9)**
46:6 60:6 64:4
74:17 80:21
81:5 92:4,16
110:1
**respectfully (1)**
111:23
**respond (1)**
40:24
**responsibility ...**
56:11 104:12
**responsible (1)**
33:6
**restate (2)**
24:23,24
**result (2)**
70:14,21
**resulted (1)**
38:4
**results (15)**
19:11 20:10,17
27:19 30:9,10
33:19 34:3
62:10,14,18,19
75:8 82:2

90:18
**retraining (2)**
53:14 54:14
**returned (1)**
6:9
**revealed (2)**
104:16 105:24
**reviewed (1)**
71:18
**re-ask (1)**
58:1
**Richfield (1)**
5:14
**right (45)**
16:7 26:14
27:22,24 28:1
30:13,15 31:15
37:12 41:12,12
43:9 44:9
46:13 49:11
77:4,14 78:7
78:14 79:22
80:8 81:3
82:13 83:7
85:24 86:16
88:21 90:10
93:24 94:18
96:13 99:11,19
99:25 100:9,18
100:21 105:5
112:9 113:19
113:25 114:5
114:12 117:7
117:10
**right-leaning (1)**
76:3
**risk (1)**
55:16
**road (3)**
2:11 5:14 22:18
**Robert (2)**
2:10 77:25
**ROGERS (1)**
2:17
**role (23)**
23:13 27:15
35:9 46:23,23

52:9 54:10,11
55:17 61:7
75:2,7 85:17
87:11,12 88:5
88:16,18 99:5
104:12 114:24
116:5,11
**rollover (1)**
38:7
**room (1)**
42:16
**routine (2)**
5:16 77:6
**Rove (5)**
12:11 14:6,12,22
43:24
**Rove's (1)**
45:4
**rude (1)**
53:8
**rule (2)**
95:19 119:17
**ruled (2)**
100:24 102:12
**rules (2)**
1:16 101:8
**ruling (2)**
81:17 92:4
**rulings (1)**
105:12
**rumors (1)**
44:18
**running (1)**
25:23
**runs (1)**
83:15

---
**S**
---

**safe (2)**
56:25 58:8
**safeguarding (1)**
81:10
**sanctions (1)**
106:3
**saw (1)**
80:24
**saying (11)**

27:20 39:2
47:21 48:3
59:9 63:3 71:5
87:19 105:7
113:9,11
**says (3)**
94:21 95:7
113:5
**scattered (1)**
106:25
**scenario (1)**
36:17
**schedule (1)**
9:1
**scheduling (1)**
28:4
**schematic (3)**
62:24 81:25
82:1
**schematics (1)**
61:21
**scheme (1)**
79:25
**school (1)**
5:18
**scope (28)**
14:8 39:16 41:2
41:7,16 61:10
69:7 70:16
71:11,15,21
72:14,22 74:8
74:22 75:5,19
76:6 78:5
82:16,20 83:23
91:6 92:2,3
97:4 103:2,15
**seal (20)**
24:18 43:17,21
44:6 55:1
66:10 77:1,3
80:22 81:16
96:7 101:14
102:1,4,15,20
102:22 103:3
103:14 119:18
**sealed (13)**
12:3,5 18:4

43:12 79:12
103:17,18
104:22 106:22
106:23 110:13
110:18,21
**sealing (4)**
96:10 100:23
102:12 111:8
**season (1)**
106:14
**sec (1)**
43:6
**second (6)**
20:20 30:25
34:20,23 65:11
78:19
**secondary (4)**
20:17 60:7 75:2
83:10
**secret (5)**
80:2 105:22
110:5 111:17
111:18
**Secretary (82)**
1:9 2:15 17:13
17:24 18:10
19:15,23 21:18
23:11 25:1,5,9
25:20 26:23
28:3,7 29:4,16
30:21 31:22
34:4,13,21
35:11,13 46:11
47:20,23 48:11
49:8 50:15
51:8 54:17,21
55:10 56:18
59:10 60:19
63:5 64:9 65:1
67:21 68:8,10
70:9 78:2 79:7
79:10,13 80:5
80:10,17 81:2
81:8,13,14
82:10 83:11,13
83:19 85:3
86:2,12 91:22

93:18 98:12
102:13 111:12
111:20,20
112:3,6,10,11
112:15,22
113:5 115:16
115:25 116:6
116:12,19
**secrets (6)**
24:20 62:22
77:9 80:7
104:13 110:3
**sections (1)**
110:17
**security (8)**
27:9 61:23 63:1
63:4,21,24
71:8,18
**see (9)**
6:13 33:18 36:7
62:17 76:9
95:18 111:18
113:13 117:8
**seek (1)**
52:18
**seeking (2)**
87:11 108:9
**seen (5)**
30:11 31:16,17
31:18 68:1
**sees (1)**
65:14
**selection (3)**
23:24 25:7
38:18
**send (2)**
113:22,23
**sending (2)**
64:6,23
**sense (12)**
7:15 10:13 22:6
24:2 25:6 38:9
55:3 56:9,13
61:13 88:10
94:1
**sent (1)**
108:2

**separate (5)**
7:16,19 53:2
54:19 101:17
**sequence (2)**
55:20 56:6
**sequencing (1)**
17:25
**series (6)**
13:21 31:23
82:7,15 83:3
102:24
**served (1)**
39:10
**server (3)**
38:20 43:24
91:20
**servers (7)**
21:12 22:11
42:24 43:2,4
44:11 96:20
**serves (4)**
18:11 33:8
40:13 41:21
**service (7)**
23:18,20 25:9
45:4,22 47:23
51:24
**services (6)**
23:21 41:24
46:2 48:8
50:15 86:10
**serving (4)**
39:8 40:9 42:2
42:10
**set (4)**
39:16 101:16
103:2 119:17
**sets (1)**
9:14
**setup (1)**
80:4
**share (4)**
53:20 71:6,16
113:21
**shared (1)**
67:20
**short (2)**

76:11 98:24
**shown (1)**
64:22
**shows (1)**
98:10
**side (2)**
42:17 98:7
**sides (2)**
106:8,11
**similar (5)**
8:4,24 9:8,14
40:12
**simple (4)**
33:14,18 35:24
63:14
**simpler (1)**
73:15
**simply (2)**
27:13 101:1
**sir (3)**
39:5 78:8 114:2
**sister (1)**
7:4
**site (28)**
16:12 20:10
21:13 28:5,10
28:16 33:11,15
34:5,6 42:22
44:10,24 45:3
47:10,10 51:3
72:19 83:11
86:9,15 87:1,1
87:14,15 90:21
91:1 116:12
**sites (1)**
62:17
**sitting (2)**
94:19 112:9
**situation (6)**
36:18 84:3 92:5
94:10 99:6
112:20
**skill (1)**
9:14
**slanting (1)**
41:25
**slope (1)**

55:15
**small (1)**
78:23
**smart (1)**
39:5
**SmarTech (74)**
13:1 19:24
20:21 22:2,20
23:3,4,14,17
23:21 24:1
25:2,7 33:1
35:16 36:21
37:7,12 38:4,7
38:10,18,19
39:6,10 40:11
41:21 42:10,23
43:4,25 44:11
45:21 46:1,3
46:11,23 47:6
47:17 48:1,10
48:15,20 49:3
49:17 50:19
51:11 64:4,22
66:9,14,16
67:8 72:18
79:8,9 86:11
86:25 89:22
90:17,24 91:1
91:17,18,23,24
93:7 94:9,11
96:20 97:15,23
98:10 116:22
**smoldering (1)**
21:9
**snapshot (2)**
19:6,6
**software (2)**
52:13 54:15
**solidifies (1)**
99:2
**Solutient (3)**
50:7 55:12
67:15
**solution (4)**
22:17 54:13
59:6 73:15
**solve (1)**

99:9
**solved (1)**
38:7
**somebody (2)**
93:19 113:1
**somewhat (1)**
108:17
**sorry (8)**
16:16,18 18:25
20:1 53:7
60:10 69:8
74:14
**sort (3)**
12:16 19:5
58:24
**SOS (1)**
30:8
**South (2)**
2:6 3:7
**SOUTHERN (...**
1:3
**speak (7)**
42:13 51:6
57:17 60:2
63:25 89:25
109:1
**speaking (1)**
23:13
**specific (9)**
9:23 10:16 14:9
22:15 32:17
44:9 77:13
83:1 94:25
**specifically (4)**
11:4 12:19
57:10 116:10
**specified (1)**
119:12
**speculate (3)**
32:12 84:16
95:18
**speculation (1)**
84:16
**spell (1)**
50:9
**spelling (1)**
117:10

**spend (1)**
37:16
**spin-off (1)**
7:18
**Spoonamore (3)**
71:4,7 98:16
**Spoonamore's...**
65:6
**spot (1)**
36:7
**Square (1)**
1:23
**SS (1)**
119:3
**staff (18)**
18:10 19:24
25:20 26:24
28:8 30:10,19
30:21 31:23
33:6 47:19
50:19 51:4,5,6
59:11 60:4,18
**standing (1)**
112:12
**start (2)**
42:12 112:25
**started (5)**
6:17 7:22,24
21:6 22:18
**starting (3)**
7:3 9:19 19:23
**state (50)**
1:9,20 2:16,18
5:10 11:10
17:13,24 18:10
19:24 21:25
23:12 25:1,21
30:21 34:5
35:11 36:13
48:11 49:8
50:16 55:10
56:18 59:11
60:19 78:3
79:7,10,13
80:10,17 81:2
81:8,14,14
93:19 102:13

111:12,20,20
112:3,6,10,11
112:15,22
113:5 116:19
119:2,5
**stated (4)**
66:12 67:4
90:20 97:3
**statement (3)**
40:20 42:4,9
**STATES (1)**
1:1
**State's (40)**
19:15 21:18
25:5,9 26:23
28:3,7 29:4,16
31:23 34:13,21
35:14 46:11
47:20,24 51:8
54:17,22 63:5
64:9 65:2
67:21 68:8,10
70:9 80:5
82:11 83:11,13
83:19 85:3
86:2,12 91:22
98:12 115:16
115:25 116:6
116:12
**stay (1)**
17:14
**steering (2)**
23:3,7
**Stenotype (1)**
119:9
**stop (3)**
37:19 93:16
95:5
**stopped (1)**
111:4
**strategies (1)**
79:17
**strategy (1)**
109:14
**Street (3)**
2:6,21 3:7
**strictly (4)**

27:16,18 54:5
109:25
**strike (2)**
39:15 105:4
**structure (3)**
65:13,17 85:3
**structured (1)**
46:20
**struggling (1)**
94:18
**students (1)**
86:25
**stuff (2)**
11:15 46:9
**subcontract (1)**
46:13
**subcontractor...**
45:22 46:17
47:2 51:24
67:22 91:24
**subcontractor...**
66:7 67:6
**subject (3)**
43:21 84:5
92:10
**submit (1)**
84:1
**subpoena (1)**
65:9
**subsequent (2)**
5:17,21
**subsequently (2)**
11:9 91:18
**substance (1)**
117:9
**substantive (1)**
89:24
**subtle (1)**
12:10
**succeeds (1)**
112:15
**suggest (1)**
40:6
**suggested (1)**
88:25
**suggestion (3)**
101:24 105:21

105:25
**Suite (2)**
1:23 2:6
**summarize (2)**
5:22 79:1
**summary (1)**
105:10
**SUMMIT (1)**
119:3
**support (1)**
84:12
**suppose (1)**
95:6
**supposedly (1)**
98:11
**sure (24)**
7:8 9:3 10:13
30:22 31:13,16
33:22 37:21
59:5 65:11
78:13,21 79:2
87:6 89:13,16
94:2 101:19,19
104:13,14
105:4 109:15
112:16
**surrounding (1)**
59:2
**suspect (1)**
32:10
**sustain (1)**
91:12
**Swift (4)**
72:19 96:19
97:16 98:3
**sworn (3)**
5:3 118:15
119:7
**system (56)**
17:8,14,16,21
20:5,16 27:9
27:12,13,20
30:9 31:25
33:4,14,25
34:2,3,11,19
34:22 35:4,10
35:24 36:3,12

37:3,7,12 40:1
50:11 54:5,6
59:2,21 61:14
61:24 62:8
65:3 70:11,19
71:18 73:6,20
74:5,19 75:2,7
75:10 82:1,6
83:22 85:15
87:21 88:7,7
88:17
**systems (9)**
55:6 63:4,17,20
63:21 68:9,9
68:13 70:7

---

**T**

**T (2)**
119:1,1
**tabulating (3)**
27:10 34:22
37:8
**tabulation (4)**
34:14 62:8
83:12 90:23
**tabulators (5)**
37:13 64:8 65:1
65:5 68:14
**take (8)**
33:12 42:12
62:9 78:16
80:23 88:4
108:11 114:15
**taken (7)**
1:17 45:14
53:15 101:2
103:24 114:17
119:12
**talk (6)**
11:1 45:8 57:18
113:3,10,11
**talking (12)**
27:16 34:2 37:9
39:20,25 66:24
75:3,3 77:6
85:11 98:17
105:6

**team (1)**
35:10
**technical (2)**
78:23 80:1
**technology (3)**
60:8 66:8 67:7
**telephone (3)**
41:24 77:17
114:9
**tell (6)**
8:18 26:16
31:14 57:10
111:11 117:12
**telling (3)**
12:12 58:20
88:9
**ten (2)**
99:22 100:2
**Tennessee (7)**
42:24 43:5,25
44:12 51:11
91:2 96:20
**tense (1)**
106:12
**term (2)**
7:18 38:3
**terms (12)**
10:10 11:16
12:10,10 27:3
34:18 38:20
42:1 73:5
108:10 111:4,7
**testify (1)**
119:7
**testifying (1)**
14:23
**testimony (9)**
11:25 12:21
14:10 90:15
91:17 93:25
104:22 119:8
119:11
**thank (16)**
5:9 19:2 45:15
60:14 78:17,22
80:19 81:18
100:4 106:16

106:18 113:15
113:17 114:3,5
114:7
**theory (2)**
90:12 98:6
**thing (2)**
93:20 102:19
**things (10)**
37:2 85:16
88:19 89:3
93:21 103:23
104:19 111:4,6
111:11
**think (61)**
7:23,24,24 17:3
17:7 19:22
28:12 30:19,20
31:17 33:23
36:11 37:1,8,9
38:3 40:5 42:8
46:14 56:4,4,7
62:25 66:12
76:10,19 80:6
81:10 85:9
87:18 89:17,19
89:23 90:3,5,6
90:11,13 91:3
91:8 95:14
96:2,5,25 99:7
99:9 100:14,15
103:1,18,21,25
104:6,7 106:1
108:23 110:6
110:16 115:10
115:22 117:2
**thinking (1)**
100:23
**Third (1)**
2:6
**thought (9)**
10:18 26:23
47:16,19 55:4
101:10 107:4,6
110:14
**threat (4)**
13:11 105:18
109:21 110:1

**threatened (4)**
11:24 12:8
15:19,22
**threats (3)**
104:15,18 107:7
**three (4)**
40:25 81:20
96:4,8
**threshold (1)**
11:23
**tie (1)**
98:20
**tied (1)**
89:7
**ties (3)**
74:4,18 90:12
**time (20)**
10:20 25:22
45:21 48:3
51:23 56:2
66:23 72:10
78:16 80:18
95:16 101:21
105:3 107:5,8
108:7,12 109:8
112:2 119:12
**timeline (1)**
10:24
**times (1)**
110:10
**tip (8)**
13:10 14:16,19
14:20,21,21
15:18,24
**tips (2)**
13:21,22
**titled (1)**
30:8
**today (4)**
5:10 70:11,20
82:21
**today's (1)**
97:4
**told (2)**
78:4,15
**tomorrow (2)**
109:8,10

**top (2)**
60:12 100:2
**total (3)**
62:10 76:19,20
**totals (2)**
36:8 62:20
**trade (11)**
24:20 80:2,7
81:6,8 104:13
105:22 110:3,5
111:17,17
**traditions (1)**
41:19
**traffic (4)**
17:17 20:5
36:13 73:18
**transcribe (1)**
108:25
**transcribed (4)**
103:7 107:16
108:3 110:17
**transcript (4)**
113:21 117:7
118:4 119:10
**Transcription ...**
119:10
**transferred (2)**
6:1 101:15
**transmission (2)**
86:19 116:2
**transmissions ...**
87:16
**transmitted (1)**
86:22
**treated (1)**
80:2
**Triad (15)**
51:23 52:7,19,20
56:10,17 58:18
59:1,8 66:9,13
66:17 67:8
68:12 69:13
**Triads (1)**
53:19
**trial (1)**
104:21
**tried (2)**

20:9 33:12
**triggered (1)**
35:14
**Trojan (1)**
72:8
**true (1)**
119:10
**truth (5)**
97:17 98:3
119:7,7,8
**truthful (1)**
11:25
**try (3)**
79:1 94:18
108:4
**trying (8)**
17:2 18:12
19:19,22 62:13
62:23 98:19
109:15
**turns (1)**
95:8
**two (14)**
31:25 34:17
37:2,9 40:21
43:17 49:13
65:7 76:10
77:5,12 80:12
111:11 113:24
**type (3)**
9:23 39:17 84:9
**types (1)**
10:7

_____ U _____

**ultimately (2)**
100:25 101:4
**umbrella (3)**
8:7 9:21,21
**Um-hum (1)**
38:2
**unaware (3)**
43:1,23 44:10
**uncommon (1)**
48:7
**undersigned (1)**
1:17

**understand (14)**
8:20 10:16
20:21 22:8
27:14 29:8
35:22,22 64:16
83:17 86:18
105:3 108:18
112:24
**understanding...**
11:7 21:22
25:14 47:13,14
56:10 58:20
64:3,21 65:2
71:4 73:3
110:4
**understanding...**
112:16
**undertaken (1)**
68:7
**undertaking (1)**
54:2
**underway (1)**
108:16
**unfounded (1)**
84:17
**unique (1)**
79:25
**UNITED (1)**
1:1
**university (38)**
5:19 61:8 74:5
74:19 75:1,9
76:2,4 82:12
83:5,17,20
84:11,12 85:24
86:5,14,22
87:9 88:15,16
88:22 89:1,2
91:5,5 92:24
93:23,24 96:14
115:7,17,21
116:1,7,13,18
116:23
**unnecessarily ...**
111:4
**unsealed (3)**
101:16 104:3

110:14
**upcoming (3)**
70:14,21 71:9
**use (6)**
23:20 37:15
42:17 47:6
109:12,14
**uses (2)**
18:22 39:3
**usually (2)**
10:6 21:8

———————
**V**
**valid (1)**
67:13
**variety (3)**
33:12 42:11
98:22
**various (3)**
52:13 59:5
110:10
**vast (2)**
46:1,3
**vendor (9)**
16:13 23:18
47:9 48:8 79:8
79:9 82:6,25
115:2
**vendors (1)**
75:21
**verify (1)**
118:3
**Verizon (6)**
23:19,21 39:3
41:21,21,23
**versus (1)**
22:13
**Veterans (2)**
97:16 98:3
**view (2)**
34:3 110:4
**views (1)**
101:6
**virtue (1)**
53:20
**vote (1)**
27:12

**voter (9)**
52:8,12 53:10,11
53:12 54:4,5,6
54:23
**votes (5)**
27:10,10,11 37:8
62:1
**voting (5)**
34:21 70:13,21
71:8 90:23
**vs (1)**
1:8
**V.J (2)**
60:6,18

———————
**W**
**W (2)**
42:22 97:24
**waive (1)**
117:10
**waived (2)**
111:18 112:6
**waives (1)**
113:9
**want (45)**
9:16 10:25
17:20 23:16,17
29:22 33:16
41:4,11 42:12
42:17 43:11
47:9,10,11,11
56:6 62:7,16
62:18 76:11,15
76:21 79:2
89:15 94:5
95:21 99:22
100:2,5 101:19
108:13 109:1
109:13 110:19
110:23 111:3,7
113:3,10,11,22
117:11,12,12
**wanted (7)**
7:1 17:17,24
18:24 19:3
55:10 78:12
**Washington (1)**

6:2
**wasn't (6)**
18:14,15 55:23
56:1 58:24,24
**wasting (1)**
55:16
**way (13)**
10:6 28:6 41:10
41:24 46:20
65:5 84:13
87:25 94:16
95:24 106:9
109:16 113:13
**ways (1)**
93:22
**Web (32)**
16:12 20:6
21:13 27:18,23
27:25,25 30:9
30:10 33:4,15
34:11,11,11
35:5 38:20
42:22 44:10,24
45:3 47:10,10
54:18 55:20
72:19 82:2
83:11 86:9,15
87:1,14 90:21
**week (2)**
28:3,7
**weeks (1)**
37:17
**weigh (1)**
108:24
**went (4)**
5:25 6:8,11,15
**weren't (1)**
59:15
**WHEREOF (1)**
119:17
**wide (2)**
42:10 98:22
**willing (2)**
108:1 109:19
**window (1)**
62:11
**wing (6)**

82:13 85:24
88:21 90:10
93:24 96:13
**withdraw (1)**
98:24
**witness (88)**
1:14 3:3 5:2
8:13,19,22
11:5 12:6 13:4
15:6,15 17:2,7
18:7 20:25
21:3 22:24
25:14 26:12,19
27:5 28:23
30:6,19 31:8
31:13,15 32:9
32:14,23 34:7
35:21 36:4
37:15 38:15,25
43:7,11,15
44:7,17,20
45:7,10,19
47:5 49:12,20
53:1,10 55:2
56:5,21 57:7
57:13,19 58:14
58:23 59:15
60:2,15 61:20
62:7 63:12,23
64:14,18 66:5
67:12 68:4,23
70:5,25 73:2
74:2 81:6
87:25 89:10
94:15 95:17
98:17 102:17
115:10 116:17
117:13 119:6,9
119:17
**words (2)**
22:12 115:5
**work (24)**
5:20,23,25 6:8
7:23 9:18 10:6
10:7,7,8 11:8
11:10 18:2
19:13 38:19

48:10 49:7,10
49:16 51:1
56:17 66:8
68:10 80:24
**worked (15)**
5:24 6:2,6,7,9,12
6:16 7:2 11:1
34:19 35:4
48:14,20 58:18
67:7
**working (7)**
8:6 9:25 15:17
25:1 54:1
58:21 90:3
**world (3)**
53:20 62:12
88:11
**worried (1)**
81:13
**wouldn't (2)**
46:24 116:9
**Wow (1)**
25:25
**written (2)**
92:9,19
**wrote (1)**
86:14

**X**

**X (2)**
4:1 95:7

**Y**

**Y (1)**
95:7
**yards (1)**
9:4
**yeah (9)**
6:5 16:10 19:1
22:16 24:25
30:21 45:10
56:1 57:13
**year (4)**
6:7 55:22 73:16
74:18
**years (1)**
73:16

**Z**

**Z (1)**
95:7

**1**

**1 (9)**
4:7 30:1,8 59:20
60:13 65:18
67:20 75:15,17
**10 (1)**
2:6
**10th (1)**
119:18
**10/23/06 (1)**
31:1
**11/2/04 (1)**
30:10
**119 (1)**
118:4
**12:03 (1)**
1:25
**1240 (1)**
2:11
**16th (1)**
2:21
**1986 (1)**
5:24
**1987 (1)**
5:25
**1988 (1)**
6:6
**1989 (1)**
6:7
**1991 (1)**
6:9

**2**

**2 (6)**
4:8 30:25 31:3,9
73:1 75:15
**2:00 (1)**
100:7
**2:06 (1)**
1:9
**2:10 (1)**
77:18
**2:57 (1)**

114:11
**200 (1)**
1:23
**2000 (9)**
7:25 8:3 9:17,19
10:2,21,23
11:2 55:25
**2001 (1)**
8:3
**2002 (4)**
33:21,23 55:25
56:4
**2004 (59)**
11:12,25 12:14
12:22 14:4,11
14:24 16:8,20
19:23 27:11
33:25 34:13
35:5 38:6
42:23 43:3
44:12 48:3
49:8 51:13,21
56:7,12 59:22
61:15 66:17,25
68:6,14 69:2
69:15 71:9,15
71:19 72:20
74:17,20 75:10
82:3 83:5,13
83:20,25 84:13
85:16 86:1,23
87:21 88:6
90:19 92:6
94:13,14 97:19
111:15 112:11
114:25 116:23
**2006 (7)**
11:12 14:4 31:2
71:9 73:6,21
74:5
**2008 (5)**
1:25 14:4,7,18
119:18
**2009 (1)**
119:24
**2300 (1)**
1:23

**26 (1)**
119:24
**26th (1)**
3:7
**28(D) (1)**
119:17

**3**

**3rd (1)**
1:24
**3:07 (1)**
117:16
**30 (2)**
2:21 4:7
**3046 (1)**
5:14
**31 (1)**
4:8
**341 (1)**
2:6

**4**

**41 (1)**
3:7
**43205 (1)**
2:12
**43215 (1)**
2:7
**43215-3420 (1)**
2:22
**43215-6150 (1)**
3:8
**44286 (1)**
5:15

**5**

**5 (1)**
4:4

**6**

**614/223-9300 (...**
3:9
**614/224-8771 (...**
2:8
**614/253-2571 (...**
2:13
**614/728-4735 (...**

2:23

**7**

**745 (1)**
1:9

**8**

**86 (1)**
5:20
**88 (4)**
6:3 53:2 62:9,17

**9**

**9/11 (1)**
21:5
**9:00 (3)**
28:16,17,20
**92 (2)**
6:14,15
**99 (1)**
7:23